

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

ORIGINAL

=====================================X

THEODORE THORSEN, CHRISTINE M.
THORSEN, AND DAVID M. THORSEN,
BOTH INDIVIDUALLY AND
DERIVATIVELY ON BEHALF OF
SONS OF NORWAY, INC.

CIVIL ACTION NO.:

CV 13-2572

v.

**COMPLAINT AND
JURY DEMAND**

CHEN, J.

SONS OF NORWAY, INC., EIVIND
HEIBERG, DAN RUDE AND DAVID NESS

LEVY, M.J.

=====================================X

Plaintiffs Theodore Thorsen, Christine Thorsen, and David Thorsen, both individually

and derivatively on behalf of Sons of Norway, Inc., allege follows:

### INTRODUCTION

1.     This case involves the system-wide corruption of a tax-exempt fraternal

organization and its punishment of those members who dare to address its many violations of

federal and state law.  The Sons of Norway, Inc. ("SofN") may have spent many of its 118 years

as an organization through which Norwegian immigrants and their families could promote and

preserve the heritage and culture of Norway, but in the last 20 years, its long-standing refusal to

address abuses coupled with marginalizing and ostracizing whistleblowers, has transformed it

into little more than a tax shelter for an insurance company.

2.     Without appropriate oversight, SofN lodges and their members engage in far-

reaching tax fraud, execute self-interested business deals, sell unregistered securities, bend the

meaning of SofN governing documents to suit immediate desires, and strong-arm any dissenters

into silence. The SofN Board of Directors and Officers actively supported the misdeeds, turning a blind eye to known corruption, or instituting Band-Aid measure that do not address the underlying issues.

3.      Recently, when pushed by tenacious whistleblowers, such as the Plaintiffs herein, to address corruption in the lodges, the SofN Board of Directors and Officers impaneled a "kangaroo court" which, following a 10-month investigation, did nothing but blame the whistleblowers and make vague representations that some symbolic action would be taken to examine issues they purposefully ignored for years. Not surprisingly, the superficial review concluded that SofN and its subordinate lodges complied with applicable law and that the whistleblowers' concerns are unfounded.

4.      The Plaintiffs, having been called liars and thieves for trying to fix SofN from within, have been defamed, shunned and made to suffer severe emotional distress by the community they and their families helped build over 70 years. They were forced to abandon the Lodge in which they were raised and that their parents and grandparents helped build-- Nansen Lodge on Staten Island, New York.

5.      The Directors and Officers of SofN, in their failure to monitor the governance and activities of the subordinate lodges and collusion with those perverted the fraternal society for personal gain, have undermined the faith placed in them by the members to act as stewards of the order, breached their fiduciary duties, and jeopardized the highly-beneficial 501(c)(8) status conferred upon SofN by the Internal Revenue Service.

6.      More immediately, their continued breaches of fiduciary duty long after the Plaintiffs and others inform them of the abuses, have caused Nansen Lodge to lose hundreds of thousands of dollars to real estate taxes that it would not have to have paid if it were properly

organized and operating in compliance with Internal Revenue Code §501(c)(2), as well as tens of thousands of dollars to one and ceaseless ill-advised and improper facilities upgrades to benefit a for-profit business. Other subordinate lodges have engaged in similar ill-advised or improper transactions to the financial detriment of SofN.

7.      Equally, by failing to institute and enforce appropriate controls over the SofN lodges, and failing to comply with their own oversight obligations, defendants have put the tax-exempt status of SofN at risk of revocation by the Internal Revenue Service, and placed entities organized by lodges to own real property out of compliance with state laws concerning nonprofit corporations.

8.      As a result of the acts and omissions of SofN and its Directors and Officers, the Thorsens seek damages to redress the harms directly against them, and compensation to SofN for the harm the organization suffered and will continue to suffer if SofN loses its tax-exempt status, or otherwise does not rein-in rogue actors within the SofN membership.

## THE PARTIES

9.      Plaintiff Theodore Thorsen ("Mr. Thorsen") is an individual residing at 708 Jewett Avenue, Staten Island, New York. Mr. Thorsen has been a member of SofN since 1956.

10.     Plaintiff Christine M. Thorsen ("Mrs. Thorsen") is an individual residing at 708 Jewett Avenue, Staten Island, New York. Mrs. Thorsen has been a member of SofN since 1965. Mr. and Mrs. Thorsen met each other at SofN Nansen Lodge 3-410 ("Nansen Lodge") in 1965, and have been married to each other since 1967.

11.     Plaintiff David M. Thorsen ("David Thorsen") is an individual residing at 708 Jewett Avenue, Staten Island, New York. David Thorsen's parents are Mr. and Mrs. Thorsen.

3

David Thorsen has been a member of SofN since the age of 5, starting as member of its youth organization.

12.     Defendant SofN is a Minnesota non-profit corporation, with its headquarters in Minneapolis, Minnesota. SofN charters two lodges on Staten Island, New York. SofN is tax-exempt pursuant to 15 U.S.C. 501(c)(8), and holds a group tax exemption pursuant to which its subordinate lodges are also tax exempt.

13.     Eivind Heiberg ("Mr. Heiberg") resides in Minnesota and is the Chief Executive Officer of SofN. Mr. Heiberg has conducted SofN business while on Staten Island, New York, including meetings with Plaintiffs and Nansen Lodge members concerning the subject matter of this lawsuit.

14.     Dan Rude ("Mr. Rude") resides in Montana and was, until November 2012, the International President of SofN. Mr. Rude has conducted SofN business while on Staten Island, New York, including meetings with Plaintiffs and Nansen Lodge members concerning the subject matter of this lawsuit.

15.     David Ness ("Mr. Ness") resides in Minnesota. Since at least 2000, he has acted as Legal Counsel to SofN and as a member of a committee empaneled by the Board of Directors to investigate and adjudicate claims brought by David Thorsen against SofN and certain of its members.

## JURISDICTION AND VENUE

16.     Jurisdiction exists under 28 U.S.C. §1332 (a), since the matters complained of represent disputes between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. Specifically, the Thorsens are citizens of New York,

SofN is a citizen of Minnesota, Messrs. Heiberg and Ness are citizens of Minnesota, and Mr.

Rude is a citizen of Montana.

17.     A substantial part of the events or omissions giving rise to the claims asserted

occurred in this District. Therefore, venue in this District is proper pursuant to 28 U.S.C. §1391

(a)(2).

## FACTUAL BACKGROUND

A. <u>SofN Organization and Lack of Oversight</u>

18.     SofN started in 1895 as a way for Norwegian immigrant farmers in Minnesota to

provide mutual benefit and aid to each other. In the ensuing 118 years, SofN grew into an

international fraternal organization with approximately 61,000 members in approximately 400

lodges across the United States, Canada and Norway. True to its mutual benefit and aid origins,

SofN members can purchase insurance through SofN and, in fact, are rewarded for doing so with

voting privileges that are not extended to members who do not purchase insurance. To date, the

assets of SofN's insurance business exceed $300 million, with $500 million in outstanding

insurance policies and other financial vehicles.

19.     SofN operates with three levels of governance:  International Lodge, District

Lodge, and Local Lodge. Local Lodges are chartered by SofN and are the most basic organized

unit within SofN. Local Lodge officers are elected by members of the lodge according to the

local lodge bylaws. Nansen Lodge, for example, elects its lodge officers in November for a one-

year term beginning in January. A group of local lodges are grouped together by geography to

form eight SofN District Lodges. The International Lodge sits atop the District Lodges and

oversees the entire organization as the "supreme legislative, executive and judicial body of Sons

of Norway." (SofN Charter Art. VII.) Officers of the International Lodge and District Lodge are

5

elected at biennial conventions. For continuity in the operation of SofN, including the operation of the $500 million insurance business, SofN employees a full-time, non-elected Chief Executive Officer, a position currently held by Defendant Heiberg.

20.     SofN's sole financial concern is its $500 million insurance business. SofN files its own Form 990 with the IRS each year addressing its insurance business, and relies upon each Local Lodge to file its own Form 990 without any guidance from SofN as to how it should do so. Indeed, Local Lodges are frequently delinquent in filing their Form 990s.

21.     SofN provided little oversight to its subordinate lodges concerning the necessary structure and characteristics of any entity holding title to real property purchased for, or on behalf of, a 501(c)(8) tax exempt organization such as itself. Upon information and belief, to the extent that any title-holding entity organized by a subordinate lodge of SofN complies with the Internal Revenue Code and Regulations, it is the result of happenstance or that entity's having sought independent tax advice, and not the result of any ongoing oversight by SofN.

22.     In December 2010, SofN demonstrated its long-term utter lack of interest in the tax compliance of its subordinate lodges when it publicized a recent resolution of its Board of Directors that SofN "establish a list of those lodges with real estate holdings and communicate annually to them the pertinent event Federal and State requirements and the necessity of complying with the law." (See Exhibit A.) Apparently recognizing the importance of monitoring its subordinate lodges' activities, the SofN Board of Directors further resolved, and incorporated into its governing document – Charter, Constitution and Procedures (the "CCP") – that the lodges shall send SofN copies of their articles of organization and other periodic filings to confirm ongoing compliance. (Id.) This resolution ought to have been unnecessary; if SofN had been doing anything to ensure that its subordinate lodges complied with the Internal

6

Revenue Code, it would have known what real property was owned for the benefit of its unincorporated subordinate lodges, which is to say, itself.

23.     Like much of the CCP, the requirement that subordinate lodges report annually concerning real estate it controls is largely ignored by both SofN and the subordinate lodges. For example, in April 2012, SofN requested Nansen Lodge the documents was required to produce pursuant to Board of Directors resolution in 2010. By August 2012, Nansen Lodge still had not produce information.

24.     SofN exerts little or no control over its subordinate Local Lodges, and does little to ensure that the subordinate Local Lodges comply with IRS laws and regulations concerning tax-exempt organizations.  Specifically, SofN does not review financial statements of its Local Lodges; does not review the minutes of meetings of the Local Lodges; does not review contracts entered into by its Local Lodges; does not require its Local Lodges to submit to any audits or make financial disclosures; does not provide any guidelines or training to Local Lodge leaders to ensure a minimum degree of knowledge concerning the laws and regulations of tax-exempt organizations; it does not even have a reliable grasp of what real property its Local Lodges own or sold, nor does it have reliable information concerning the uses to which proceeds from the sale of Local Lodge-owned real property have been put.

   B.  Nansen Lodge: Origins of the Lodge, Nansen Properties and Social Club

25.     Nansen Lodge is an unincorporated subordinate Local Lodge operating on Staten Island.  SofN chartered Nansen Lodge in 1938.

26.     In 1948, Nansen Lodge purchased approximately 10 acres of real property located at 3456 Victory Boulevard, Staten Island, New York (the "Lodge Property"), at which it could meet and hold events in furtherance of SofN's mission to promote and preserve the heritage and

7

culture of Norway. The Lodge Property featured picnic grounds and a small building (the "Small Hall"), which the members used for meetings and other gatherings. Nansen Properties, Inc. ("Nansen Properties"), a newly-formed entity organized under the New York Business Corporation Law held title to the Lodge Property.

27. To meet the needs of its growing membership, Nansen Lodge decided to build a new, larger meeting hall, now commonly referred to as the main hall (the "Main Hall"). In 1961, under the leadership of its President, Thoralf M. Thorsen, Nansen Properties subdivided a one-acre lot from the Lodge Property, upon which the Main Hall was built. The address for the Main Hall is 3441 Victory Boulevard, Staten Island, New York. Although technically two separate lots, 3441 and 3465 Victory Boulevard share an entrance and a parking lot.

28. On June 11, 1964, Nansen Lodge organized Nansen Lodge Social Club, Inc. ("Social Club") pursuant to the New York State Not-For-Profit Corporation Law. Social Club holds the liquor license for the Main Hall, where Nansen Lodge built a bar so its members can enjoy alcoholic beverages as an adjunct to the fraternal activities of SofN. Initially, Social Club held a "Club" license under the New York State Alcoholic Beverage Control Law, which permitted Social Club to serve alcoholic beverages to its members and their guests at the Main Hall. Social Club's members were only those members of Nansen Lodge who paid the separate membership fee to Social Club.

C. The IRS Grants Tax Exemption to Nansen Properties As a Place for Nansen Lodge and "Other Lodges" to Meet

29. In or about 1950, Nansen Properties applied for tax exemption pursuant to Section 101(6) of the Internal Revenue Code of 1939. In its application, Nansen Properties represented to the Internal Revenue Service that it was organized "to hold and manage property for the use of the members of [Nansen Lodge]." (See Exhibit B.) Nansen Properties also represented that (i)

the property was rented to "other lodges" when Nansen Lodge was not using it, (ii) income to

Nansen Properties from the rent and contributions was used for operating expenses, and (iii) the

income did not inure to the benefit of any private shareholder or individual. (Id.)

     30.    By letter dated October 31, 1950, the Internal Revenue Service denied Nansen

Properties' application for tax exemption pursuant to Section 101(6) of the 1939 Code on the

grounds that it is not a corporation organized and operated exclusively for religious, charitable,

scientific, literary, or educational purposes...," instructing Nansen Properties that

"[c]ontributions made to [Nansen Properties ] **are not deductible** by the donors in arriving at

their taxable net income...." (Id.; emphasis added.) Nevertheless, the Service recognized that

Nansen Properties is entitled to exemption under Section 101(14) of the 1939 Code (codified as

§ 501(c)(2) in the Internal Revenue Code of 1986) which confers tax-exemption upon entities

that hold title to real property for other tax-exempt organizations. (Id.)

     31.    The Internal Revenue Service's letter to Nansen Properties is explicit. It states

that "[Nansen Properties] will not be required to file income tax returns unless [it] change[s] the

character of [the] organization, the purposes for which [it was] organized, or [the] method of

operation." (Id.) The Internal Revenue Service instructed Nansen Properties to report any

change in the character or purpose of the organization, or method of operation, to the Service so

that it could make a determination as to Nansen Properties continued tax exemption. (Id.)

    D.  <u>Nansen Lodge is Dominated by a Cabal that Bullies Dissenters and Misleads Members</u>

     32.    Fifty years after the Internal Revenue Service issued the exemption letter to

Nansen Properties, the character of the organization and its method of operation has changed

dramatically. It is no longer a place where Nansen Lodge meets, socializes, shares Norwegian

culture and, occasionally, permits other SofN lodges to do the same. Rather, is a commercial catering hall where Nansen Lodge occasionally meets.

33.     Since the mid-90s, for-profit caterer, A Taste of Honey, Inc. ("ATOH"), has enjoyed a rather privileged position vis-à-vis Nansen Lodge, as the exclusive caterer and concessionaire for the Lodge Property. The principal for the ATOH Catering Establishment license, Evelyn Rogers, is not a member of Nansen Lodge or SofN.

34.     The "other lodges" to which Nansen Properties told the Internal Revenue Service it rented the facilities cannot rent the Lodge Property except through ATOH, and only if it hires ATOH to cater the event. Nansen Lodge is only entitled to use the Main Hall approximately 37 times per year, no fewer than 10 of which are weekday evening meetings of Social Club to discuss their role in upcoming events catered by ATOH. In fact, the Executive Board discourages the Nansen Lodge constituencies from choosing meeting times that may interfere with ATOH's catering business, and agrees to reschedule Lodge meetings if the caterer is able to rent the property.

35.     ATOH's dominance over the Lodge Property occurred simultaneously with the consolidation of power and control over Nansen Lodge and Nansen Properties by a cabal of members who abused the trust of their fellow members by purposely misinforming them as to critical issues concerning the Lodge to promote personal agendas that benefit themselves and their family members. ATOH reports that it was introduced to Nansen Properties by cabal member Paul Kornbrekke. He was the Vice President of Nansen Properties at that time, and his wife the "rental agent."

36.     The mid-90s also saw a marked change in the governance of Nansen Lodge, Nansen Properties, and Social Club. Prior to that time, oversight within the Lodge and its

10

entities was vested in a body that represented a cross-section of the membership. Nansen Lodge business, including business concerning Nansen Properties and Social Club, was discussed openly at Nansen Lodge meetings and important decisions were made by the members with advice from the various boards and committees within Nansen Lodge.

37.     In 1995, governance of Nansen Lodge vested in an Executive Board that from 1995 to the present has always included at least one--but most often two--of cabal members Paul Kornbrekke, Kenneth Gundersen, Richard Maren and Harry Kuell.  This group gradually eliminated business discussions from Nansen Lodge meetings and discouraged members from seeking transparency in its decision-making by ridiculing them and accusing them of being "un-fraternal."

38.     For example, in 1996, when he Executive Board wanted to approve a $200,000 to $300,000 renovation of the Main Hall without a membership vote, Mrs. Thorsen had to push the Executive Board to ensure that all members were notified in writing about the proposed renovation and given the opportunity to vote on it.  Even so, by 2000, Nansen Lodge had not completed all of the renovations contemplated in 1996, yet the money set aside for it was gone.

39.     In 1995, Social Club changed its Alcoholic Beverage Control license to a "Catering Establishment" license, which permits Social Club to sell alcoholic beverages in the Main Hall to the general public during catered functions.  The principals currently listed with the New York State Alcoholic Beverage Control Board for this Catering Establishment license are Nansen Lodge members Ernest Thorkildsen, Erik Lorentzen, and Kenneth Gundersen.

40.     Even though it was no longer licensed as a members-only club, Social Club continued to collect the separate membership fee from Nansen Lodge members and continued to

11

represent to Nansen Lodge members that it was a members-only club. Social Club did not end its practice of collecting the separate membership fee until May 2010.

E. SofN Alerted Several Times to Cabal's Abusive Tactics, But Refuses to Act

41. SofN was well-aware of the questionable tactics employed by the Executive Board, having received letters from multiple Nansen Lodge members alerting them to the strong-arm tactics employed by the Executive Board, the increasingly opaque proceedings of the Executive Board, and the senseless business decisions of the Executive Board that seemed to hurt Nansen Lodge rather than help it. In a letter dated July 13, 1996, to John Lund, SofN's General Counsel and occasional Chief Executive Officer, one such member, Paul Andersen, presciently stated, "It seems to me that by signing the contracts [with ATOH] the Nansen Propert[ies] and Social [Club] Boards in [November 16, 1995,] succeeded in giving the Lodge away to the Caterer." (See Exhibit C.)

42. Mr. Andersen sent SofN copies of the ATOH exclusive catering contract for the Main Hall and Small Hall. Mr. Lund read the contracts, but neither he nor anyone else at SofN seem to consider whether having an "exclusive caterer" for Nansen Properties is consistent with promoting in preserving the heritage and culture of Norway, or whether the mere fact of having an "exclusive caterer" signaled misuse of the title-holding tax-exempt entity form.

43. Certainly, no one at SofN seemed to consider the extent to which more than $100,000 per year of unrelated business taxable income ("UBTI") that Nansen Properties generated as a result of its relationship with the "exclusive caterer" would "change the character of [the] organization... or [the] method of operation," such that Nansen Properties would no longer be entitled to tax exemption. (Exhibit B.) To be sure, the "exclusive caterer" prevented

12

Nansen Properties from renting its facilities to "other lodges," which is a sole business activity Nansen Properties reported to the Internal Revenue Service.

44.    Simply, SofN refused to act upon the concerns of its members. Apparently ignoring the fact that Mr. Andersen's concerns were focused on the actions of the Nansen Lodge leadership, Mr. Lund states that Mr. Andersen's concerns are "local lodge issue[s]" that SofN can only address if the lodge leadership requests its help. The futility of asking those whom one believes to be destroying an organization to seek help to investigate claims against themselves was apparently lost on Mr. Lund. Rather than acting to preserve the entity over which he had authority, Mr. Lund invited Mr. Andersen to call him to discuss the issue in greater detail. However, as set forth in a letter dated September 15, 1996, Mr. Lund did not return Mr. Andersen's telephone calls.

45.    After Mr. Andersen sought help from SofN to address the problems he saw at Nansen Lodge, on September 14, 1996, the executive Board of Nansen Lodge met with 3rd District Lodge officers John Hlivyak, Charles Nielsen, Audun Gythfeldt, and Sandy Ginsberg to discuss how best to silence Mr. Andersen at the next Lodge meeting. (See Exhibit D.) Mr. Kornbrekke reported that he discussed Mr. Andersen's accusations with all three boards at Nansen Lodge, and "there was a unanimous vote... that the accusations were unfounded and incorrect." (Id.) Mr. Kornbrekke also claimed to have consulted with counsel to determine whether concerns expressed by Mr. Anderson could result in legal liability for Nansen Lodge if the "exclusive caterer" were to read them.

46.    It is unclear from the minutes of the meeting exactly what claims the caterer could possibly have against Nansen Lodge or what evidence Mr. Kornbrekke presented to these boards

13

such that their "unanimous vote" could have any probative value. Nevertheless, the 3rd District

Officers were satisfied and supported the Executive Board's efforts to silence Mr. Andersen.

47.     By letter dated June 16, 1997, from Mr. Andersen to Mr. Lund, demonstrates that

the Executive Board acted consistently with what they and the 3rd District Lodge officers decided

on September 14, 1996. (See Exhibit E.) The Executive Board prevented Mr. Anderson from

reading a letter of protest into the meeting minutes even though their doing so violated Roberts

Rules of Orders. In addition, the Executive Board made improper negative comments about the

letter, poisoning the well before the Nansen Lodge members even had a chance to hear the letter.

48.     Mr. Andersen's letter was read at the next meeting, held on October 18, 1996. At

that meeting, when anyone spoke in favor of Mr. Andersen's concerns, Nansen Lodge officers

heckled the speaker, calling him or her "dumb," saying that the speaker did not "did not know

what he was talking about," and yelling such things as, "Get out of here. You do not belong

here." (Id.) The meeting chair did not make any attempt to call his fellow officers to order.

SofN chose not to act in response to the bullying tactics employed by the Executive Board to

stifle discourse concerning the "exclusive catering" contracts with ATOH.

49.     Mr. Andersen also informed Mr. Lund of specific violations of SofN rules

concerning the finances of Nansen Lodge, which SofN chose to ignore. Specifically, even though

the Executive Board is required to keep accurate financial records and members have a right to

examine those books, Nansen Lodge withheld financial records from the members. (Id.) Mr.

Andersen and other members asked to see the Lodge's books on November 11, 1996. They were

not permitted to see the books until June 13, 1997.

14

50.     When Mr. Andersen finally received the financial records, he and others could not make sense of them. (Id.) They were unable to account for a large portion of the Lodge's expenditures and the Executive Board would not explain them.

51.     Mr. Andersen informed SofN about blatant disregard for Lodge by-laws and Robert's Rules of Order, which SofN chose to ignore. Specifically, the Executive Board sought additional changes to the by-laws and attempted to call a vote of the members without having a meeting to discuss the changes. (Id.) Mr. Andersen lawfully requested a special meeting to discuss the changes, but the Executive Board decided not to have one, stating that both SofN and the 3rd District Lodge told them they did not have to have the special meeting. Without an opportunity for dissenters to present any negative aspects of the proposed changes, the members voted in favor of the changes.

52.     Mr. Anderson continued the Sisyphean task of protesting the questionable decisions and tactics of the Executive Board, without satisfaction, for at least four years and the appointment of a new General Counsel, David Ness. On or about September 15, 2000, Mr. Anderson wrote to Mr. Ness to report some of the more recent abuses of the Nansen Lodge leadership.

53.     In the September 15, 2000 letter, Mr. Anderson reported the circumstances under which he had been charged with having "made and caused embarrassment to the Lodge Officers." (Exhibit F.) To investigate these charges, on November 14, 1999, Lodge President Joan McKillop impaneled an ad hoc committee chaired by cabal-member Harry Kuell. Mr. Kuell held a committee meeting to review the evidence against Mr. Anderson, but Mr. Anderson was not given the opportunity to question individuals who sent letters that were cited in the

charges against him, was not permitted to present his own witnesses, and was not permitted to make a final statement.

54. Not surprisingly, in a letter dated January 21, 2000, the ad hoc committee found that Mr. Anderson had gone outside SofN rules and reprimanded him. The ad hoc committee distributed the letter to Lodge members to maximize the embarrassment Mr. Anderson suffered, and requested that they vote on whether to accept the letter. Since Mr. Anderson was prevented from providing exculpatory evidence, it is not surprising that the membership voted 57 to 11 against him.

55. The lack of due process employed by the ad hoc committee violates the SofN rules, so Mr. Andersen sought the help of the new General Counsel, Mr. Ness, to investigate his claims. Mr. Anderson explained to Mr. Ness the inconsistencies between and among the numbers on financial reports provided to the members by the Social Club, Nansen Properties and the Executive Board, and what is reported to the Internal Revenue Service.

56. Any of the items reported by Mr. Anderson ought to have given Mr. Ness pause. The financial concerns raised by Mr. Anderson ought to have resulted, at the very least, in a review of Nansen Lodge financial records and meeting minutes to ascertain whether there is any truth to Mr. Andersen's concerns, particularly since his claims, if true, can have negative implications for the tax-exempt status of Nansen Lodge, Nansen Properties and SofN. Ever true to his predecessor, Mr. Ness did nothing.

57. Mr. Andersen was not the only person who reported to SofN about the unfairness and bullying tactics employed by the Executive Board at the time. On or about May 1, 1997, Nansen Lodge member Claire Kristensen wrote to Mr. Lund to report that after several years of active participation in Nansen Lodge, she and her family would no longer attend Lodge events

due to the "abusive manner in which several senior members were silenced when they had the temerity to speak out." (Exhibit G.) She urged Mr. Lund to "carefully scrutinize[]" the recent changes to the by-laws that had been submitted to SofN for its review and approval. (Id.)

58.     Mr. Lund responded with a platitude, but then-President of the 3rd District, John Hlivyak, to whom Ms. Kristensen copied the letter, responded with a reprimand. (Exhibit H.) Instead of addressing any of her concerns, he blamed her for having not run for office to change things from within the Lodge. Further, he discredited her authority to recognize abusive behavior, stating, "I see that you and your husband have only been members of Nansen since September, 1993.... My point mentioning these things is that you seem unfamiliar with proper procedure." (Id.) Finally, Mr. Hlivyak directed Ms. Kristensen to bring any "serious charge" in accordance with rules that would require Ms. Kristensen to ask those about whom she was complaining to bring charges against themselves. (Id.)

59.     Mr. Hlivyak could not have known in 1997, that in 2009, a group of engaged Nansen Lodge members would run for office to change things from inside the Lodge. These members, who included David Thorsen, would be railroaded by the cabal, subject to an unlawful impeachment and widespread defamation, causing them to resign from office and Nansen Lodge. SofN remained consistent throughout: it refused to check the unfraternal and unlawful actions of the cabal and blamed the victims.

F.   The Executive Board Further Consolidates Power by Gutting the By-Laws and Instituting a Manual of Procedures.

60.     The Executive Board further consolidated their power in 2004 when it pared down the Nansen Lodge bylaws and instituted a Manual of Procedures. The Executive Board informed the Nansen Lodge members that SofN requested the revision to standardize the bylaws, making them easier to understand and alter when necessary.

17

61.     In fact, SofN did no such thing. SofN had begun permitting lodges to use pared-down bylaws along with manuals a procedure to simplify the administrative aspects of setting up the lodges; it did not request that all lodges change to standardized bylaws.

62.     In June 2007, Mrs. Thorsen asked Leonard Dahl, then Nansen Lodge President, for a copy of the Manual of Procedures. He claimed not to know what she was talking about. Finding it rather odd that the Lodge President would feign ignorance of the Lodge's governing documents, Mrs. Thorsen asked International Lodge about Nansen Lodge's manual of procedure and learned that SofN did not require its lodges to submit copies of their Manuals of Procedure. Simply, permitted its subordinate lodges to institute means of governing themselves, but over which SofN maintained no control. This institutional lack of oversight made it possible for the Nansen Lodge leadership to engage in the corrupt and self-serving practices set forth herein.

G. Under the ATOH Contracts, Nansen Properties Assumes Nearly All Entrepreneurial Risk

63.     ATOH and Nansen Properties are parties to two separate contracts concerning Nansen Lodge property: (1) a "Catering Contract" for the Main Hall, as to which Social Club holds the liquor license (see Exhibit I); and (2) a "Picnic Grounds Contract" for the Small Hall and picnic grounds (see Exhibit J; collectively, the "Catering Contract" and the "Picnic Grounds Contract" shall be referred to as the "ATOH Contracts").

64.     Social Club is a party to the Catering Contract, since it holds the liquor license and ATOH needed to be styled as a "concessionaire" of Social Club. Under the Catering Contract, ATOH pays Social Club a percentage of its gross revenue (which is actually net of several costs, including ATOH's labor costs) and Social Club provides the alcoholic beverages for ATOH's on-site catered affairs. Social Club is not a party to the Picnic Grounds Contract because ATOH holds the liquor license for that venue.

18

65.     Pursuant to the ATOH Contracts, ATOH is the exclusive caterer for all non-Lodge events.  In exchange for this highly favorable provision, ATOH does not pay a set rent to Nansen Properties with which Nansen Lodge could (i) make reasonable financial forecasts, (ii) afford to pay its property taxes and utilities, or (iii) focus its efforts on promoting and preserving the heritage and culture of Norway.  Rather, ATOH pays Nansen Properties a percentages of its "gross revenue" for on-site catering which, by secret side-agreement with Paul Kornbrekke (the "Secret Side Agreement"), is actually **net** revenue.

66.     Under this arrangement, Nansen Properties' financial viability is tied directly to the performance of ATOH. If ATOH does poorly, Nansen Properties does poorly. The opposite, however, is not necessarily true due to appallingly unfavorable contract terms and the Secret Side Agreement. When ATOH does well, Nansen Properties still struggles to pay its bills and must focus all its efforts on fundraising to meet the shortfall and promoting ATOH's business interests. Indeed, the entire Nansen Lodge --including Social Club and the Lodge itself – have made promoting ATOH's business its raison d'être, along with fundraising to cover the shortfall between Nansen Properties' income from ATOH and Nansen Properties' operating cost.

67.     If there were any doubt as to the centrality of ATOH's business interests to Nansen Lodge, one need only consider the appallingly unfavorable financial terms of the ATOH Contracts, as well as the actual manner in which the ATOH Contracts are performed. Specifically, ATOH operates its business -- both on-site and off-site catering -- from the Small Hall, over which ATOH has exclusive control.  ATOH advertises itself as "A Taste of Honey at Nansen Park," and its business address is 3465 Victory Boulevard – the address of the Small Hall.  ATOH uses the commercial kitchen in the Small Hall to prepare food for both its on- and

off-site catering. Indeed, ATOH's exclusive use of the Small Hall prevents Nansen Lodge from using the facility for Lodge activities.

68.     Most troubling, even though Nansen Lodge uses the Main Lodge only 37 days per year, the picnic grounds only two days per year, and the Small Hall no more than eight days, under the ATOH Contracts: (i) ATOH does not pay rent to Nansen Properties for its year-round, exclusive use of the Small Hall; (ii) ATOH does not pay anything to Nansen Lodge for use of the commercial kitchen for its off-site catered events, which do not generate any revenue to Nansen Properties; (iii) ATOH does not contribute money to pay the utilities consumed in its use of the commercial kitchen for events that do not generate revenue to Nansen Properties; (iv) ATOH does not maintain, repair, or replace the appliances or fixtures in the commercial kitchen at the Small Hall, over which she has exclusive control, and does not pay anything toward the operating costs of the Main Hall; (v) ATOH pays only 25% of the cost of the groundskeeper for the picnic grounds while Nansen Properties pay 75%; and (vi) ATOH does not even pay for dishwashing detergent used in the course of her exclusive control of the commercial kitchen in which the dishwasher is located.

69.     Under the Secret Side Agreement with Paul Kornbrekke, ATOH deducts what it deems to be "pass-through" costs from its gross revenue to arrive at the net figure from which he calculates the fee it pays Nansen Properties. These "pass-through" costs include a flat fee that ATOH deducts from what it charges its customers for each plate of food it serves, to cover the cost of linens, centerpieces, and even the cost of ATOH's wait staff.

70.     Nansen Lodge did not know about the Secret Side Agreement until Mrs. Thorsen asked questions directly of ATOH to understand how it arrived at the fee it paid Nansen Properties. (See Exhibit K.) Nansen Lodge could not have found out any sooner because it has

no right to review the books and records of ATOH to ensure that it is complying with the terms of the Picnic Grounds Contract, and it could only review documents concerning the Catering Contract except in the highly unlikely scenario where, on two separate occasions, it catches ATOH providing it with inaccurate counts of attendees at catered events. The ATOH Contracts offer no guidance as to how Nansen Lodge can confirm that ATOH provided Nansen Properties with incorrect information when Nansen Properties has no right to review ATOH's books and records.

71.     Not surprisingly, given the manner in which ATOH and Nansen Properties allocate their profits and losses, Nansen Properties perpetually operates at a loss. The property taxes for the 10-acre Lodge Property are more than $67,000 per year, and cost of utilities to operate a full-time catering facility is exorbitant.

72.     The terms of ATOH Contracts and the parties' course of dealing evince an implied partnership between ATOH and Nansen Properties in ATOH's catering business. ATOH contributes the sales support, administrative support, and food service; Nansen Properties contributes the location for on-site events, the commercial kitchen, all property taxes and utilities, all maintenance and upgrades to the Main Hall and Small Hall, and 75% of the maintenance to the Picnic Grounds (the "Deemed Partnership"). Moreover, Nansen Lodge provides free labor to the Partnership by organizing work parties of Nansen Lodge members who believe that they are volunteering for the benefit of Lodge.

73.     More troubling still, the Food Service Establishment license for the Main Hall is held in the name of "Nansen Social Club, Inc. D.B.A.: Taste of Honey at Nansen Park." (See Exhibit P.) Not only does Social Club represent that it is **doing business as** "Taste of Honey," but the mere fact that it is a not-for-profit corporation operated by a §501(c)(8) purporting to **do**

21

**business** as anything strongly suggests that it is step beyond UBTI and strayed far from the mission of the Sons of Norway.

74. Equally troubling, Social Club's sole reason for seeking a Food Service Establishment license was to benefit ATOH. Social Club applied for its license in 2010, and its doing so was a source of controversy in Nansen Lodge. Members were concerned, justifiably, that the Lodge would incur fines and penalties for health code violations resulting from the acts or omissions of ATOH.

75. True to form, Paul Kornbrekke proclaimed that Social Club was **required** to hold the Food Service Establishment license because they served food at meetings. This is, however, pure fiction. The food served at the meetings was not prepared on-site and the law defining Food Service Establishment specifically carves out "food service operations were a distinct group mutually provides, prepares, serves and consumes the food such as a... fraternal organization." Once again, Mr. Kornbrekke and the rest of the cabal took steps on behalf of Nansen Lodge under false pretenses that (a) cost Nansen Lodge money it would not otherwise have had to spend it; (b) place Nansen Lodge under greater regulatory scrutiny and risk of fines; and (c) provided no benefit to Nansen Lodge, but benefitted ATOH by transferring the risk of incurring finds to Nansen Lodge.

H. Opaque Management and SofN Refusal to Act Turn Operating Surplus at Nansen Properties into Negative Balance

76. In 1994, the year before ATOH became the exclusive caterer at Nansen Lodge, the Nansen Properties reserve fund contained more than $200,000. This surplus was reduced to about $100,000 in 2002, and was completely depleted by 2007. Nansen Properties used the reserve fund money to help finance various capital improvements for the benefit of ATOH, including building an addition to the Small Hall, renovating the grill area of the picnic grounds,

22

renovating the Main Hall, redecorating the Main Hall, and funding the basic operating costs of the facilities. The renovation of the grill area alone cost about $150,000, even though the estimated cost quoted to Nansen Lodge members was $40,000.

77.     Unbeknownst to the Nansen Lodge members, Nansen Properties had begun relying heavily upon loans from Nansen Lodge. It had become a practice for Nansen Properties to "repay" Nansen Lodge in December of one year, and for Nansen Lodge to make a new loan in January of the next year, so that neither year-end financial statement reflected the true nature of their financial arrangement.

78.     In a particularly creative example of bookkeeping, on July 25, 2006, Nansen Lodge Treas. and cabal member Richard Maren transformed an outstanding principal loan balance of $97,103, owed by Nansen Properties to Nansen Lodge, into a $97,103 "investment." (Compare Exhibit M and Exhibit N.)  This is done without the consent of the Nansen Lodge members, without any regard for whether doing so promoted or preserved the culture and heritage of Norway, and without any regard as to the prudence of having a tax-exempt fraternal benefit society invest in a money-bleeding catering venture.

79.     In addition to the fictitious loan payoffs and highly speculative investments, Nansen Properties met the gap between income from the ATOH Contracts and its operating expenses by having Social Club pay some of his expenses and selectively pay a "rent" at year-end to decrease Social Club's net profits.  (See Exhibit L.) Further, the Minutes of Nansen Lodge meetings show that surplus revenue from Nansen Lodge events and fundraisers are frequently given to Nansen Properties to cover the expense of operating a catering facility, and Social Club regularly pays Nansen Properties expenses to lower its own taxable income.

80.     The Thorsens first became aware of the financial problems at Nansen Properties in April 2007, when the 2006 Nansen Properties' annual financial report was presented.  At that time, the Thorsens first noticed that Nansen Properties had depleted its reserve funds and had become dependent upon loans from Nansen Lodge to bridge the six to seven-month off season. The dire financial condition prompted Mrs. Thorsen and David Thorsen to join the governing board of Nansen Properties.

81.     Soon after joining Nansen Properties' board, Mrs. Thorsen learned of the extent to which the Executive Board usurped the power of Nansen Properties and Social Board Specifically, Mrs. Thorsen received for the first time bylaws of Nansen Properties that had been changed in November 1995 by the Executive Board of Nansen Lodge, making Nansen Properties responsible to the Executive Board and mandating that it act at the direction of the Executive Board for general management and business affairs of Nansen Properties. This change removed what few checks and balances had been in place when the independent boards of Nansen Lodge, Nansen Properties and Social Club were not answerable to each other.  It also vested power over the Lodge Property exclusively with the cabal.

82.     Upon information and belief, the impetus for the change of the bylaws was a dispute between the Nansen Properties Board and the Executive Board of Nansen Lodge over use and access to reserve funds of Nansen Properties. Without the approval of the Nansen Properties Board, the Executive Board withdrew $13,688 from Nansen Properties' reserve funds account to pay for upgrades sought by ATOH to the large hall (specifically, the deposit for the purchase of new drapes).  George Johnson challenged the action as *ultra vires* the bylaws of the Nansen Lodge and Nansen Properties.  After a delay of several months during which the Executive Board was to produce supposed "supplementary rules" that gave it the authority to

24

usurp the Nansen Properties' Board, the Executive Board changed the bylaws to give itself the right to do as it wished.

83.     The change to the 2005 Nansen Properties bylaws was not widely known within Nansen Lodge because the Executive Board did not publish the proposed changes for the membership to review, as it had always done in the past. Instead, the cabal-led Executive Board informed the Lodge members that the bylaw changes were necessary and in the best interest of the Lodge, and the members approved the changes sight unseen.

I.    The Cabal Thwarts All Efforts For a Commercially Reasonable Contract with the ATOH and Personally Benefit from the ATOH Contracts

84.     With the ATOH Contracts scheduled to expire in January 2011, in or about 2008, Nansen Properties appointed a contract committee (the "Contract Committee") to review the overall performance of the ATOH Contracts, recommend changes to them, and either to negotiate a new ATOH Contracts or contracts with a different caterer. Mrs. Thorsen was a member of the Contract Committee.

85.     The Contract Committee met a few times in 2008 and 2009 and identified several specific contractual terms that it considered necessary for the next catering contract. These necessary provisions included the right to audit the books and records of the caterer to ensure that the caterer was performing under the contract, and an end to the Secret Side-Agreement.

86.     Evelyn Rogers attended one session with the Contract Committee early in the review process, wherein the committee set out their requirements for the new contract. Thereafter, ex officio committee member Paul Kornbrekke, then-President of the Executive Board of Nansen Lodge, undertook to be the sole point of communication between ATOH and Contract Committee concerning the new contract, and essentially acted as ATOH's agent in the negotiations.

25

87.     Neither the Kornbrekkes nor Evelyn Rogers disclosed their existing relationship before they signed the initial ATOH Contracts. At the time when the Contract Committee was attempting to negotiate new ATOH Contracts, Evelyn Rogers and the Kornbrekke family owned Grasmere Grill, Ltd. ("Grasmere Grill"), a restaurant on Staten Island. Indeed, Ruth Kornbrekke served as the Chief Executive Officer of Grasmere Grill and Nansen Lodge member Brian Kornbrekke, son of Paul and Ruth Kornbrekke, served as Principal Executive Officer. After the Kornbrekkes and Ms. Rogers sold Grasmere Grill in 2009, ATOH has employed Brian Kornbrekke as one of its main chefs.

88.     On several occasions prior to October 2009, Ruth Kornbrekke stated that Brian Kornbrekke hoped to buy ATOH from Ms. Rogers. That plan has come to fruition: Nansen Lodge approved Brian Kornbrekke as its new caterer, ratifying the sale of ATOH or assignment of the ATOH Contracts for Brian Kornbrekke's benefit, at its March 2013 Lodge meeting. This, naturally, calls into question whether the misinformation spread by the Kornbrekkes concerning the nature of their relationship with Evelyn Rogers was part of a plan to install Brian Kornbrekke as the exclusive caterer for Nansen Properties with the highly-favorable contract terms of the Deemed Partnership.

89.     Inexplicably, SofN does not view the situation is involving any conflict of interest on the part of Paul Kornbrekke. When asked about the sale or transfer of the ATOH Contracts to Brian Kornbrekke, given facts giving rise to the ATOH Contracts, David Ness stated that there is no conflict of interest because no member of Nansen Lodge has complained that there is a conflict of interest. Nevertheless, it is ludicrous to a find that a fiduciary has no conflict of interest simply because no one else has complained about it.

90.     One must view Paul Kornbrekke's role in negotiating and executing the ATOH

Contracts in light of the past business relationship of the Kornbrekkes and Ms. Rogers, and the

substantial, tangible benefit conferred upon Brian Kornbrekke by virtue of the transfer – whether

through sale or assignment – of the ATOH Contracts.  Simply, as an officer of Nansen Lodge,

and while acting in that capacity, Paul Kornbrekke negotiated the ATOH Contracts with his

son's and wife's business partner, as a result of which his son now enjoys a business relationship

in which Nansen Properties assumes the entrepreneurial risk of the Deemed partnership, as well

as a first refusal to purchase the Lodge Property (which right of first refusal appeared in the

execution copies of the ATOH Contracts, but was never discussed with the Contract Committee.

J.     New Leaders at Nansen Lodge Force Cabal to Fast Track Approval of ATOH Contracts

91.     At the November 6, 2009, Nansen Lodge election meeting, several new leaders

were elected to the Executive Board of Nansen Lodge after being nominated to office from the

floor.  The new leaders, who included Brian Olsen as President, plaintiff David Thorsen as Vice

President, and Christine Hansen as Treasurer (collectively, the "New Leaders") promised to

review the operations of Nansen Lodge and its affiliated corporations to ensure that they are

operating in the best interest of Nansen Lodge.  Paul Kornbrekke remained on the Executive

Board in the office of Counselor, along with Eleanor Tollevsen, who had who had been serving

as Lodge Secretary since 1996. The newly-elected officers were to be installed at the January 15,

2010, Lodge meeting.

92.     By letter dated December 9, 2009, nine Nansen Lodge members formally

requested a special meeting to "allow the general membership… to have an overview of the

proposed contract [with ATOH] and financial history of [Nansen] Properties, Inc. since our

initial contract with the caterer in 1994."  Instead of honoring this lawful request and scheduling

27

the special meeting with reasonable notice to the members, on December 14, 2009, the outgoing Executive Board gave fewer than 24 hours' notice of a special meeting to discuss the contract committee and documents security on the premises.

93.    At the special meeting, the holding of which was protested and ultimately ruled out of order, Mr. Kornbrekke stated that the new contract was being finalized and that Nansen's lawyer and accountant thought it was "good." Mr. Kornbrekke would not, however, reveal any specifics about the contract, stating that it is the job of the Contract Committee to handle the details of the contracts. When additional members asked about the contract terms, both Ken Gundersen and Harry Kuell declared them to be out of order.

94.    SofN officer Barbara Bernsten attended the special meeting as a representative of SofN. She declared the meeting to be legitimate and the notice sufficient. Notwithstanding that, on Friday, January 8, 2010, the President of the Third District Lodge Ralph Petersen declared the special meeting to be null and void due to improper notification.  (See Exhibit O.)

95.    With the special meeting called out of order and the New Leaders scheduled to take office installed in their offices in seven days, Paul Kornbrekke and Kenneth Gundersen pushed to get the new ATOH Contracts signed shortly after Mr. Petersen sent his email, to ensure that no one had an opportunity to request a special meeting to discuss the contract terms and question the financial wisdom of Nansen Properties' relationship with ATOH.

96.    When Nansen Properties and Social Club signed the new ATOH Contracts, the then-current ATOH Contracts had more than a year before they expired. The new ATOH Contracts extended the exclusive catering relationship for a period of up to 15 years from January 8, 2010.  (See Exhibits I, J.)  Paul Kornbrekke witnessed the signatures and Kenneth Gundersen took the signatories' acknowledgments.  The Treasurer, Christian Logan, signed on

behalf of Nansen Properties because the president was out of town and the vice president, Mrs. Thorsen, was not informed of the meeting.

97.     The newly-executed ATOH Contracts contained the right of first refusal to purchase the Lodge Property that was never discussed by the Contract Committee, was not a provision of any draft contracts circulated among the Contract Committee, and was not voted upon by the Lodge Membership, whom the outgoing Executive Board did not permit to have knowledge of the contract terms in any event.

K.  Cabal Thwarts New Leaders' Attempts to Bring Nansen Lodge into Compliance

98.     Upon taking office and seeing first-hand the regulatory morass in which Nansen Lodge placed itself in the absence of meaningful oversight, the New Leaders voted to hire the law firm of Fox Rothschild LLP ("Fox Rothschild") to advise it concerning compliance issues. Paul Kornbrekke and Eleanor Tollevsen voted against hiring Fox Rothschild, but the vote in favor carried 3 to 2.  (See Exhibit Q.)

99.     All attempts by the New Leaders to understand how the cabal had been running Nansen Lodge, and to investigate claims as to immediate issues facing Nansen Lodge, were met with refusals to share information, hostility and unfounded accusations by the cabal. These tactics were, of course, the same tactics the employed with a high degree of success since the mid-90s, when they began bullying Paul Andersen, and which SofN demonstrated repeatedly that it would not curtail. For example, in February 2010, after David Thorsen spoke with the New York City Board of Health to understand a permitting issue, Paul Kornbrekke asserted that his having done so put Nansen Lodge at risk for findings of $1,000 per day. This claim, necessarily, caused a good deal of distress among the Lodge members, and undermined the trust Lodge members placed in the New Leaders.  Nevertheless, Mr. Kornbrekke's assertions were

apparently unfounded: he would not produce any evidence of this threatened $1,000 per day fine and a search of the Board of Health files revealed no such fine, either.

100.    In addition to the seeming ambivalence of SofN, Messrs. Kornbrekke, Gundersen, Kuell, Maren, and the rest of the cabal, were aided in their efforts to dominate SofN, benefit the Kornbrekke family, and discredit the New Leaders by then-International Lodge Secretary Barbara Bernsten. Every member of SofN is entitled to attend any SofN official meeting regardless of lodge membership. When Ms. Bernsten attended Nansen Lodge meetings, she would be introduced as a representative of International Lodge, and use the weight of her office to lend an air of legitimacy to cabal actions. For example, on December 15, 2009, she declared as lawful a special meeting held with less than 24 hours' notice given to only 20% of the members; at an April 27, 2010 meeting of Nansen Lodge she declared that the terms "officer" and "director" mean the same thing despite their different meanings in the abstract and different roles and responsibilities within the SofN organization.

101.    Hostility toward the New Leaders came to a head on April 27, 2010, when the cabal voted to impeach Brian Olsen and defendant David Thorsen for trumped-up charges that, in substance, were little more than a miscommunication and for hiring Fox Rothschild with Executive Board approval. The cabal unilaterally determined that the New Leaders ought to have put the hiring of counsel to a membership vote even though they had stripped from the membership responsibility for nearly all decisions. Notably, the cabal hired an attorney to address Worker's Compensation Board of Health issues during same timeframe without member approval.

102.    Their impeachment attempt was thwarted. On or about May 13, 2010, then-3rd District President Ralph Petersen sustained the New Leaders' appeal of the impeachment.

30

Nevertheless, on May 24, 2010, the New Leaders each resigned their offices and their membership in Nansen Lodge, along with several supporters, in protest over the abuses of the cabal. The previous Executive Board members, led by Paul Kornbrekke, resumed their offices.

103.    David Thorsen joined Fredheim Lodge on Staten Island, where he continues to lead local efforts to promote and preserve the heritage and culture of Norway.

L. Cabal Makes the New Leaders Scapegoats, Blaming 20-year Downward Trajectory on Three Months of Leadership and Defaming the Thorsens with Impunity

104.    Soon after wresting control of Nansen Lodge from the New Leaders, Paul Kornbrekke and the rest of the cabal embarked on a campaign to discredit the Thorsens and the New Leaders, accusing Brian Olsen and David Thorsen of stealing money from the Lodge and otherwise causing its financial problems. With the help of defendant Heiberg and SofN chief financial officer Len Gorensen, the cabal filed a claim on Nansen Lodge's officers and directors bond for reimbursement of legal fees that Nansen Lodge incurred during Brian Olsen and David Thorsen's leadership.

105.    Even though Fox Rothschild had been duly hired by the Executive Board of Nansen Lodge, and it was within the power of the Executive Board to hire Fox Rothschild, SofN paid Nansen Lodge's claim. SofN never showed Nansen Lodge's bond claim to Brian Olsen or David Thorsen so that they might respond to the allegations of theft against them. SofN never even asked Brian Olsen or David Thorsen about Nansen Lodge's claims. Instead, SofN simply paid the claim.

106.    In paying the bond claim, SofN adopted and ratified the statements and representations of the cabal that Brian Olsen and David Thorsen stole from Nansen Lodge when , in fact, they merely paid legal fees incurred by a firm hired by the Executive Board. Simply, by

31

paying the claim, SofN added its imprimatur to the slanderous statements; legitimizing them despite their untruth.

107.    Their statements and representations concerning the Thorsens were widespread within the closeknit Norwegian-American community, and continue to the present. Mr. Thorsen, Mrs. Thorsen, and David Thorsen continue to receive reports from friends and acquaintances that Nansen Lodge members told them that David Thorsen stole from the Lodge, causing its financial weakness. These reports from not only from within the United States but also from Norway and Sweden.

108.    Mr. and Mrs. Thorsen have also suffered harm at the hands of the cabal. Specifically, Mrs. Thorsen is no longer invited to sing at SofN events, despite having been invited to do so regularly for most of her adult life. Mrs. Thorsen has suffered extreme emotional distress, which permeates all aspects of her life  Due to the stress of Mr. Thorsen, who has lived with a neurological disorder the last 30 years, went from being able to walk with the occasional assistance of a walker to being unable to walk and needing inpatient physical therapy treatment. As a direct consequence, Mrs. Thorsen's had to retire from her job to care for her husband. This, too, has compounded the overwhelming sense of isolation the Thorsens endure.

M. David Thorsen Attempts to Clear Name by Submitting Disputes to SofN

109.    Although the Thorsens tried to move on with their lives Nansen Lodge, the SofN-supported defamation campaign has made doing so impossible. Beginning in October 2011, David Thorsen filed a series of six disputes with SofN, seeking adjudication of matters that concerned themselves as individuals and SofN as an entity. True to form, SofN did nothing until the Thorsens hired counsel. Then, SofN did markedly less than the minimum required under the CCP.

110.   In addition, wishing to ensure that SofN could no longer claim to have no knowledge about goings-on at Nansen Lodge, on or about February 4, 2011,Mrs. Thorsen sent defendant Heiberg several thousand pages of documents concerning Nansen Lodge governance and the ultra vires actions of the cabal, including meeting minutes, monthly newsletters and other documents supporting the actions complained about herein. (See Exhibit R.) Mrs. Thorsen sought action on the part of SofN, yet defendant Heiberg responded by thanking her for the "long-term commitment and support," as well as the "background material on Nansen Lodge." Not surprisingly, Mr. Heiberg ignored the substance of Mrs. Thorsen's letter and the documents she sent him. (See Exhibit S.)

111.   CCP §1.8.5.1, states that the dispute resolution procedures of SofN "are meant to to provide prompt, fair and efficient opportunities for dispute resolution…" Notwithstanding, SofN failed to resolve Mr. Thorsen's complaints in a prompt or efficient manner. In fact, on several occasions during the nine-month period during which SofN was investigating David Thorsen's complaints, SofN attempted to narrow the scope of Mr. Thorsen's complaints or otherwise delay in adjudicating them.  For example, in response to a January 27, 2012 email in which David Thorsen requested to meet with Mr. Heiberg during a February trip to Minneapolis, Mr. Heiberg stated, apropos of nothing, that SofN can put the "dispute investigation on hold until you come to Minneapolis next month for conversation." (See Exhibit T.)

112.   Thereafter, in SofN's report concerning its investigation, SofN stated that Mr. Thorsen waived several claims, which were then reinstated by counsel. This is completely untrue and there is nothing in the written record from which one could reasonably conclude that Mr. Thorsen waived any of his complaints.

113.    Of the six written complaints that Mr. Thorsen submitted from October 2011 to December 2011, SofN resolved only one – a complaint concerning Nansen Lodge's violation of the December 2010 International Lodge Board of Directors resolution stating that all lodges must report information about their real estate holdings to International Lodge each year.

114.    SofN went to great lengths to avoid making any decision concerning the remaining five complaints, which were addressed to (i) the widespread libel and slander against the Thorsens, (ii) the insurance fraud in which Nansen Lodge and SofN engaged when it paid Nansen Lodge's bond claim against Mr. Olsen and Mr. Thorsen, (iii) Barbara Bernsten's abuse of her International Lodge office, (iv) the misuse of the SofN logo and name, and (v) violations of securities laws

115.    SofN proposed the appointment of a committee to address his complaints. Mr. Thorsen agreed, and SofN formed the Dispute Resolution Committee (the "Committee") with then-International Lodge Pres. defendant Dan Rude, defendant Heiberg, and David Ness. Critically, Mr. Ness acted as a member of the Committee and actively participated in the investigation and analysis of Mr. Thorsen's claims. He did not act merely as counsel.

116.    Consistent with prior practice, SofN did not ask the Thorsens anything about their complaints. Their investigation apparently consisted of speaking with some Nansen Lodge members. The Thorsens were not given an opportunity to comment upon any statement made in opposition to David Thorsen's complaints, or an opportunity to review any documents that were submitted against his interests.

117.    The Committee's Final Determination (the "Final Determination") was depressingly consistent with the actions of all levels of SofN when faced with any challenges to the status quo: it changed facts to fit its preferred outcome, and did as little as it possibly could

34

get away with while still appearing to have fulfilled its obligations. Specifically, the Committee decided that by consenting to the formation of a committee, Mr. Thorsen waived nearly all of his complaints. This waiver, of course, was not in writing even though Mr. Thorsen submitted written complaints with written evidence to support the complaints.

118.    The Committee next determined that it did not want to decide the complaint concerning Barbara Berntsen's abuse of power, even though the CCP's dispute resolution provisions purport to be the sole means to present and resolve disputes against SofN officers. Finally, the Committee determined that they would not adjudicate Mr. Thorsen's the libel and slander claims because members of Nansen Lodge claim that Mr. Thorsen defamed them, leading the Committee to decide that Mr. Thorsen and his unidentified should arbitrate.

119.    Mr. Thorsen never agreed to adjudicate claims against those who defamed him and his family, and would not submit to arbitration similar because the Committee shirked its responsibilities. (See Exhibit U.) Because Mr. Thorsen would not agree to waive procedural steps for the benefit of Nansen Lodge, SofN concluded that he did not wish to have his complaints adjudicated at all and closed its case without decided any of the outstanding issues. This refusal to decide his complaints left him without a forum, other than this court, to adjudicate his claims.  By letter from his counsel dated November 19, 2012, David Thorsen notified the Committee of the shortcomings its report. (See Exhibit X.)

120.    The Committee did make to recommendations in response to David Thorsen's complaints: (1) that Nansen Lodge had to produce corporate documents demonstrating that Nansen Properties is a tax-exempt entity; and (2) that it would hire auditors to review the structure of Nansen Lodge and its practices. (See Exhibit V.) The Committee stated that if Nansen Lodge did not provide the required documentation to demonstrate its compliance with

the Internal Revenue Code and the CCP, by October 31, 2012, Nansen Lodge risked losing its charter. Upon information belief, Nansen Lodge did not provide the required documentation, yet the threatened sanction was not imposed. (Id.)

121.    The Committee did hire auditors but, consistent with all prior behavior, the auditors did not perform the depth of review necessary to ensure that Nansen Lodge complied with all applicable laws and regulations. (See Exhibit Wk.) First, the auditors are Certified Public Accountants from the Midwest. They are not white-collar criminal investigators and there is no reason to conclude that the auditors have any knowledge of New York State for federal criminal statutes. Upon information and belief, the auditors did not analyze the minutes or monthly newsletters of Nansen Lodge, Nansen Properties, and Social Club in the context of the operative bylaws and/or Manuals of Procedure, to determine if the actions of Nansen Lodge, Nansen Properties, and Social Club were duly authorized. The auditors most certainly did not speak with the Thorsens to better understand the bases of David Thorsen's complaints.

122.    In fact, from a letter of defendant Heiberg dated March 27, 2013, it appears that all the auditors did was review some financial records, talk to some Nansen Lodge members, and make the determinations that Nansen Lodge did not pay anyone off the books (a fact which is established from the financial records and from statements recorded both in meeting minutes and on cassette), Nansen Lodge did not engage in any illegal activity (although the basis of the auditors' knowledge of white-collar criminal activity in New York State is questionable), and that the Board of Nansen Lodge did not financially benefit from its decisions (notably, the Committee made no such finding as to the family members of the Board of Nansen Lodge). (Id.)

36

N. SofN's Willful Lack of Oversight Leads to Questionable Operations by Lodges Across
the United States

123.    Although Nansen Lodge forms the basis of the Thorsens' knowledge of activity

within SofN that is entirely contrary to permitted activities of §501(c)(8) entities, Nansen Lodge

is not the only example of what is at risk when the parent entity fails or refuses to monitor the

activities of its subordinate lodges. The improper formation of title-holding corporations is

widespread, as is inurement. For example, Oslo Lodge in Bremerton, Washington, and

Tordenskjold Lodge in Spokane, Washington are each in the process of selling the real property

they own. Oslo Lodge, in particular, notes that its Lodge had become a catering hall rental

business, rather than a fraternal benefit society.  In addition, upon information and belief, the

title-holding entities for both Oslo Lodge and Tordenskjold Lodge were not §501(c)(2) entities

required by the CCP.

124.    Other lodges have sold their real property and, as a result, maintain an excess of

liquid assets on hand, or dissipated the funds over time. SofN does not have records of these

real property sales or the proceeds therefrom, because it has not implemented controls over how

Lodge assets are to be expended or otherwise transferred.

125.    SofN is complicit in the improper practices of its subordinate lodges. It does not

require that Lodge officers undergo any sort of training as to what a §501(c)(8) must do to

safeguard the parent entity's tax exempt status and, by extension, its own tax exempt status. To

the extent it is ever consulted by lodges about changes they wished implement in their

governance, SofN rubberstamps the changes without regard for whether the new governance

practice complies with Internal Revenue Code and Regulations.

126.   In fact, SofN has begun encouraging its lodges to implement stripped-down bylaws so that changes within the Lodge can be implemented with the more malleable manuals of procedure. At a recent District Lodge meeting, its guest speaker, Joseph Annotti of the American Fraternal Alliance (of which SofN is a member), advocated a Sons of Norway where its members appointed professional managers to run the business of the organization and membership events that sound more like occasional, charitable flash mobs than pursuit of a common object. If the American Fraternal Alliance's model is adopted across SofN, the organization risks extinction because it will cease to be a **fraternal** benefit society and will only be an insurance company.

127.   Upon information and belief, a fundamental change in the SofN organization is exactly what the International Lodge is working towards. SofN appears to be taking steps to convert its insurance business to either a stock or mutual insurance company so that it can trade on the SofN name by selling financial services products to the general public. To that end, SofN has begun exploring alternate names for the fraternal organization. Typically, this course is being pursued without the input of SofN members or, at the very least, without candid disclosure.

## COUNT ONE:  BREACH OF FIDUCIARY DUTY

(Against Heiberg, Rude and Ness, Derivatively on behalf of SofN)

128.   Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 127 as if fully set forth herein.

129.   The Thorsens are each members of SofN and, therefore, have standing to bring this claim.

38

130.    The Thorsens bring this claim for breach of fiduciary duty against defendant Heiberg, defendant Rude and defendant Ness derivatively on behalf of SofN.

131.    The Thorsens did not make a demand to SofN that SofN bring this claim for breach of fiduciary duty directly against defendants Heiberg, Rude and Ness because doing so would have been futile. Because Mr. Heiberg is the CEO of SofN, any person to whom the Thorsens could make their demand would need Mr. Heiberg's consent before bringing suit. It is unreasonable to think that Mr. Heiberg would consent to bringing a lawsuit against himself for breach of fiduciary duty.

132.    As officers of SofN, defendants Heiberg and Rude owed SofN the fiduciary duties of care and loyalty. As counsel and a high-level decision-maker of SofN, defendant Ness owed SofN the fiduciary duties of care and loyalty.  In particular, defendants Heiberg, Rude and Ness had a duty to safeguard SofN's tax exempt status, without which SofN would have to pay taxes on the $300 million in assets from the insurance business that SofN holds.

133.    Defendants Heiberg, Rude and Ness breached their fiduciary duties of care and loyalty through the acts and omissions set forth herein, including the failure or refusal to implement controls and procedures to ensure that the subordinate lodges complied with Internal Revenue Code and regulations concerning tax-exempt entities.

134.    As a result of defendants Heiberg, Rude and Ness's breach of fiduciary duty, SofN and its subordinate lodges have suffered substantial damages, including having to pay real estate taxes on land that would have been tax free if SofN ensured that the title holding entities were properly organized.

135.    By virtue of their roles as CEO and International Lodge President, both defendants Heiberg, Rude and Ness served on the Committee and ostensibly investigated David

Thorsen's complaints. Rather than taking action to address Mr. Thorsen's complaints and to preserve SofN's tax exempt status, defendants Heiberg, Rude and Ness chose to ignore the duties owed to SofN thereby ensuring that the behaviors and activities that are putting SofN's tax exempt status at risk are not curtailed.

136. As a result of defendants Heiberg, Rude, and Ness's breaches of fiduciary duty, SofN lodges across United States organized as not-for-profit corporations, not being organized as 501(c)(2) tax-exempt entities, earn excess of UBTI from their rental activities, and carry excess liquid assets instead of funding programs. Tragically, if SofN employed any controls over the subordinate lodges and ensured that the title-holding entities were properly organized and managed, the subordinate lodges would not have the massive financial burden of real estate taxes, the satisfaction of which causes the lodges to pursue excessive UBTI.

137. As result of defendants Heiberg, Rude, and Ness's breaches of fiduciary duty, SofN has been damaged in an amount to be determined at trial. Without discovery and analysis concerning the specific harms suffered by each of the nearly 400 lodges of SofN, it is impossible to quantify the damages suffered by SofN. Further, if SofN loses its tax exemption, SofN will be damaged to the extent of the taxes, fines, penalties and interest it incurs (at the International Lodge, District Lodge and Local Lodge levels).

## COUNT TWO: DEFAMATION PER SE

### Thorsens against SofN

138. Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 137 of the Complaint as if fully set forth herein.

139. While officers or directors of a subordinate lodge of SofN, Paul Kornbrekke, Kenneth Gundersen, Richard Maren, Harry Kuell, and others at Nansen Lodge, stated or

represented that David Thorsen stole and/or misappropriated money from Nansen Lodge when he caused Nansen Lodge to pay attorneys. They continue to make these statements and representations to the present day. These statements and/or representations are untrue.

140.    While officers or directors of a subordinate lodge of SofN, Paul Kornbrekke, Kenneth Gundersen, Richard Maren, Harry Kuell, and others at Nansen Lodge, stated or represented that Mr. and Mrs. Thorsen resigned their memberships from Nansen Lodge because their son stole and/or misappropriated money from Nansen Lodge when he caused Nansen Lodge to pay attorneys. Further, Paul Kornbrekke, Kenneth Gundersen, Richard Maren, Harry Kuell, and others at Nansen Lodge, stated or represented that Mr. and Mrs. Thorsen resigned their memberships from Nansen Lodge because they were ashamed that their son stole and/or misappropriated money from Nansen Lodge. They continue to make these statements and representations to the present day. These statements and/or representations are untrue.

141.    Paul Kornbrekke, Kenneth Gundersen, Richard Maren, Harry Kuell, and others at Nansen Lodge publicized their statements and representations orally and in writing.

142.    Paul Kornbrekke, Kenneth Gundersen, Richard Maren, Harry Kuell's statements were made with malice or with reckless disregard as to the truth of the statements. Mr. Kornbrekke was present when the Executive Board of Nansen Lodge voted to hire Fox Rothschild LLP. Kenneth Gundersen, Richard Maren, and Harry Kuell had access to the meeting minutes that would have shown them that the Executive Board voted to hire Fox Rothschild.

143.    As a result of the untrue statements of Paul Kornbrekke, Kenneth Gundersen, Richard Maren, Harry Kuell, and others at Nansen Lodge, David Thorsen, Theodore Thorsen

and Christine Thorsen have suffered damages, including extreme emotional distress, loss of

income, money damages, and the dignitary harm of being charged with a breach of trust.

144.    Paul Kornbrekke, Kenneth Gundersen, Richard Maren, Harry Kuell, and others at

Nansen Lodge made their untrue statements while acting as agents of SofN, in their official SofN

capacities, and while performing work on behalf of SofN.  Thus, SofN is liable to the Thorsens

for the defamatory statements made by Paul Kornbrekke, Kenneth Gundersen, Richard Maren,

Harry Kuell.

### COUNT THREE:  DEFAMATION

Thorsens against SofN

145.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through

144 of the Complaint as if fully set forth herein.

146.    By paying or causing a third-party to pay the bond claim filed by Nansen against

the New Leaders concerning the hiring and payment of Fox Rothschild, SofN adopted as fact the

defamatory statements made by Nansen Lodge members.

147.    The defamatory statements made by Nansen Lodge members are untrue.  Thus,

the adopted statements of SofN are untrue.  David Thorsen filed a complaint with SofN, seeking

redress for their defamatory statements.  Upon information and belief, SofN have continued

making the untrue statements it adopted, without privilege to do so.

148.    SofN made the defamatory statements either with malice or with reckless

disregard as to the truth of the statements.  Indeed, SofN had access to the minutes that would

have demonstrated to them that the Executive Board of Nansen voted to hire Fox Rothschild.

Further, neither SofN nor any third party ever asked the Thorsens about the defamatory

statements.  If the Thorsens were asked about the statements, they would have had the opportunity to deny them.

149.    As a result of the defamatory statements made by SofN, the Thorsens have suffered damages, including extreme emotional distress, loss of income, money damages and the dignitary harm of being charged with a breach of trust.

## COUNT FOUR:  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### Thorsens against SofN

150.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 149 of the Complaint as if fully set forth herein.

151.    Paul Kornbrekke, Kenneth Gundersen, Richard Maren, and Harry Kuell engaged in extreme and outrageous conduct when it, among other things, railroaded the New Leaders, lied to the Lodge Membership, negotiated and executed the malignant contracts, impeached David Thorsen and Brian Olsen, defamed the Thorsens, and prosecuted a false bond claim against David Thorsen and Brian Olsen.

152.    Paul Kornbrekke, Kenneth Gundersen, Richard Maren, and Harry Kuell's extreme and outrageous conduct was intended to cause severe emotional distress, or they engaged in the extreme and outrageous conduct with disregard of the substantial probability of causing severe emotional distress.

153.    The Thorsens each suffered severe emotional distress as a result of the extreme and outrageous conduct of Paul Kornbrekke, Kenneth Gundersen, Richard Maren, and Harry Kuell.

154.    As a result of the severe emotional distress caused by Paul Kornbrekke, Kenneth Gundersen, Richard Maren, and Harry Kuell, the Thorsens have suffered damages.

155.    Paul Kornbrekke, Kenneth Gundersen, Richard Maren, Harry Kuell, engaged in the extreme and outrageous conduct while acting as agents of SofN, in their official SofN capacities, and while performing work on behalf of SofN.  Thus, SofN is liable for the damages suffered by the Thorsens as a result of Paul Kornbrekke, Kenneth Gundersen, Richard Maren, Harry Kuell's extreme and outrageous conduct.

44

## COUNT FIVE: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

David Thorsen against SofN

156.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 155 as if fully set forth herein.

157.    SofN engaged in extreme and outrageous conduct when it paid, or caused a third-party to pay, the bond claim against David Thorsen, effectively finding as a fact that he stole or misappropriated Nansen Lodge funds, when SofN did not undertake a proper investigation of the claims against Mr. Thorsen.

158.    SofN's extreme and outrageous conduct was intended to cause severe emotional distress, or it engaged in the extreme and outrageous conduct with disregard of the substantial probability of causing severe emotional distress.

159.    The Thorsens each suffered severe emotional distress as a result of the extreme and outrageous conduct of SofN.

160.    As a result of the severe emotional distress caused by SofN, the Thorsens have suffered damages.

WHEREFORE, the Thorsens and SofN respectfully seek:

1.    judgment in their favor and against the defendants;

2.    damages;

3.    punitive damages;

4.    pre-and post-judgment interest:

5.    costs and attorneys' fees;

6.    the appointment of a receiver over SofN; and

7.    such other and further relief as this court deems just and proper.


**JURY DEMAND**

The plaintiffs demand a jury for all issues so triable.


Dated:  Brooklyn, New York
        April 26, 2013

                              RESPECTFULLY SUBMITTED,


                              David M. Thorsen, *pro se*
                              908 Jewett Avenue
                              Staten Island, NY  10314
                              718 442-1881 tel
                              CThor42332aol.com


46



1455 West Lake Street
Minneapolis, MN 55408-2666

 **SONS OF NORWAY**

December, 2010

To all District and Lodge Presidents:

At the Fall Board meeting, the Board of Directors voted to pass the following resolutions:

- WHEREAS many lodges have real estate holdings, and
- WHEREAS US Federal law requires lodges to establish a separate 501(c)(2) Corporation to hold title to their real estate holdings, and
- WHEREAS Canada and Norway may also have laws regarding lodge real estate holdings, and
- WHEREAS states may have additional real estate holding laws, and
- WHEREAS Chapter 1.17.1. of the Sons of Norway Charter, Constitutions and Procedures 2008-2010 requires lodges form a separate non-profit corporation for acquiring real estate,
- THEREFORE BE IT RESOLVED that Sons of Norway establish a list of those lodges with real estate holdings and communicate annually to them the pertinent Federal and State requirements and the necessity of complying with the law.

AND

- WHEREAS lodges have real estate holdings, and
- WHEREAS there are US Federal and State laws concerning real estate holding filings,
- THEREFORE BE IT RESOLVED that lodges with real estate holdings shall send copies of their annual or periodic federal or state Articles of Incorporation or Charter filings to Sons of Norway, and
- BE IT FURTHER RESOLVED THAT this procedure be included in the Sons of Norway Charter, Constitutions and Procedures in the Procedures Section 5.17.1. Real Estate Holdings.

In an effort to make sure that our lodges are compliant with their local requirements, Sons of Norway is requiring that all lodges that own real estate:

1. Immediately inform Sons of Norway headquarters of the type of real estate holdings they currently have, along with the appropriate person to contact for future information.

---

2.  Send in a copy of their Articles of Incorporation or Charter to confirm that a separate 501(c)(2) Corporation has been properly established and is active under local law.
3.  Send headquarters a copy of their annual or periodic federal/state filings to verify that their corporations are active and are following their respective requirements.

In the future, Sons of Norway headquarters will annually contact each lodge as a reminder to maintain active files on each 501(c)(2) that is listed within our organization and send out periodic reminders to the entire lodge system about the real estate requirements.

Please contact Liz Reque at lreque@sofn.com or (612) 821-4608 if you have any questions about the above listed requirements.

Sincerely,

Eivind Heiberg
Chief Executive Officer





**U. S. TREASURY DEPARTMENT**
WASHINGTON 25

OFFICE OF
COMMISSIONER OF INTERNAL REVENUE

ADDRESS REPLY TO
COMMISSIONER OF INTERNAL REVENUE
AND REFER TO

IT:P:ER
CFH

#188.1

OCT 31 1950

Nansen Properties, Inc.
5456 Victory Boulevard
Staten Island, New York

Gentlemen:

Reference is made to the evidence submitted by you in support
of your claim to exemption from Federal income tax under the pro-
visions of section 101(6) of the Internal Revenue Code.

The information furnished discloses that you were incorporated
in 1948, under the laws of the State of New York. Your purposes are
to hold and manage property for the use of the members of Lodge
Nansen #410, Sons of Norway. Pursuant to the provisions of a voting trust
agreement executed on July 50, 1948, by and between Lodge Nansen #410,
Sons of Norway, and nine individuals as trustees, one share of your
total outstanding capital stock of nine shares, no par value, owned by
the Lodge, was assigned to each of the trustees as voting trustee, for
a period of five years. It is provided that each trustee shall issue
and deliver to the Lodge, certificates for the number of shares
transferred by it to the trustees. Any vacancy in the voting trustees
is, according to the terms of the voting trust agreement, filled by
the Lodge. Although your bylaws provide for the payment of dividends,
and according to the terms of the trust certificate issued by each
trustee to Lodge Nansen #410, Sons of Norway, the Lodge shall be
entitled to receive payments equal to any dividends that may be
collected by the trustee, it appears that no dividends have been paid.
Your activities consist of holding title to, and managing property
for the use of Lodge Nansen #410, an exempt organization. However,
when the grounds are not in use by the Lodge, they are rented to
other lodges. Your income is derived from rentals and contributions
and it is used for operating expenses. None of your income inures to
the benefit of any private shareholder or individual.

Section 101(6) of the Internal Revenue Code provides for the
exemption of:

"Corporations, and any community chest, fund or foundation,
organized and operated exclusively for religious, charitable,
scientific, literary, or educational purposes, or for the
prevention of cruelty to children or animals, no part of the
net earnings of which inures to the benefit of any private
shareholder or individual, and no substantial part of the
activities of which is carrying on propaganda, or otherwise
attempting, to influence legislation."

2 - Nansen Properties, Inc.

In order to be entitled to exemption under the provisions of section 101(6) of the Internal Revenue Code, an organization must, among other things, be formed and operated exclusively for one or more of the specified purposes. The information furnished discloses that your activities consist of holding title to, and managing property for the benefit of Lodge Nansen #410, Sons of Norway. Therefore, as you do not fall within the contemplation of this section of the law, it is held that you are not entitled to exemption from Federal income tax under the provisions of section 101(6) of the Internal Revenue Code.

Contributions made to you are not deductible by the donors in arriving at their taxable net income in the manner and to the extent provided by section 23(o) and (q) of the Internal Revenue Code, as amended.

It is the opinion of this office, however, that you are entitled to exemption from Federal income tax under the provisions of section 101(14) of the Internal Revenue Code.

Accordingly, you will not be required to file income tax returns unless you change the character of your organization, the purposes for which you were organized, or your method of operation. Any such changes should be reported immediately to the collector of internal revenue for your district in order that their effect upon your exempt status may be determined.

You will be required, however, to file annually, an information return on Form 990 with the collector of internal revenue for your district so long as this exemption remains in effect. This form may be obtained from the collector and is required to be filed on or before the fifteenth day of the fifth month following the close of your annual accounting period.

Bureau letter dated September 20, 1950, in which you were advised that inasmuch as you had failed to establish that you are entitled to an exempt status income tax returns should be filed by you, is hereby revoked.

The collector of internal revenue for your district is being advised of this action.

By direction of the Commissioner.

Very truly yours,

E. I. McLarney

Deputy Commissioner



SEP 23 '96  09:20AM

Lanoka Harbor, 7-13-96.

Sons of Norway International Headquarters
1455 W. Lake St.
Minneapolis, MN 55408-2666
Att'n: Mr. John Lund.

Dear Mr. Lund,

I am a member of Nansen Lodge #410 S.I.,N.Y. and very concerned about the current development within the Nansen Lodge.
The attached copies of the two contracts between the Lodge, Nansen Properties, Nansen Social Board and the Caterer "A Taste of Honey" is in my opinion a total disaster for the Lodge. The Lawyer representing Nansen advised strongly against signing the contracts. He quit and would have nothing to do with it and the Nansen Boards went ahead and signed the contracts anyway.It seems to me that by signing the contracts the Nansen Property and Social Boards on 11-16-95 succeeded in giving the Lodge away to the Caterer.
The President on the Property Board was sick and in ill health and signed the contract under duress; I think this in an illegal procedure so I am sending the attached documents to you to get your legal opinion on it and hopefully you can find a way to nullify the contracts for the benefit of the Lodge.
Very little information on the contracts is reported to the Lodge members and thus keeping the members in darkness regarding these disastrous contracts.
The Lawyer who quit will not have any more to do with Nansen Lodge and I think as of now, the Lodge does not have a competent Lawyer to represent the Lodge.
I feel it is important that the Supreme Lodge is informed about the problem and I would appreciate if you would send me your opinion and advise on how this mess can be solved.

Fraternally yours,

Paul A. Andersen
708 Colgate Ave.
Lanoka Harbor,
N.J. 08734-1508



**September 14, 1996**          **3:00 p.m.**          Nansen Main Hall

**Attendees:**   John Hlivyak, Charles Nielsen, Sandy Ginsberg, Audun Gythfeldt, Gail Peterson, Ken Gundersen, Paul Kornbrekke, Joan McKillop, George Finstrom.

**Topic:**  Discussion of letters sent by Paul Andersen regarding Nansen's contract with their contractor: "A Taste of Honey."

Paul Andersen, a member distributed a letter to Nansen members, dated September 2, 1996, with accusations against Nansen caterers, "A Taste of Honey." Paul Kornbrekke has spoken to Paul Andersen regarding this letter. [Two weeks prior to the distribution and mailing of his letter to the lodge, Paul A. had requested a list of Nansen members, Sally Lorentzen's response was that it was not appropriate to do so].

Paul Kornbrekke met with Nansen's three Boards. Paul Kornbrekke read Paul Andersen's letter to the board going through the letter point by point. There was a unanimous vote of all three boards that the accusations were unfounded and incorrect. Nansen spoke to an attorney to get legal counsel on the issue, if the caterer should read the letter would Nansen Lodge be liable?

In the mean while, Paul Andersen wrote a second letter, dated July 13, 1996, to John Lund, International SON Counsel [which we do not have a copy here].

Paul Kornbrekke read John Lund's response letter [dated August 29, 1996] to the members present [he received this copy from Ted Thorsen]. Mr. Lund remarked that the resolutions of this issue lies within the lodge, unless Nansen Lodge requests the International assistance.

Point of question, John Lund <u>did not copy</u> his response to Nansen Lodge, nor did Nansen receive a copy of Paul A.'s letter to John Lund.

Sandy Ginsberg and Charlie Nielsen stated that John Lund and the International lodge do not usually get involved in local lodge issues. They are both concerned with John Lund's statement <u>"timely action."</u>

Paul K. and Ken remarked on the statement that insinuates the <u>attorney said</u> <u>not to sign</u> the contract. That particular attorney <u>quit two months after</u> the contract was signed.

Ken Gundersen mentioned that at the 'Annual Propery Board meeting', a Nansen member had handed out some information and copies of the caterers contract to certain individuals. This was around the time when Nansen was discussing the renovation of the main lodge. Paul K. restated that the accountant had mentioned to the board meeting, and before the Lodge, that he "stands behind" his numbers.

George stated that three different entities, officers of the corporation approved the audits. When this group (regarding the renovation) raised their concerns, they were told, you can make your own audit and pay the costs at your own cost. This group then changed their tactics and focused their attention and accusations to the caterers.

Charlie Nielsen said there is a more deep seated problem, there appears to be a minority of people on committees, who are unhappy.

George wants to know, what are our procedures? Mr. Lund should receive a copy of Paul A.'s letter to Nansen members, and some one should ask Mr. Lund why he wrote directly to Paul A. Ad did not contact Nansen? What can the Third District do to help us [Nansen?]

Charlie said that John Lund mentioned to him at the International Convention that he had received

a letter from a Nansen member concerning the caterer. Charlie only knew there was dissention of a few about the renovation of the building. George asked Charlie why didn't he ask Lund more specific questions at that time?

Sandy stated he called John Lund the day after Paul K. had called Sandy. Sandy is waiting for John Lund to call him back. Sandy's concern, is that this letter is not Paul Andersen's, the style of writing and the words do not reflect Paul A.'s style.

John asked the question: "Do you feel this letter is then on behalf of a group?" Discussion ensued that it was felt Paul A. has become the spokesperson in fact for a group.

Charlie stated, when there is an internal problem in a lodge, it should be reported to the District President, John Hlivyak, then to the Counselor, Audun Gythfeldt. It should be handled by the Third District and Audun should be the moderator. There should be a meeting among all the persons involved, with Nansen Lodge President, John Hlivyak, and Audun Gythfeldt.

George feels we should keep the problem in Nansen's Executive Committee.

Paul K. Nansen's plan will be:

1) Nansen's attorney writes a response to Paul A.'s letter of September 2, 1996. This will prevent/avoid any litigation from the caterer, and will protect Nansen and the caterer.

2) Meet with the three boards, before it goes to the floor of the lodge at the Friday, October 4, 1996 meeting. If this topic should arise at the September 20, 1996 meeting, Joan must ask to have the discussion tabled. [We want to meet with the boards, get the letter from the attorney, and there is a LOV Orienteering meet and several members will not be at the lodge meeting.]

Charlie stated that it is not debatable. Table the discussion to the next meeting, say that the executive board is aware of this letter and want to study it further.

Paul K. and Sandy believe that George Outzen is one of the Nansen members behind Paul A.'s letter. They feel that someone on the Nansen board is giving information to the people behind Paul A.'s letter. Paul K. believes that Paul A. is being used as a vehicle for others, and that Paul A. may not realize what ramifications he may be eventually set up for.

Sandy and Charlie will contact John Lund. They will convey information to John Hlivyak, who will speak to Audun, who will then speak with Paul K.

Charlie, Paul A. has wanted to speak with him. Charlie will ask Paul A. if the letter he wants to discuss is the letter to Nansen Lodge or the letter to John Lund.

The meeting was closed at approximately 4:10 p.m.

Respectfully submitted,

Gail Peterson
Zone Five Director

c: Peterson: SON\N-9-14-96.wpd



708 Colgate Avenue
Lanoka Harbor, N.J. 08734-1508
June 16, 1997.

Sons of Norway
1455 West Lake Street
Minneapolis, MN 55408-2666
Att'n: Mr. John Lund, General Counsel

Dear Brother Lund:

This letter is a follow up to my letter of 9-16-96. It has been a long time since my last letter to you because I did not receive Nansen's final financial statements from the Accountant and Nansen's Boards before 6-13-97. I write now to update you about recent events at Nansen Lodge --events which highlight the procedural irregularities taking place at Nansen meetings. I care deeply about the welfare of Nansen Lodge and hope that these difficulties will soon be behind us, although recent events do not suggest that a resolution is forthcoming.

Some history is in order here. As you are aware, I have spoken out against the catering contracts between Nansen and A Touch of Honey -- contracts I believe poorly represent Nansen's best interests. The reaction of the Lodge's officers to my concern has consistently shown a disregard for Lodge procedure (as well as a disregard for basic civility). For example, I wrote an open letter to Nansen's members informing them of my interpretation of the catering contracts. At the first meeting in October (10-4-96) I raised my hand to request the floor, was acknowledged by the vice-president (who was running the meeting) and asked to have that letter read aloud. My request was denied, after which both the Lodge's treasurer and the Social Club's vice-president stood up and made some negative remarks concerning the letter. At this point I asked again for the letter to be read aloud, only to be told I was out of order. A motion was then made, seconded, and voted upon to postpone the reading of the letter until the next meeting.

This, of course, was not the proper procedure according to Sons of Norway Charter & Constitution -- General Provision #69 and/or Robert's Rules of Order Section 16. Upon my proper request, the letter should have been read up; a motion could then have been made to postpone any action on it. Moreover, the negative comments about my letter from Nansen officers should not have been permitted without and express reading of the letter.

The major problem with this incident is not that it occurred, but that it was not an isolated event. For example, at the next meeting (10-18-96) my letter was read up on the floor. Three of Nansen's officers spoke out against the letter, as was their right. But when a lodge member known to be supportive of my position requested the floor, another officer yelled "Get out of here. You do not belong here." (The member in question has been a member for 59 years, by the way.) Another lodge member, (a member for 34 years) also known to be supportive of my position, then requested the floor and was recognized. As he was speaking, a Nansen officer

jumped up, told him he was "dumb" and that he did not "know what he was talking about." Shockingly, the presiding officer did not once interfere or attempt to call his fellow officers to order.

These incidents may seem minor -- an internal lodge matter rather than a larger Sons of Norway concern. And indeed, were this all, I would not be writing this letter right now. But this surface disregard for the rules appears to also go much deeper, indicating a problem that the larger Sons of Norway organization should properly be made aware of.

For example, under Nansen's by-laws, any member has the right to examine the lodge's records. I, along with several other members, asked to see the lodge's books on 11-11-96. We were promised access to those records at that time. Through a confluence of events (including the coming of the holidays) we did not meet at the accountant's office until 2-22-97, some three months later. At that meeting, we requested copies of all the financial statements. The complete financial statements for 1996 should have been available within 60 days from 12-31-96 in accordance with our Charter and Constitution. In fact, only some of the documents were available. We did not receive the final 1996 statement for the Social Club until 3-14-97 and did not receive the Property Board statement until 6-13-97. This is about <u>six months</u> after we initially requested (and were promised) the financial records.

The extreme delay evidenced in the production of the financial records concerns us greatly. The accountant does not seem to be responsible for the delay; he prepares the statements as he receives the complete information from the boards. The accountant's statement is dated 3-1-97. This information is by right available to all lodge members and is the responsibility of the three lodge boards to produce. Such delay cannot help but give the impression that someone is hiding something, somewhere. Moreover, the financial statements that we have been able to examine simply do not add up in any coherent way. Let me repeat: careful study of Nansen's financial records both by me and by several other members has not been able to identify a large proportion of Nansen's expenditures. This seems very problematic, both in terms of the by-law requirement paragraph 48 that Nansen's officers keep books accurately, and in terms of common business sense

A final example of the procedural irregularities at Nansen Lodge concerns the recent proposed changes in our by-laws. The executive board of the lodge proposed revisions to the by-laws which were read publicly at the first meeting in March (3-7-97). Voting on those revisions was scheduled for the first meeting in April (4-4-97). At the second meeting in March (3-4-97), five members of the Lodge (including me) presented a written letter to the lodge president requesting a special meeting to discuss those proposed by-laws changes. According to our by-laws (chapter II paragraph 129) the president is <u>required</u> to call such a meeting when requested in writing by five or more members. The meeting, of course, needed to be held prior to the vote.

I informed the necessary people that I would be available for a meeting anytime after 4-8-97, requesting a postponement of the scheduled vote. Whether the meeting needed to be scheduled to accommodate my schedule is probably open to question, even though I was one of the five signers of the letter. What is most important here is not that the vote went on as

scheduled, but that the special meeting was <u>never called</u>. I was later informed by a lodge officer that the executive board had checked with the international and the third district and were advised that our written request for a special meeting was not applicable. I find it hard to believe that such advice was dispensed, given that our by-laws specifically state the opposite.

These extensive procedural irregularities are very troubling. While some of these concerns may seem minor, or rooted in particular interpersonal interactions, the whole set of events related here suggests a pattern of disregard for the Sons of Norway's by-laws and a breakdown of fraternal spirit. I trust you will examine the by-laws changes carefully before approving them, and that you will keep careful watch over issues raised by the dissent in our lodge.

Fraternally,

Paul A. Andersen

cc: Mr. John Hlivyak
    President, District Lodge No. 3



Lanoka Harbor, 9-15-00

SONS of NORWAY
1455 W. Lake St.
Minneapolis, MN 55408-2666
Att'n: Brother David Ness,
        Counselor

Dear Brother Ness,

I have had correspondence with Brother John Lund while he was legal Counselor regarding problems in Nansen Lodge #410 on S.I., N.Y.
Maybe John Lund has informed you about the problems which after 4 years still has not been solved satisfactorily.
As a member in good standing for over 32 years, I have within the By-laws and Rules of SON inquired about the correctness of the financial statements issued to the members. They do not add up in any coherent way and instead of addressing the issues, the Boards continuously try to suppress correct information the members have a right to know. I have from the very beginning told them and the Officers at the International Headquarters in Minneapolis: "I will not relent on it It is wrong." It is not fraternal attitude and not in accordance with SON Chapter and By-laws and the Corporate laws of the State of NY.

I wrote a letter dated 3-28-99 recommending to the Boards that they hire a CPA to audit all the financial data without any written disclaimer. The SON Chapter and By-laws must be followed by all members regardless what position they hold in the Lodge. I have been a member of the By-laws committee and know what is required.

Art 184 in the By-laws states if the Boards hire a CPA he must audit all financial statements.
The CPA writes on his statements: "I do not audit them."
Therefore, the Nansen Boards are breaking the SON rules.
The financial data do not add up in any coherent way. I and other members want to know the correct data and we are entitled to get this information. I have been working on this for the good of the Order for over four years.

Due to the questions and suggestions I and other members have tried with no luck to get satisfactory and honest answer to, the president Joan McKillop instead decided on 12-14-99 to file charges against me and had me face an ADHOC committee to explain the unsubstantiated charges they claim I had made and caused embarrassment to the Lodge Officers. I have not done that at all. Besides making recommendations I have only asked questions they as Board members have a duty to answer.

The Chairman Harry Kuell of the ADHOC Committee terminated the meeting before hearing the testimony of two my witnesses. Among several items listed in their complaint letter are especially letters from two individuals listed as proof of my misconduct These individuals were not present at the meeting so I could not question them nor was I per the By-laws permitted to summarize and give my final statement.

This ADHOC hearing was not run in accordance with the SON By-laws. The whole set-up was a Kangaroo Court and no proof was shown that I was guilty of anything. They were only interested in embarrassing me and trying to shut me up.
The Chairman promised to send me a copy of the tape and notes taken at the meeting. I have not received them

Instead they wrote a letter dated 1-21-00 indicating giving me a reprimand for going outside SON Rules. This letter was distributed to the Lodge members and requested them to vote on the findings. The vote was 57 against me and 11 for me. No judgment was levied against me so how can the members vote me guilty?

Addition to Ness ltr
dated 9-26-00

1

I mailed you a letter dated 9-15-00 regarding problems at Nansen Lodge #410 SI, NY.
The following data should have been included in the letter but unfortunately was left out.

The Charter and Constitution of SON very clearly spells out the By-laws and Rules which all
members are required to adhere to.

Referring to the 9-15-00 letter, I have been a member of SON since 1968, elected and appointed to the
the By-laws , the Scholarship, the Nominating committees and the Stockholders, the Property and
the Social Boards.

In that respect, I have studied and researched what I had do to fulfill the requirements I must perform
in accordance with the Constitution and By-laws. The Constitution and By-laws has been my Bible all
the time and when I was accepted into the Lodge, I, like all the other members promised to abide by
the Constitution and By-laws. I have and still do that and expect all the other members to do
likewise.

I am a graduate Engineer with over 24 years of world wide working experience dealing with contracts
and specifications and during that time I was engaged as a Project Engineer for six years for the
49000 ton Refrigeration Plant in the World Trade Center in New York City.

Referring to the CPA, I think the Supreme Lodge is absolutely correct in stating the CPA shall _Audit_
all financial statements.

Referring to Paragraph 184 in our By-laws it is indicated: "If the Officers appoint a Certified Public
Accountant he shall _Audit_ all financial accounts of the Lodge and report to the Lodge. He shall also
_Audit_ all Committee reports containing financial accounts before they are adopted by the Lodge. At
no time shall the fiduciary obligation of the Lodge be abrogated".

Paragraph 183 states **"The Trustees shall supervise the personal property of the Lodge and perform**
such other duties as may be required of them by the Lodge. The Trustees shall keep accurate accounts
of same and report to the Boards of Directors and the Lodge as requested".

It indicates to me that the CPA should _Audit_ the Trustees accounts too..

The Nansen Boards hire a CPA, but he states in writing: "I do not _Audit_ the financial data".
(See the attached page of the CPA's financial statement)

The Nansen Boards are not following the By-laws.

By not doing the _Auditing_, as required by the By-laws the members have no protection and assurances
regarding the correctness of the financial statements they receive.

All Nansen members deserve honest, correct information on this. We are not getting it.
(See the attached financial sheet showing the different amounts from the CPA, the Rental Agent
and the Social Club Treasurer)

The financial statements do not measure up to the By-laws standard since they do not in any way
spell out in detail the data so the members can compare and understand them. .

At the financial meetings the Board members first explain what they have been engaged in during the
past year and then hand out their financial statements.

This is not right, the members should be furnished with the data in good time beforehand to be
prepared to ask relevant questions.

Addition to Ness ltr
dated  9-26-00

3

I went to the Lodge meeting on 2-6-98 and the following was announced by the  Chairman of the renovation committee: "He is going to re-activate the renovation committee for the purpose of modernizing the kitchen. He explained they will get together shortly to discuss and plan what they want to do before calling in contractors to do the job. He expects to  complete the project in one year."

.Today, over four years later, the kitchen renovation has not been done, the Federal Handicap Law has not been obeyed, lots of money has been spent on a project not completed.

We want to know what is going on  Why has  the project the members approved and voted on, a project the Boards so enthusiastically introduced  on the 6-21-96 meeting been ignored and money spent on other projects?

The way the Boards operate now the members are kept in the dark. This is not in accordance with the By-laws.

For any proposal favorably to the Boards, they allow the members plenty of time to study it, but present something unfavorable to them especially questions about  financial matters it will be vaguely talked about  but mostly not discussed or acted upon at all.

Nansen Lodge is no longer an open viable fraternal society with an informed membership.
The way the Boards operate now is in stark conflict with SON by-laws and the corporate law of the State of New York..

I think it is imperative now the leaders of the Supreme SONS of  NORWAY take an active interest in the situation at  Nansen  Lodge and the fraternal welfare of the members.

9-17-00

Preliminary calculations based on assessment value of Nansen:

Info received from visit to the tax assessment office on SI.:

| 3465 Victory Blvd: | Park land | $ 408,150 |
| | Building | $   1,350 |
| | Total | $ 409,500 |

| 3441 Victory Blvd | Land | $ 75,600 |
| | Building | $ 51,000 |
| | Total | $ 126,600 |

Grand total: $ 409,500 plus $ 126,600   =   $ 536,100

Est. tax rate $10.961/$ 1,000  This is the rate for private home property. Nansen is
probably considered commercial property and thus
the tax rate will probably be higher.

Total real estate tax for Nansen in 1999 is $ 50,704

Tax rate $ 10,961/$ 1,000  is  $ 0,010961/Dollar

Tax $ 50,704/ $ 0.010961  =  $ 4,625,855.30 estimated total assessment value of
Nansen.

Estimated value per member:

700 members = $ 4,625,855.30/700 = $ 6,608.36

600 members = $ 4,625,855.30/600 = $ 7,709.76

500 members = $ 4,625,855.30/500 = $ 9,251.71

This is a lot of money the members should think about and be concerned with.

Financial statements from CPA, Social Cluband Rental Agent
9-20-00

1995  Financial meeting
**CPA** Bar income          $31,666          ScCl Bar income $ 8,251
    Bar expenses      $16,725          Bar Exp.  $23,237
    Profit            $14,941          Loss    ($14,986)
Difference not accounted for. Where is it?
**Rental Agent** statement not received.


1996 financial statement
**CPA**  Bar Income         $27,862          ScCl Bar income  $ 9,369
    Bar Exp           $ 9,767          Bar exp.    $10,923
    Profit            $18,095          Loss      ($ 1,554)
Difference not accounted for. Where is it?
**Rental Agent** Bar Income  $22,071
**ScCl** Treasurer reported  $ 9,369
**Difference**               $12,702
Difference not accounted  for. Where is it?


1997 Financial meeting
**CPA** statement not received.
**Rental Agent's** Bar Income $25,364          ScCl  Bar Income $ 6,481
**ScCl** Treasurer Bar Sales  $ 6,481          Bar Exp.   $13,264
**Difference**                $18,883          Loss     ($ 7,783)
Difference not accounted for. Where is it?


1998 Financial meeting
**CPA's** Bar income         $34,712          ScCl Bar income $ 6,032
    Bar  Expenses     $14,289          Bar Exp    $13,264
    Profit            $20,423          Loss      ($ 7,232)
Difference not accounted for. Where is it?

**Rental Agent** Bar  Income  $40,810
**ScCl** Treasurer Bar Sales  $ 6,032
**Difference**                $34,778
Difference not accounted  for. Where is it?


1999 Financial meeting
**CPA's** Bar Income         $43,018          ScCl Bar Income $ 6,194
    Bar Exp           $15,515          Bar Exp $11,581
    Profit            $27,503          Loss     ($ 5,387)
Difference not accounted for. Where is it?

**Rental Agent** Bar Income   $40,810
**ScCl** Treasurer  Bar Sales  $ 6,194
**Difference**                $34,616

Difference not accounted for. Where is it?


**Note:**
    The  members are getting  financial statements from 3 different sources.
    They do not match up.  Explain  why.



17 Providence Street
S.I., N.Y. 10304-4306
May 1, 1997

Mr. John M. Lund, General Counsel
Sons of Norway International Headquarters
1455 W. Lake Street
Minneapolis, Minn. 55408-2666

Dear Mr. Lund:

We recently renewed our membership in Sons of Norway for
the period ending 3/3/98 although it is quite unlikely
that we will continue to attend meetings at Nansen Lodge.

Until the early fall of 1996 we participated in a majority
of lodge activities. What occurred during two meetings in
October '96 caused us to withdraw. After witnessing, in
disgust, the abusive manner in which several senior members
were silenced when they had the temerity to speak out (these
were the men who built and maintained the lodge for many
years) our continuing participation became impossible for
us. Our Norwegian background is one of civility and respect
for others but, the oppressive atmosphere created at Nansen
has served to stifle freedom of expression if it should differ
in any way. For those of us familiar with " Folket's Fiende"
or " An Enemy of the People" that's what one becomes if
one utters a contrary opinion.

We know there is concern about declining membership. On
paper, Nansen may appear to be swelling it's ranks. The
reality is quite different, with relatively few who continue
to attend meetings after joining the lodge. As new members
come in, many with a variety of skills and abilites that
could enhance the organization, they are told " This is your
lodge, we want your participation." However, having once wit-
nessed the humiliating and unfraternal dressing downs which
members speaking out are subjected to, one realizes it's
prudent to keep your mouth shut and clap your hands like
robots no matter what you think or say privately.

My husband and I will not relinquish our ability to think
in order to be Nansen members in good standing. Neither of
us has been subjected to the abuse so briefly outlined in
this letter. In our case, it has been far more subtle.

We are intensely proud of our Norwegian heritage and have been privleged to meet many fine individuals at Nansen with back-grounds similar to ours. However, we felt in good conscience, that there is something wrong at Nansen. It may be concealed for now, but, it is there. It would be unfortunate if this wealthy lodge ( smack dab in the middle of N.Y.C. ) should be allowed to decline without anyone realizing what is happening until it is accomplished. Nansen wouldn't be the first lodge to go - just in that manner.

As I indicated at the outset, we plan to continue our affiliation with Sons of Norway. This letter is to voice our concern for its' future and in particular, the well being of Nansen.

A change in the bylaws have recently been voted for which will be submitted to you for review. We urge that they be carefully scrutenized for potential future problems before receiving your approval.

Sincerely yours,

*Claire Kristensen*

(Mrs.) Claire Kristensen

cc: Pres. John Hlivyak



# SONS OF NORWAY

*Fraternal Benefit Society with Life Insurance*
DISTRICT LODGE No. 3
Connecticut, District of Columbia, Florida, Maryland, Massachusetts, New Jersey
New York, Pennsylvania, Rhode Island, South Carolina and Virginia

*President*
JOHN HLIIVAK
56 Trebbe Drive
Manchester, CT 06040
(860) 646-3009

*Vice President*
ALLAN ARNESON
2385 Saratoga Bay Drive
West Palm Beach, FL 33409
(561) 683-2156

*Secretary*
BARBARA WESTBY
7700 Westfield Drive
Bethesda, MD 20817
(301) 320-5395

*Treasurer*
ARDIS MORTON
9224 Dellwood Drive
Vienna, VA 22180
(703) 281-3463

*Zone 1*
PER SAGAARD
82-71st Street
Brooklyn, NY 11209
(718) 836-7965

*Zone 2*
ROLF EKLOFF
181 Sunset Blvd.
Wading River, NY 11792
(516) 929-4250

*Zone 3*
GRETHE IDLAND
1 North Cape Trail
Rockaway, NJ 07866
(201) 627-0890

*Zone 4*
HENRY ANDERSEN
HC#1, Box 257
Cairo, NY 12413
(518) 634-7183

*Zone 5*
GAIL PETERSON
3021-7th Avenue
Brooklyn, NY 11232
(718) 851-4678

*Zone 6*
RANNVEIG WERNER
18650 Chickadee Lane
Gaithersburg, MD 20879
(301) 869-5010

*Zone 7*
GERTRUDE WATT
3 Water Street
Baldwinsville, NY 13027
(315) 635-9359

*Zone 8*
NORMAN HALLS
1353 Plumtree Road
Springfield, MA 01119
(413) 783-5583

*Zone 9*
JOSEPH CENTINEO
13338 Twin Lake Avenue
Spring Hill, FL 34609
(352) 683-3769

*Zone 10*
ELLEN-CARIN PIASKOSKI
56 Constitution Avenue
South Weymouth, MA 02190
(617) 335-9976

*Zone 11*
ROGER SEAN
4044 Olive Avenue
Sarasota, FL 34231
(941) 922-4404

*Counselor*
AUDUN GYTHFELDT
630 W. Homer Avenue
Morristown, NJ 07960
(201) 267-5250

*Public Relations*
*Social/Cultural Director*
DIANA SYVERTSEN
130 North Street
Iselin, NJ 08830
(908) 636-0496

*Youth Director*
JUDITH MACK
P.O. Box 1185
25 Winter Street
Burlington, MA 01803
(617) 935-9620

Mrs. Claire Kristensen
17 Providence Street
Status Island, NY   10304

May 12th, 1997

Dear Mrs. Kristensen,

    I received a copy of the letter which you mailed to John Lund, General Counsel of Sons of Norway International last week. Due to several commitments out of state, I have not had time to sit down and respond to your letter until now. I must say that this is a difficult letter to respond to because your statements are rather vague; alluding to facts and incidents that are never clearly stated, or even mentioned for that matter.

    After checking with your Lodge President, I assume that this must be a carryover from an earlier incident regarding the corporation which manages the Nansen property. To my knowledge, the allegations made were responded to by the proper officers and a satisfactory explanation was given to those contesting the action taken. Perhaps this was not to the liking of those who were opposed to the action, but in our fraternal order, majority rules and there are times when we must accept the will of that voting body, even though we do not personally believe it was the wisest course of action to take.

    I attended your Lodge's installation of officers meeting in February and at that time, I stated that it seemed strange that no one contested any position; all were elected without opposition. If a person is to succeed in changing or influencing policy with a lodge, they must be willing to assume the responsibilities of one of the offices that establish such policy. Also, procedures are set up to govern both the possessions and individuals of a lodge. To try to circumvent them or undermine them is a waste of time and effort.

    In checking my records, I see that you and your husband have only been members of Nansen since September, 1993. Your membership is renewable in March, however, so there is the possibility that you may have belonged to another lodge before that. My point in mentioning these things is that you seem unfamiliar with proper procedure. If you have a serious charge to make, then it should be done in accordance with Chapter XII of the Sons of Norway Constitution of Local Lodges.

*Communication is the key to a Stronger Fraternity*

(2)

If you wish to make a positive contribution to your lodge, do it the correct way. You should consolidate the efforts of those who agree with your thinking and then back those individuals who can best represent your viewpoints. Then, have them run for the office or offices where you feel it will do the most good for your cause. If you would rather just speak from the floor, then be prepared. Know what you want to address and what the facts are.

I will certainly read the proposed By-law change, when it arrives, with the greatest attention to detail. Do not expect, however, that I will change any item that has been approved by the members of your Lodge and does not violate the rules of the Order. I appreciate your concern for the future of Nansen Lodge and hope that you will apply your energies toward the proper procedures for influencing it course from here on.


Fraternally,


John Hlivyak
3rd Dist. Pres.



3.1.1

## CATERING CONTRACT

THIS AGREEMENT made the 8 day of January, 2009 2010, by and between

A TASTE OF HONEY, INC., a New York Corporation (hereinafter referred to as

CONCESSIONAIRE) with principal offices located at 3465 Victory Boulevard,

Staten Island, New York 10314, and NANSEN LODGE SOCIAL CLUB, INC.,

(hereinafter referred to as LICENSEE) a New York Corporation, with its principal

office located at 3441 Victory Blvd., Staten Island, New York 10314 and NANSEN

PROPERTIES, INC. (hereinafter referred to as OWNER), a New York

Corporation, with its principal office located at 3441 Victory Boulevard, Staten

Island, New York 10314.

WITNESSETH: That the CONCESSIONAIRE and the LICENSEE, for the

consideration hereinafter named, mutually agree and covenant as follows:

### ARTICLE I   DEFINITIONS

The following terms, as used herein, shall be construed as follows:

A.   PREMISES – shall be deemed to include the main lodge hall building,
and the paved parking area surrounding the main lodge hall building
located at 3441 Victory Blvd., Chelsea Heights, Staten Island, NY
owned by NANSEN PROPERTIES, INC.

B.   THIRD PARTY EVENT – shall be deemed to include any event for
which the RENTAL AGENTS of LICENSEE have contracted to
make the PREMISES available or any event which has been arranged
by CONCESSIONAIRE to take place at the PREMISES.  Nothing in
this agreement shall be construed to prohibit CONCESSIONAIRE

from contracting with THIRD PARTIES to provide catering services to THIRD PARTIES at the PREMISES. CONCESSIONAIRE is also permitted to utilize the kitchen at PREMISES to prepare food for OFF-PREMISES catering to THIRD PARTIES.

C.     NON-THIRD PARTY EVENT – shall be deemed to be a social event held by committees of NANSEN LODGE for the welfare of NANSEN LODGE at the PREMISES.

D.     OFF-PREMISES CATERING – shall be deemed to be food prepared by the CONCESSIONAIRE at the PREMISES but not consumed on the PREMISES.

E.     COST BASIS-shall be deemed to be the average monthly cost for gas, electric, real estate taxes, water/sewer, refuse pick-up and insurance.

ARTICLE II – PURPOSE AND SCOPE

The CONCESSIONAIRE agrees to make its food catering services available to all THIRD PARTIES who rent the PREMISES from the LICENSEE and to the LICENSEE for events held by the LICENSEE.

ARTICLE III – EXCLUSIVITY

The LICENSEE agrees to make the premises exclusively available to the CONCESSIONAIRE for the service of food to the exclusion of all other CONCESSIONAIRES or CATERERS. LICENSEE agrees to utilize the services of CONCESSIONAIRE for all functions held at the premises involving the service of and consumption of food except for NON-THIRD PARTY EVENTS as noted in ARTICLE I(C).

## ARTICLE IV CHARGES

CONCESSIONAIRE agrees to pay the LICENSEE a sum equal to thirty-one (31%) of CONCESSIONAIRE'S gross revenue collected for catering services provided at THIRD PARTY EVENTS at the PREMISES (except for events held on Monday through Thursday in the daytime for which CONCESSIONAIRE shall pay twenty percent (20%) and events on those days held in the evening for which CONCESSIONAIRE shall pay twenty-five percent (25%) in exchange for LICENSEE granting the CONCESSIONAIRE exclusive use of the PREMISES for catering to the exclusion of all other CATERERS.  LICENSEE will not receive any payment for revenue collected by CONCESSIONAIRE for NON-THIRD PARTY EVENTS, OFF-PREMISE catering business that may be provided to THIRD PARTY EVENTS such as by not limited to balloons, flowers, linens, entertainment, rides, equipment rental etc.

All fees charged for catering services will be established by CONCESSIONAIRE.  Payment due under this agreement shall be made by CONCESSIONAIRE on a monthly basis to RENTAL AGENT.

## ARTICLE V DURATION

A)      This agreement shall continue for a period of five (5) years, commencing on the date of execution of this contract.  LICENSEE and their members and agents and CONCESSIONAIRE will use their best efforts to enter contracts for THIRD PARTY EVENTS and will not engage in any activity or conduct which will unfavorably reflect on the business and reputation of LICENSEE and CONCESSIONAIRE.  CONCESSIONAIRE may assign this agreement in the event

of a sale of CONCESSIONAIRE'S business, with the consent of LICENSEE which consent will not be unreasonably withheld.

B)     CONCESSIONAIRE will have the option to extend this agreement for an additional five (5) year term from January 1, 2015 thru December 31, 2019 , by giving notice to  LICENSEE of it's intention to exercise said option in writing  by June 30, 2014, but in no event prior to June 1, 2014.

C)     The LICENSEE will examine it's annual cost basis for the immediate twelve (12) month period prior to CONCESSIONAIRES exercise of said option. If during said twelve (12) month period and annually for the balance of the term of the option term, the cost basis to OWNER and/or LICENSEE is less than the aggregate amount paid by CONCESSIONAIRE pursuant to Article IV herein, to OWNER and/or LICENSEE for that twelve (12) month period, CONCESSIONAIRE shall have the option to make a lump sum payment to OWNER and/or LICENSEE in an amount equal to the difference between the aggregate amount paid by CONCESSIONAIRE to OWNER and/or LICENSEE and the annual cost basis. Should CONCESSIONAIRE elect not to make the lump sum payment, this agreement shall terminate on the date the last booked THIRD PARTY EVENT is held. CONCESSIONAIRE will, upon election not to pay the lump sum payment, cease entering contracts for THIRD PARTY EVENTS.

D)     The CONCESSIONAIRE shall have a second option to extend this agreement for an additional five (5) year term from January 1, 2020 to December

31, 2024, by giving OWNER notice of it's intention to exercise said option, in

writing, by June 30, 2019 but in no event prior to June 1, 2019.


E)     In the event OWNER elects to sell the PREMISES (as defined herein and as

defined in the PICNIC GROUNDS CONTRACT executed between A TASTE OF

HONEY, INC. and NASEN PROPERTIES, INC. simultaneously herewith),

OWNER hereby grants to CONCESSIONAIRE an exclusive assignable option to

purchase the PREMISES (as defined herein and as defined in the PICNIC

GROUNDS CONTRACT executed between A TASTE OF HONEY, INC. and

NASEN PROPERTIES, INC. simultaneously herewith) . Within thirty (30) days of

NANSEN PROPERTIES, INC. listing the property with a licensed real estate

agency or marketing the property itself, NANSEN PROPERTIES,INC. will give A

TASTE OF HONEY, INC. written notice of it's intentions to sell the property.

Within thirty (30) days of said notice, A TASTE OF HONEY, INC. AND NANSEN

PROPERTIES, INC. will each secure a written appraisal from a licensed NY State

Appraiser and the parties will jointly agree on a third NY State licensed appraiser

and the sale price for the exercise of the aforementioned option shall be the average

of the three (3) appraised values. Should CONCESSIONAIRE elect to purchase the

property the contract shall be drawn in accordance with the usual custom and

practice of Staten Island and shall contain a  standard clause: allowing buyers

sufficient time to conduct environmental studies; allowing a  45 day financing

contingency; providing for marketable title to be delivered to buyer and all other

customary and standard contract terms typically contained in a Staten Island real estate contract.

F)    CONCESSIONAIRE will pay twenty five percent (25%) of the expenses paid by LICENSEEand/or owner to the independent contractor caretaker (presently $11.00 per hour). Any increase in the amount of payment on an hourly basis made to the independent contractor must be approved by CONCESSIONAIRE. LICENSEE/OWNER will pay seventy-five per-cent (75%) of said caretakers expense.

ARTICLE VI  EQUIPMENT

   A.    CONCESSIONAIRE acknowledges that all cooking equipment and utensils located at the PREMISES at the time that CONCESSIONAIRE took occupancy are the property of LICENSEE.  LICENSEE hereby agrees to permit CONCESSIONAIRE to use said equipment in CONCESSIONAIRE'S everyday operation including for OFF-PREMISES catering.  At the termination of this agreement all equipment owned by LICENSEE shall remain the property of LICENSEE.  CONCESSIONAIRE will not remove any tables or chairs from the PREMISES without the prior consent of the LICENSEE.

   B.    Nothing in this agreement shall be construed to prohibit CONCESSIONAIRE from purchasing their own kitchen equipment

and bringing it to the PREMISES for use in CONCESSIONAIRE'S

business.  At the termination of this agreement, CONCESSIONAIRE

shall retain ownership of any equipment purchased by

CONCESSIONAIRE and brought to the PREMISES.

CONCESSIONAIRE shall be responsible for maintaining and

repairing its own equipment.  Attached here to and designated as

SCHEDULE A is a list of all property located in the premises at the

commencement of this agreement which is the property of

LICENSEE.

C.     LICENSEE will repair and maintain/service as necessary all

LICENSEE'S equipment during the term of this agreement.  In the

event an item or equipment can not be repaired but must be replaced,

the LICENSEE shall be responsible for the replacement with

comparable equipment.

ARTICLE VII – MAINTENANCE.

A.     CONCESSIONAIRE agrees to maintain the main lodge hall building,

side rooms, stage, coatroom, Bride's Room, restrooms, kitchen and

bar in a clean and sanitary condition immediately after all contracted

use by CONCESSIONAIRE.  It is further understood that

CONCESSIONAIRE will oversee the cleaning of the kitchen.  Any

landscaping that is required to be done to the PREMISES shall be

done at the sole discretion, cost and expense of LICENSEE.

LICENSEE/OWNER is responsible on at least a weekly basis for

cutting the grass at the PREMISES and maintaining and/or replacing grass as needed so as to maintain the appearance of the premises so that it is suitable for THIRD PARTY EVENTS. Supplies for minor repairs, maintenance and clean up will be provided LICENSEE to CONCESSIONAIRE. In the event any repairs are required to be affected to the PREMISES which will require a skilled craftsman or licensed contractor, LICENSEE shall assume the cost of any such repairs. LICENSEE will be responsible for any structural repairs to the PREMISES including but not limited to gas service, plumbing service and plumbing systems, heating service and heating systems, electrical service and electrical systems, air conditioning service and air conditioning systems, roofing, restrooms, parking lots, sewer lines, ansul systems and any and all structural components of any structure at the PREMISES and replacement of any structural components or structures. LICENSEE agrees to install proper lighting in the PREMISES including the parking lots. LICENSEE shall be responsible for painting the PREMISES as needed and for resurfacing the parking lot as needed.

B.   In the event LICENSEE and CONCESSIONAIRE determine that changes, renovations, alterations or modifications of the existing kitchen facilities of PREMISES are required in order to enhance or facilitate the conduct of CONCESSIONAIRE'S and LICENSEE'S

business, LICENSEE will effect such changes, renovations, modifications or alterations at LICENSEE'S sole cost and expense.

C.  LICENSEE and CONCESSIONAIRE will consult with each other before any such changes, renovations, alterations or modifications are effected to the PREMISES so as to ensure that the catering business is not interfered with by any such work performed.

D.  In the event that CONCESSIONAIRE wishes to suggest and contribute to the cost of any capital improvements, such contribution will be discussed on each improvement's individual merits.

E.  LICENSEE is solely responsible for any modifications, alterations, changes, removals or improvements to the PREMISES that may be required or imposed by New York City Department of Health, New York City Fire Department or any other municipal agency notwithstanding the fact that CONCESSIONAIRE is or may be named on any permit or license issued by any such municipal agency. Any such modifications, alterations, changes, removals or improvements to the premises shall be done in a timely and workmanlike fashion and in such a way and at times so as not to interfere with the conduct of CONCESSIONAIRE'S business.

## ARTICLE VIII – UTILITIES AND SERVICES

A.  LICENSEE will pay the cost of all utility services, (natural gas, electric, water) for the PREMISES as well as all real estate taxes and assessments for the PREMISES.

B.    LICENSEE will be responsible for the cost of trash and refuse

removal and with providing the CONCESSIONAIRE with sufficient

facilities for the safe and clean storage of trash and refuse.

CONCESSIONAIRE will comply with applicable laws regarding

recycling, however, LICENSEE will be responsible for the cost of

trash and refuse removal and with providing the

CONCESSIONAIRE with sufficient facilities for the safe and clean

storage of trash and refuse.  CONCESSIONAIRE will comply with

applicable laws regarding recycling, however, LICENSEE will

provide facilities for the storage of such recyclables.

C.    In the event that an ansul system or other fire protection system,

including sprinkler system, is required to be installed in or at the

PREMISES, the LICENSEE will install same at LICENSEE'S sole

cost and expense.

## ARTICLE IX – CONDITIONS AND COVENANTS

The obligations undertaken by the parties to this agreement shall be

subject to the following conditions and additional covenants:

A.    The CONCESSIONAIRE shall not assign its interest in this

agreement without the written consent of the LICENSEE nor shall the

CONCESSIONAIRE sublicense any use of the premises to any other

personnel or permit any other commercial activity not related to the

catering business at the PREMISES, without the express written consent of the LICENSEE, which will not be unreasonably withheld.

B.   The CONCESSIONAIRE acknowledges its status as an independent contractor and licensee with respect to the PREMISES and is responsible for any damage and injury due to willful or negligent acts of it or its employees.

C.   CONCESSIONAIRE covenants to give written notice to all parties to whom it contracts for the catering of social event to be held on the PREMISES, of its status as an independent contractor and licensee with respect to the PREMISES and its exclusively responsibility as and between the parties hereto, for the fitness of all food provided at social event catering by it. In the event that the CONCESSIONAIRE should fail to give such notice and, as a result thereof, suit is brought against the LICENSEE, the CONCESSIONAIRE agrees to indemnify the LICENSEE and hold the LICENSEE harmless for reasonable legal fees and court costs incurred in lawsuits in which the quality of said food is at issue and in which the LICENSEE has been named as defendant, co-defendant or third-party defendant. Noting in this paragraph shall be construed as a waiver on the part of the LICENSEE for responsibility with respect to the PREMISES.

D.   The CONCESSIONAIRE agrees to maintain such insurance as will protect it from claims under workman's compensation acts and other statutory employee benefits.

E.    The CONCESSIONAIRE shall, at its own expense, obtain an
insurance policy or policies from an insurance carrier or carriers
licensed in the State of New York, which shall insure the LICENSEE
against any and all claims resulting from CONCESSIONAIRE'S use
of the property and service of food in an amount of total coverage to
be no less than ONE MILLION DOLLARS ($1,000,000.00) and, shall
provide LICENSEE with a certificate of insurance demonstrating
compliance with the terms of this Agreement within twenty (20) days
of the execution of this Agreement.  The insurance carrier shall be
directed to provide Notice of Cancellation of said insurance policy to
OWNER.  The referred to policy shall cover the MAIN HALL
BUILDING.

F.    The CONCESSIONAIRE agrees to submit an accident report, on a
form to be provided by the LICENSEE, immediately after any
occurrence, and further to immediately submit an accident report to
the LICENSEE'S insurer, when requested in writing..

G.    The CONCESSIONAIRE agrees to engage only those employees and
subcontractors who are skilled in their trades.

H.    The CONCESSIONAIRE agrees to take all necessary precautions for
the safety of its employees and subcontractors and shall comply with
all applicable provisions of Federal, State, County and Municipal
safety laws and codes to prevent accidents or injury to person on,
about or adjacent to areas in which its employees or subcontractors

are working. CONCESSIONAIRE shall erect and properly maintain at all times, as required by the conditions or its operations, all necessary safeguards for the protection of its employees and subcontractors.

I. The CONCESSIONAIRE must provide a trained fire safety representative in order to comply with government requirements for THIRD PARTY EVENTS.

## ARTICLE X – NEW YORK STATE LIQUOR AUTHORITY APPROVAL

This agreement is subject to the continued renewal by the New York State Liquor Authority of a Petition for approval of Food Concession Arrangement by the CONCESSIONAIRE and LICENSEE. It is understood by the parties hereto that the CONCESSIONAIRE will only provide food and catering services in the main lodge hall and all liquor will be provided by LICENSEE in accordance with applicable regulations of the State of New York Liquor Authority.

In furtherance of the provisions of this Article, LICENSEE, and CONCESSIONAIRE agree that they will enter into a Petition for Approval of a Food Contract Arrangement in accordance with New York State Liquor Authority Form S-29.

## ARTICLE XI – USE OF PREMISES

A. The CONCESSIONAIRE has the use of the PREMISES for THIRD PARTY EVENTS and at other times the LICENSEE will have use of the PREMISES. The LICENSEE will have the PREMISES available

for the CONCESSIONAIRE to show to prospective clients at the times requested. The CONCESSIONAIRE will have the use of the PREMISES on all other dates not indicated in the attached Schedule B.

B.    The main lodge hall building is available for use by the LICENSEE, members of NANSEN LODGE, or non-members.  At all events held at the main lodge hall building except meetings and lodge events, food consumed thereon must be provided by CONCESSIONAIRE.

C.    The CONCESSIONAIRE shall prepare the main hall for scheduled lodge meeting, as per seating plan, and perform the necessary clean-up after meeting.

## ARTICLE XII - AUDIT

In the event LICENSEE determines a discrepancy on two (2) separate occasions, between the actual number of guests at a THIRD PARTY EVENT and the number of guests reported by CONCESSIONAIRE, the LICENSEE shall have the option to perform an audit of CONCESSIONAIRE'S records at LICENSEE'S expense.  Any head count must be verified on the date of the event by a representative of LICENSEE and CONCESSIONAIRE.

## ARTICLE XIII – MISCELLANEOUS

LICENSEE shall be responsible for clearing any and all municipal violations that may be placed against the PREMISES provided however, any such violation is not the result of any act or omission on the part of the CONCESSIONAIRE in furtherance of any responsibility the CONCESSIONAIRE has pursuant to the

terms of this agreement.  In the event a municipal violation is placed against the

PREMISES as a direct result of any omission or commission on the part of the

CONCESSIONAIRE, CONCESSIONAIRE will use its best efforts to cause the

violation to be removed at CONCESSIONAIRE'S sole cost and expense.

LICENSEE agrees to cooperate fully with CONCESSIONAIRE in the event

CONCESSIONAIRE is required hereunder to clear any violation.

LICENSEE will supply alcoholic beverages at events held in the main lodge

hall.  CONCESSIONAIRE will be responsible for hiring and maintaining sufficient

personnel for the preparation and service of the food products prepared by

CONCESSIONAIRE.

CONCESSIONAIRE agrees to make all contractual arrangements for

food/catering with THIRD PARTIES for events to be held on the PREMISES and

that all such arrangements must be on a contractual basis between the

CONCESSIONAIRE and such THIRD PARTIES.

LICENSEE will give CONCESSIONAIRE written notice at least ninety (90)

days prior to an event not included on SCHEDULE B that LICENSEE intends to

utilize any portion of the PREMISES, and LICENSEE will have to use of the

PREMISES on said date provided that date is not already booked or committed by

CONCESSIONAIRE.  If after receiving such Notice of Intent to utilize any portion

of the premises on date not included on SCHEDULE B, CONCESSIONAIRE

receives a request for a THIRD PARTY EVENT, the THIRD PARTY EVENT will

have priority.  It is agreed and understood that all commitments for event submitted

to CONCESSIONAIRE by LICENSEE will be made only by the RENTAL AGENT

for the LICENSEE and that such commitments and arrangements for any such events for the use of the PREMISES will be made only after mutual agreement on the availability of the date between the LICENSEE and the CONCESSIONAIRE. CONCESSIONAIRE will provide the LICENSEE with a monthly report of current and future commitments of the use of the PREMISES, no later than the first (1st) Monday of the month.

IN WITNESS WHEREOF, the parties have signed and affixed their corporate seals to this Agreement the day and year first above written.

**WITNESS**

**NANSEN PROPERTIES, INC.**

By: Christian Logan
    Properties Treasurer

**WITNESS**

Ernest Thorkilder

**NANSEN SOCIAL CLUB, INC.**

By: Ernest Thorkildsen
    Social Bd President

**WITNESS**

Evelyn Rogers, pres

**A TASTE OF HONEY, INC.**

By: Evelyn Rogers, pres

STATE OF NEW YORK            )
COUNTY OF RICHMOND           ) SS.:

ON THE __8__ DAY OF _January_ IN THE YEAR 2009, 2010 BEFORE ME, THE UNDERSIGNED, PERSONALLY APPEARED _Chester Logan_, PERSONALLY KNOWN TO ME OR PROVED TO ME ON THE BASIS OF SATISFACTORY EVIDENCE TO BE THE INDIVIDUAL(S) WHOSE NAME(S) IS (ARE) SUBSCRIBED TO THE WITHIN INSTRUMENT AND ACKNOWLEDGED TO ME THAT HE/SHE/THEY EXECUTED THE SAME IN HIS/HER/THEIR CAPACITY(IES), AND THAT BY HIS/HER/THEIR SIGNATURE(S) ON THE INSTRUMENT, THE INDIVIDUAL(S), OR THE PERSON UPON BEHALF OF WHICH THE INDIVIDUAL(S) ACTED, EXECUTED THE INSTRUMENT.

_Kenneth G Gundersen_

SIGNATURE AND OFFICE OF INDIVIDUAL
TAKING AKNOWLEDGEMENT

KENNETH G. GUNDERSEN
Notary Public, State of New York
No. 01GU6000447
Qualified in Richmond County
Commission Expires Dec. 15, 1999 2013

STATE OF NEW YORK            )
COUNTY OF RICHMOND           ) SS.:


ON THE ___8___ DAY OF _January_ IN THE YEAR ~~2009~~ 2010, BEFORE ME,
THE UNDERSIGNED, PERSONALLY APPEARED _Ernest Thackhart_,
PERSONALLY KNOWN TO ME OR PROVED TO ME ON THE BASIS OF
SATISFACTORY EVIDENCE TO BE THE INDIVIDUAL(S) WHOSE NAME(S) IS
(ARE) SUBSCRIBED TO THE WITHIN INSTRUMENT AND ACKNOWLEDGED
TO ME THAT HE/SHE/THEY EXECUTED THE SAME IN HIS/HER/THEIR
CAPACITY(IES), AND THAT BY HIS/HER/THEIR SIGNATURE(S) ON THE
INSTRUMENT, THE INDIVIDUAL(S), OR THE PERSON UPON BEHALF OF
WHICH THE INDIVIDUAL(S) ACTED, EXECUTED THE INSTRUMENT.



SIGNATURE AND OFFICE OF INDIVIDUAL
TAKING AKNOWLEDGEMENT
~~taste of honey catering dec 28th 99~~

KENNETH G. GUNDERSEN
Notary Public, State of New York
No. 01GU6000447
Qualified in Richmond County
Commission Expires Dec. 18, 1999 -2013

STATE OF NEW YORK      )
COUNTY OF RICHMOND    ) SS.:

ON THE _8_ DAY OF _January_ IN THE YEAR ~~2009~~ *2010*, BEFORE ME,
THE UNDERSIGNED, PERSONALLY APPEARED  EVELYN ROGERS,
PERSONALLY KNOWN TO ME OR PROVED TO ME ON THE BASIS OF
SATISFACTORY EVIDENCE TO BE THE INDIVIDUAL(S) WHOSE NAME(S) IS
(ARE) SUBSCRIBED TO THE WITHIN INSTRUMENT AND ACKNOWLEDGED
TO ME THAT HE/SHE/THEY EXECUTED THE SAME IN HIS/HER/THEIR
CAPACITY(IES), AND THAT BY HIS/HER/THEIR SIGNATURE(S) ON THE
INSTRUMENT, THE INDIVIDUAL(S), OR THE PERSON UPON BEHALF OF
WHICH THE INDIVIDUAL(S) ACTED, EXECUTED THE INSTRUMENT.


_____
SIGNATURE AND OFFICE OF INDIVIDUAL
TAKING AKNOWLEDGEMENT


KENNETH G. GUNDERSEN
Notary Public, State of New York
No. 01GU0000447
Qualified in Richmond County
Commission Expires Dec. 16, ~~1999~~ *2013*



3.1

## PICNIC GROUNDS CONTRACT

THIS AGREEMENT made the ___8___ day of January 2010, 2009, by and between

A TASTE OF HONEY, INC., a New York Corporation with principal offices

located at 3465 Victory Boulevard, Staten Island, NY 10314, hereinafter referred to

as the CATERER and NANSEN PROPERTIES, INC., a New York Corporation,

with its principal office located at 3441 Victory Boulevard, Staten Island, NY   10314

(mailing address P.O. Box 140122 Staten Island, NY 10314-0012), hereinafter

referred to as the OWNER.

WITNESETH:        That the CATERER and the OWNER, for consideration

hereinafter named, mutually agree and covenant as follows:

ARTICLE I – DEFINITION

The following terms, as used herein, shall be construed as follows:

A)      PREMISES – shall be deemed to include all real property with the

buildings and improvements thereon situated and located at 3465 Victory

Boulevard, Chelsea Heights, Staten Island, New York owned by NANSEN

PROPERTIES, INC., including the old lodge hall (small hall), picnic area, athletic

fields, bar-b-que area, rest rooms and parking facilities and specifically excluding

the main lodge hall building and paved parking area surrounding the main lodge

hall building.

B)      THIRD PARTY EVENT – shall be deemed to include any event for

which the rental agents of OWNER have contracted to make the PREMISES

available or any event which has been arranged by CATERER to take place at the

PREMISES.  Nothing in this agreement shall be construed to prohibit CATERER from contracting with THIRD PARTIES to provide catering services to THIRD PARTIES at the PREMISES.  CATERER is also permitted to utilize the kitchen at the PREMISES to prepare food for OFF-PREMISES catering to THIRD PARTIES.

C)   NON-THIRD PARTY EVENT – shall be deemed to include social events held by COMMITTEES OF NANSEN LODGE, INC., for the welfare of NANSEN LODGE, INC. at the premises.

D)   OFF-PREMISES CATERING – shall be deemed to be food prepared by the CATERER at the premises but not consumed on the PREMISES.

E.   COST BASIS-shall be deemed to be the average monthly cost for gas, electric, real estate taxes, water/sewer, refuse pick-up and insurance.


ARTICLE II – PURPOSE AND SCOPE

The CATERER agrees to make its food catering services available to all THIRD PARTIES who rent the PREMISES from the OWNER and to the OWNER for events held by the OWNER.

ARTICLE III – EXCLUSIVITY

The OWNER agrees to make the premises exclusively available to the CATERER for the service of food to the exclusion of all other CATERERS. OWNER agrees to utilize the services of CATERER for all functions held at the PREMISES involving the service of and consumption of food.

ARTICLE IV – EXCEPTIONS TO EXCLUSIVITY

The exclusive license granted to the CATERER in Article III above shall not apply in a case where (i) any NANSEN LODGE COMMITTEE chooses to use the PREMISES for a social event and any committee elects to prepare their own food for said event; (ii) if NANSEN LODGE, INC. elects to use the lodge hall (small hall) and/or picnic area for a social event in conjunction with its normal affairs and the committee

elects to prepare their own food for said event;  (SEE ATTACHED APPENDIX OF DATES, SPECIAL EVENTS AND SOCIAL DIRECTOR'S CALENDAR).  In any of the above cases, the event will be referred to as a NON-THIRD PARTY EVENT. In no way will this paragraph be construed as a prohibition on the part of OWNER from engaging the services of CATERER to provide catering for a NON-THIRD PARTY EVNT.  It is the intention of the parties to this agreement that CATERER have the sole and exclusive right to provide catering services at the PREMISES subject only to the exceptions set forth in this Article IV.

The exceptions hereinabove set forth shall in no way defeat or impair the exclusive rights of the CATERER  in that no other CATERER may cook or prepare food at the PREMISES at any time during the term of this agreement, or cook or prepare food off the PREMISES and bring it to the PREMISES for consumption.

ARTICLE V – CHARGES

The CATERER agrees to pay a sum equal to thirty-one percent (31%) of CATERER'S gross revenue collected for catering services provided at THIRD PARTY EVENTS at the PREMISES in exchange for OWNER granting the

CATERER exclusive use of the premises for catering to the exclusion of all other caterers.  OWNER will not receive any payment for revenue collected by CATERER for NON-THIRD PARTY EVENTS, off-PREMISES catering or other services related to the catering business that may be provided to THIRD PARTY EVENTS such as but not limited to balloons, flowers, linens, entertainment, rides, equipment rental, etc.  OWNER shall not receive any payment for revenues generated by CATERER through the sale of wine or liquor at the picnic grounds.

All fees charged for catering services will be established by CATERER.

ARTICLE VI – DURATION

A)     This agreement shall continue for a period of five (5) years commencing on the date of execution.  OWNER and their members and agents and CATERER will use their best efforts to enter contracts for THIRD PARTY EVENTS and will not engage in any activity or conduct which will unfavorably reflect on the business and reputation of OWNER and CATERER.  CATERER may assign this agreement in the event of a sale of CATERER's business, with the consent of OWNER which consent will not be unreasonably withheld.

B)     CATERER will have the option to extend this agreement for an additional five (5) year term from January 1, 2015 thru December 31, 2019, by giving OWNER notice of it's intention to exercise said option in writing by June 30, 2014, but in no event prior to June 1, 2014.

C) The OWNER will examine it's annual cost basis for the immediate twelve (12) month period prior to CATERER'S exercise of said option. If during said twelve (12) month period and annually for the balance of the term of the option the cost

basis to OWNER  is less than the aggregate amount paid by CATERER to OWNER
and/or LICENSEE pursuant to ARTICLE V herein,  for that twelve (12) month
period, CATERER shall have the option to make a lump sum payment to OWNER
and/or LICENSEE in an amount equal to the difference between the aggregate
amount paid by CATERER  to OWNER  and the annual cost basis. Should the
CATERER elect not to make the lump sum payment, this agreement shall terminate
on the date the last booked THIRD PARTY EVENT is held. CATERER will, upon
election not to pay the lump sum payment, cease entering contracts for THIRD
PARTY EVENTS.

D)  The CATERER shall have a second option to extend this agreement for an
additional five (5) year term from January 1, 2020 to December 31, 2024, by giving
OWNER notice of it's intention to exercise said option, in writing, by June 30, 2019
but in no event priot to June 1, 2019.

E)      In the event OWNER elects to sell the PREMISES (as defined herein and as
defined in the CATERING CONTRACT executed between A TASTE OF HONEY,
INC., NANSEN LODGE SOCIAL CLUB, INC. and NASEN PROPERTIES, INC.
simultaneously herewith) , OWNER hereby grants to CATERER  an exclusive
assignable option to purchase the PREMISES (as defined herein and as defined in
the CATERING CONTRACT executed between A TASTE OF HONEY, INC.,
NANSEN LODGE SOCIAL CLUB, INC. and  NANSEN PROPERTIES, INC.
simultaneously herewith) . Within thirty (30) days of NANSEN PROPERTIES, INC.
listing the property with a licensed real estate agency or marketing the property
itself, NANSEN PROPERTIES,INC. will give A TASTE OF HONEY, INC. written

notice of it's intentions to sell the property. Within thirty (30) days of said notice, A TASTE OF HONEY, INC. AND NANSEN PROPERTIES, INC. will each secure a written appraisal from a licensed NY State Appraiser and the parties will jointly agree on a third NY State licensed appraiser and the sale price for the exercise of the aforementioned option shall be the average of the three (3) appraised values. Should CATERER elect to purchase the property the contract shall be drawn in accordance with the usual custom and practice of Staten Island and shall contain a standard clause: allowing buyers sufficient time to conduct environmental studies; allowing a 45 day financing contingency; providing for marketable title to be delivered to buyer and all other customary and standard contract terms typically contained in a Staten Island real estate contract.

F)      CATERER will pay twenty five percent (25%) of the expenses paid by OWNER and/or owner to the independent contractor caretaker (presently $11.00 per hour). Any increase in the amount of payment on an hourly basis made to the independent contractor must be approved by CATERER. OWNER will pay seventy-five per-cent (75%) of said caretakers expense.


ARTICLE VII – EQUIPMENT

A)      CATERER acknowledges that all cooking equipment and utensils located at the PREMISES at the time that CATERER took occupancy are the property of OWNER. OWNER hereby agrees to permit CATERER to use said equipment in CATERER'S everyday operation including for OFF-PREMISES

catering. At the termination of this agreement all equipment owed by OWNER shall remain the property of OWNER. CATERER will not remove any tables or chairs from the premises without the prior consent of the OWNER.

B) Nothing in this agreement shall be construed to prohibit CATERER from purchasing their own kitchen equipment and bringing it to the PREMISES for use in CATERER'S business. At the termination of this agreement, CATERER shall retain ownership of any equipment purchased by CATERER and brought to the PREMISES. CATERER shall be responsible for maintaining and repairing its own equipment. CATERER shall use reasonable care in the use of OWNER'S equipment. Attached hereto and designated as SCHEDULE A is a list of all property located in the premises at the commencement of this agreement which is the property of OWNER.

C) OWNER will repair OWNER'S kitchen equipment during the term of this agreement as needed. In the event an item of equipment cannot be repaired but must be replaced, the OWNER shall be responsible for the replacement of any equipment with comparable quality equiptment provided same was not damaged by the negligence of the CATERER. SEE SCHEDULE A.

ARTICLE VIII – MAINTENANCE

A) CATERER agrees to be responsible for clean up after all events. Supplies, other than paper towels and plastic garbage bags, for clean up will be provided by OWNER to CATERER. In the event any repairs are required to be affected to the PREMISES which will require a skilled craftsman or licensed contractor, OWNER shall assume the cost of any such repairs. OWNER will be

responsible for any structural repairs to the premises including but not limited to gas service, plumbing service and plumbing systems, heating service and heating systems, electrical service and electrical systems, air conditioning service and air conditioning systems, roofing, restrooms, parking lots, picnic areas, athletic fields, sewer lines, ansul systems and any and all structural components of any structure at the PREMISES and replacement of any structural components or structures. OWNER agrees to install proper lighting in the PREMISES including but not limited to the picnic area, barbecue area, athletic fields, outdoor restrooms and parking lots. OWNER shall be responsible for maintaining the parking lot as needed. Owner, on at least a weekly basis, agrees to cut the grass at the premises and maintain/replace grass as needed so as to maintain the appearance and functionality of the premises for THIRD PARTY EVENTS. Any landscaping that is required to be done to the PREMISES shall be done at the sole discretion, cost and expense of LICENSEE.

B) In the event OWNER and CATERER determine that changes, renovations, alterations or modifications of the existing kitchen facilities or PREMISES are required in order to enhance or facilitate the conduct of CATERER'S and OWNER'S business, OWNER will effect such changes, renovations, modifications or alterations at OWNER'S sole cost and expense.

C) OWNER and CATERER will consult with each other before any such changes, renovations, alterations or modifications are effected to the PREMISES so as to insure that the catering business is not interfered with by any such work performed.

D.    In the event that CONCESSIONAIRE wishes to suggest and contribute to the cost of any capital improvements, such contribution will be discussed on each improvement's individual merits.

E)    OWNER is solely responsible for any modifications, alterations, changes, removals or improvements to the PREMISES that may be required or imposed by New York City Department of Health, New York City Fire Department or any other municipal agency notwithstanding the fact that CATERER is or may be named on any permit or license issued by any such municipal agency. Any such modifications, alterations, changes, removals or improvements to the PREMISES shall be done in a timely and workmanlike fashion and in such a way and at times so as not to interfere with the conduct of CATER'S business.

ARTICLE IX – UTILITIES AND SERVICES

A)    OWNER will pay the cost of all utility services (natural gas, electric, water) to the PREMISES as well as all real estate taxes and assessments for the PREMISES.

B)    OWNER will be responsible for the cost of trash and refuse removal and with providing the caterer with sufficient facilities for the safe and clean storage of trash and refuse. CATERER will comply with applicable laws regarding recycling, however OWNER will provide sufficient facilities for the storage of such recyclables.

C)    In the event that an ansul system or other fire protection system, including a sprinkler system, is required to be installed in or at the PREMISES, the OWNER will install same at OWNER'S sole cost and expense.

## ARTICLE X – CONDITIONS AND COVENANTS

The obligation undertaken by the parties to this agreement shall be subject to the following conditions and additional covenants:

A)      CATERER shall not assign its interest in this agreement without the written consent of the OWNER nor shall the CATERER sub-license any use of the premises to any other personnel or permit any other commercial activity not related to the catering business at the PREMISES, without the written consent of the OWNER, which will not be unreasonably withheld.

B)      CATERER acknowledges its status as an independent contractor and licensee with respect to the PREMISES and is responsible for any damage and injury due to willful or negligent acts of it or it's employees.

C)      CATERER covenants to give written notice to all parties to whom it contracts for the catering of social events to be held on the PREMISES, of its status as an independent contractor and licensee with respect to the PREMISES and of its exclusive responsibility as and between the parties hereto, for the fitness of all food provided at social events catered by it, as well as non-alcoholic beverages provided as an integral part of such service (and alcoholic beverages that may be served pursuant to any licenses held by CATERER). In the event that the CATERER should fail to give such notice and, as a result thereof, suit is brought against the OWNER, the CATERER agrees to indemnify the OWNER and hold the OWNER harmless for reasonable legal fees and court costs incurred in lawsuits in which the quality of said food or beverages is at issue and in which the OWNER has been named the defendant and/or third party defendant. Nothing in th is paragraph

utilize said old lodge hall (small hall) for a THIRD PARTY EVENT. OWNER will attempt to have the PREMISES available for the CATERER to show to prospective clients at the times requested. CATERER may book events in advance of any dates not listed in SCHEDULE B.

The old lodge hall (small hall) is available for use by OWNER and during such use OWNER may bring in prepared food or serve food provided by CATERER.

ARTICLE XIII – MISCELLANEOUS

OWNER shall be responsible for clearing any and all municipal violations that may be placed against the PREMISES provided, however, any such violation is not the result of any act or omission on the part of the CATERER in furtherance of any responsibility the CATERER has pursuant to the terms of this agreement. In the event a municipal violation is placed against the PREMISES as a direct result of any omission or commission on the part of the CATERER, CATERER will use its best efforts to cause the violation to be removed at CATERER'S sole cost and expense. OWNER agrees to cooperate fully with CATERER in the event CATERER is required hereunder to clear any violations.

CATERER agrees to make all contractual arrangements with THIRD PARTIES for events to be held on the PREMISES and that all such arrangement must be on a contractual basis between the CATERER and such THIRD PARTIES.

OWNER will give CATERER written notice at least ninety (90) days prior to an event not included on SCHEDULE B that OWNER intends to utilize any portion

of the premises AND owner will have the use of the PREMISES on said date provided that date is not already booked or committed by CATERER.

It is agreed and understood that al commitments for events submitted to CATERER by OWNER will be made only by the RENTAL AGENT for the OWNER and that such commitments and arrangements for any such events for the use of the PREMISES will be made only after mutual agreement on the availability of the date between the OWNER and the CATERER. CATERER will provide the OWNER with a monthly report of current and future commitments for the use of the PREMISES no later than the first Monday of the month.

IN WITNESS WHEREOF, the parties have signed and affixed their corporate seals to this agreement the day and year first above written.

WITNESS

NANSEN PROPERTIES, INC.

BY: *Christian Logan*
*Properties Treasurer*

WITNESS

A TASTE OF HONEY, INC.

BY: EVELYN ROGERS, PRES

*Evelyn Rogers, pres*

STATE OF NEW YORK )
COUNTY OF RICHMOND ) SS.:

ON THE __8__ DAY OF _January_ IN THE YEAR 2009, 2010 BEFORE ME, THE UNDERSIGNED, PERSONALLY APPEARED EVELYN ROGERS, PERSONALLY KNOWN TO ME OR PROVED TO ME ON THE BASIS OF SATISFACTORY EVIDENCE TO BE THE INDIVIDUAL(S) WHOSE NAME(S) IS (ARE) SUBSCRIBED TO THE WITHIN INSTRUMENT AND ACKNOWLEDGED TO ME THAT HE/SHE/THEY EXECUTED THE SAME IN HIS/HER/THEIR CAPACITY(IES), AND THAT BY HIS/HER/THEIR SIGNATURE(S) ON THE INSTRUMENT, THE INDIVIDUAL(S), OR THE PERSON UPON BEHALF OF WHICH THE INDIVIDUAL(S) ACTED, EXECUTED THE INSTRUMENT.

SIGNATURE AND OFFICE OF INDIVIDUAL
TAKING AKNOWLEDGEMENT

KENNETH G. GUNDERSEN
Notary Public, State of New York
No. 01GU6000447
Qualified in Richmond County
Commission Expires Dec. 15, 1996 2013

STATE OF NEW YORK          )
COUNTY OF RICHMOND      ) SS.:

ON THE __8__ DAY OF __January__ IN THE YEAR 2009, *2010*, BEFORE ME, THE UNDERSIGNED, PERSONALLY APPEARED __Christa Logg)__ PERSONALLY KNOWN TO ME OR PROVED TO ME ON THE BASIS OF SATISFACTORY EVIDENCE TO BE THE INDIVIDUAL(S) WHOSE NAME(S) IS (ARE) SUBSCRIBED TO THE WITHIN INSTRUMENT AND ACKNOWLEDGED TO ME THAT HE/SHE/THEY EXECUTED THE SAME IN HIS/HER/THEIR CAPACITY(IES), AND THAT BY HIS/HER/THEIR SIGNATURE(S) ON THE INSTRUMENT, THE INDIVIDUAL(S), OR THE PERSON UPON BEHALF OF WHICH THE INDIVIDUAL(S) ACTED, EXECUTED THE INSTRUMENT.

_____
SIGNATURE AND OFFICE OF INDIVIDUAL TAKING AKNOWLEDGEMENT

~~Taste of honey picnic 12-29-09~~

KENNETH G. GUNDERSEN
Notary Public, State of New York
No. 01GU6000447
Qualified in Richmond County
Commission Expires Dec. 19, 1999 *2013*



ATOA "Package deal" Info

**From:** drogers428@aol.com
**To:** ERogers276@aol.com; TThor353@aol.com
**Subject:** Re: Minutes from Dec 16 2008 Joint Board Meeting, Request for "Breakdown Cha...
**Date:** Mon, 5 Jan 2009 10:15 am

Christine-Unfortunately it's 9:30AM on Monday and I am looking at this request for the first time. Since I will be leaving work shortly, I am going to have to give you very brief answers.

1. Regarding a chart-I don't believe that it is possible to create a chart that will cover all situations. Prices change annually(both food and bar), and we create "custom menus" on a regular basis. We have weekday rates as well as weekend rates and people can substitute items on any of our standard menus. Having said that, at least 80% of our parties fall into two categories. A Standard Package(Club 16 being the most popular) or a Non package. I believe that the chart that I gave you and Chris is the best I can do. I will quickly give two examples based on December parties to illustrate:

Package Party-Club 16-Donna Smith 12/6/08
Package Price$43/pp
Plate Charge $2.50/pp
Service Charge $5.00/pp
BWS Bar Incl $9.00
Choc Fountain Incl $4.50
Balloon Trees Incl $1.00/pp
Net Food Cost $21.00/pp x 125 Guests @ 31% = $813.75 Rent

Non Package Party-St Vincent's- 12/18/08
Non Package Price $21/pp
Plate Charge $2.50
Service Charge $5.00/pp
Net Food Cost $13.50/pp x 95 Guests @ 25% = 320.63 Rent

2. Promotional Parties -There are two groups. Powerful You and The Business Guild. We make no money on these events.
Once again, I will give an example from December.

Powerful You -12/11/08
26 People Attended which is more than usual since it was their Christmas Meeting. Normal Headcount would be around 15 people. We Billed 26 @ $15= $390 for Food Coffee, Tea, Linen & Service. The Waitress Receives $100 of the $390.

3. Member Discounts.  The easiest way to do this again, is using the two parties above.

If Donna Smith were a member- Her discount would be 10% of $43 or $4.30/pp plus she would save 18% of $4.30 on Service.
If St Vincent's were a member-The Discount would be 10% of $21 or $2.10/pp plus they would save 18% of $2.10 on Service.

The main reason that it has been done this way is to simplify the transaction between the member and our Office Staff.  We don't expect everyone to understand how we arrive at our food cost and we really don't don't want to share the details of our rental agreement with staff and others.  This is your discount and we will be happy to administer it however you want.

Sorry, but this is the best I can do given the timeframe.  I'm off to work and will be gone all day.





Case 1:13-cv-02572-PKC Document 1 Filed 04/27/13 Page 113 of 181 PageID # 113

| | | |
|---|---|---|
| Form **990** | **Return of Organization Exempt From Income Tax** | OMB No. 1545-0047 |

**Return of Organization Exempt From Income Tax**

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code
(except black lung benefit trust or private foundation)

**2005**

Department of the Treasury
Internal Revenue Service

▶ The organization may have to use a copy of this return to satisfy state reporting requirements.

**Open to Public Inspection**

**A** For the 2005 calendar year, or tax year beginning _____ , 2005, and ending _____

**B** Check if applicable:

- ☐ Address change
- ☐ Name change
- ☐ Initial return
- ☐ Final return
- ☐ Amended return
- ☐ Application pending

Please use IRS label or print or type. See specific instructions.

Nansen Lodge , No 410, District 3
Sons of Norway
P.O. Box 140122
Staten Island, NY 10314

**D** Employer Identification Number
13-2881755

**E** Telephone number

**F** Accounting method: ☒ Cash ☐ Accrual ☐ Other (specify) ▶

● Section 501(c)(3) organizations and 4947(a)(1) nonexempt charitable trusts must attach a completed Schedule A (Form 990 or 990-EZ).

**H and I are not applicable to section 527 organizations.**

**H (a)** Is this a group return for affiliates? . . . . ☐ Yes ☒ No

**G** Web site: ▶ N/A

**H (b)** If 'Yes,' enter number of affiliates ▶

**J** Organization type (check only one) . . . . . . ▶ ☒ 501(c) 8 ◀ (insert no.) ☐ 4947(a)(1) or ☐ 527

**H (c)** Are all affiliates included? . . . . ☐ Yes ☐ No (If 'No,' attach a list. See instructions.)

**K** Check here ▶ ☐ if the organization's gross receipts are normally not more than $25,000. The organization need not file a return with the IRS; but if the organization chooses to file a return, be sure to file a complete return. **Some states require a complete return.**

**H (d)** Is this a separate return filed by an organization covered by a group ruling? ☒ Yes ☐ No

**I** Group Exemption Number . . . ▶ 0108

**L** Gross receipts: Add lines 6b, 8b, 9b, and 10b to line 12 . . ▶ 23,633.

**M** Check ▶ ☒ if the organization is not required to attach Schedule B (Form 990, 990-EZ, or 990-PF).

**Part I** Revenue, Expenses, and Changes in Net Assets or Fund Balances (See Instructions)

| | | | |
|---|---|---|---|
| 1 | Contributions, gifts, grants, and similar amounts received: | | |
| a | Direct public support . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1a | |
| b | Indirect public support . . . . . . . . . . . . . . . . . . . . . . . . . | 1b | |
| c | Government contributions (grants) . . . . . . . . . . . . . . . . | 1c | |
| d | Total (add lines 1a through 1c) (cash $ _____ noncash $ _____ ) | 1d | |
| 2 | Program service revenue including government fees and contracts (from Part VII, line 93) . . . . | 2 | 0. |
| 3 | Membership dues and assessments . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 | 3,390. |
| 4 | Interest on savings and temporary cash investments . . . . . . . . . . . . . . . . | 4 | 1,041. |
| 5 | Dividends and interest from securities . . . . . . . . . . . . . . . . . . . . . . . . | 5 | |
| 6a | Gross rents . . . . . . . . . . . . . . . . . . . | 6a | |
| b | Less: rental expenses . . . . . . . . . . . | 6b | |
| c | Net rental income or (loss) (subtract line 6b from line 6a) . . . . . . . . . . . | 6c | |
| 7 | Other investment income (describe . . . . . ▶ _____ ) | 7 | |
| 8a | Gross amount from sales of assets other than inventory . . . . | (A) Securities 8a | (B) Other |
| b | Less: cost or other basis and sales expenses . . . . . | 8b | |
| c | Gain or (loss) (attach schedule) . . . . . . . . | 8c | |
| d | Net gain or (loss) (combine line 8c, columns (A) and (B)) . . . . . . . . . . . . | 8d | |
| 9 | Special events and activities (attach schedule). If any amount is from **gaming,** check here . . . . ▶ ☐ | | |
| a | Gross revenue (not including $ _____ of contributions reported on line 1a) . . . . . . . . . . | 9a | 19,202. |
| b | Less: direct expenses other than fundraising expenses . . . . . . . . . . . . . . . | 9b | 9,304. |
| c | Net income or (loss) from special events (subtract line 9b from line 9a) . . . . . . . Statement 1 | 9c | 9,898. |
| 10a | Gross sales of inventory, less returns and allowances . . . . | 10a | |
| b | Less: cost of goods sold . . . . . . . . . . . . | 10b | |
| c | Gross profit or (loss) from sales of inventory (attach schedule) (subtract line 10b from line 10a) . | 10c | |
| 11 | Other revenue (from Part VII, line 103) . . . . . . . . . . . . . . . . . . . . . . . | 11 | |
| 12 | **Total revenue** (add lines 1d, 2, 3, 4, 5, 6c, 7, 8d, 9c, 10c, and 11) . . . . . . . . | 12 | 14,329. |
| 13 | Program services (from line 44, column (B)) . . . . . . . . . . . . . . . . . . | 13 | |
| 14 | Management and general (from line 44, column (C)) . . . . . . . . . . . . . . | 14 | |
| 15 | Fundraising (from line 44, column (D)) . . . . . . . . . . . . . . . . . . . . | 15 | |
| 16 | Payments to affiliates (attach schedule) . . . . . . . . . . . . . . . . . . . . | 16 | |
| 17 | **Total expenses** (add lines 16 and 44, column (A)) . . . . . . . . . . . . . . | 17 | 15,334. |
| 18 | Excess or (deficit) for the year (subtract line 17 from line 12) . . . . . . . . . . | 18 | -1,005. |
| 19 | Net assets or fund balances at beginning of year (from line 73, column (A)) . . . . | 19 | 164,549. |
| 20 | Other changes in net assets or fund balances (attach explanation) . . . . . . . . | 20 | |
| 21 | Net assets or fund balances at end of year (combine lines 18, 19, and 20) . . . . . . | 21 | 163,544. |

**BAA For Privacy Act and Paperwork Reduction Act Notice, see the separate instructions.**

TEEA0109L 02/03/06

Form **990** (2005)

13-2861755

**Part II Statement of Functional Expenses** All organizations must complete column (A). Columns (B), (C), and (D) are required for section 501(c)(3) and (4) organizations and section 4947(a)(1) nonexempt charitable trusts but optional for others.

Page 2

| Do not include amounts reported on line 6b, 8b, 9b, 10b, or 16 of Part I. | | (A) Total | (B) Program services | (C) Management and general | (D) Fundraising |
|---|---|---|---|---|---|
| 22 Grants and allocations (att sch) (cash $ ___ non-cash $ ___) If this amount includes foreign grants, check here ▶ | 22 | | | | |
| 23 Specific assistance to individuals (att sch) | 23 | | | | |
| 24 Benefits paid to or for members (att sch) | 24 | | | | |
| 25 Compensation of officers, directors, etc. | 25 | 0. | | | |
| 26 Other salaries and wages | 26 | | | | |
| 27 Pension plan contributions | 27 | | | | |
| 28 Other employee benefits | 28 | | | | |
| 29 Payroll taxes | 29 | | | | |
| 30 Professional fundraising fees | 30 | | | | |
| 31 Accounting fees | 31 | 1,500. | | | |
| 32 Legal fees | 32 | | | | |
| 33 Supplies | 33 | | | | |
| 34 Telephone | 34 | | | | |
| 35 Postage and shipping | 35 | 1,076. | | | |
| 36 Occupancy | 36 | | | | |
| 37 Equipment rental and maintenance | 37 | | | | |
| 38 Printing and publications | 38 | | | | |
| 39 Travel | 39 | | | | |
| 40 Conferences, conventions, and meetings | 40 | | | | |
| 41 Interest | 41 | | | | |
| 42 Depreciation, depletion, etc (attach schedule) | 42 | 178. | | | |
| 43 Other expenses not covered above (itemize): | | | | | |
| a See Statement 2 | 43a | 12,580. | | | |
| b | 43b | | | | |
| c | 43c | | | | |
| d | 43d | | | | |
| e | 43e | | | | |
| f | 43f | | | | |
| g | 43g | | | | |
| 44 Total functional expenses. Add lines 22 through 43. (Organizations completing columns (B) - (D), carry these totals to lines 13 - 15) | 44 | 15,334. | | | |

**Joint Costs.** Check ▶ ☐ if you are following SOP 98-2.
Are any joint costs from a combined educational campaign and fundraising solicitation reported in (B) Program services? N/A ▶ ☐ Yes ☐ No
If 'Yes,' enter (i) the aggregate amount of these joint costs $ ___; (ii) the amount allocated to Program services $ ___; (iii) the amount allocated to Management and general $ ___; and (iv) the amount allocated to Fundraising $ ___

BAA

TEEA0102L 11/01/05

Form **990** (2005)   Nansen Lodge , No 410,  District 3          13-2881755          Page **3**

## Part III   Statement of Program Service Accomplishments                     N/A

Form 990 is available for public inspection and, for some people, serves as the primary or sole source of information about a particular organization. How the public perceives an organization in such cases may be determined by the information presented on its return. Therefore, please make sure the return is complete and accurate and fully describes, in Part III, the organization's programs and accomplishments.

What is the organization's primary exempt purpose? ▶ _____

| All organizations must describe their exempt purpose achievements in a clear and concise manner. State the number of clients served, publications issued, etc. Discuss achievements that are not measurable. (Section 501(c)(3) and (4) organizations and 4947(a)(1) nonexempt charitable trusts must also enter the amount of grants and allocations to others.) | Program Service Expenses (Required for 501(c)(3) and (4) organizations and 4947(a)(1) trusts; but optional for others.) |
|---|---|
| **a** _____<br>_____<br>_____<br>_____<br>(Grants and allocations    $            ) If this amount includes foreign grants, check here . . ▶ ☐ | |
| **b** _____<br>_____<br>_____<br>_____<br>(Grants and allocations    $            ) If this amount includes foreign grants, check here . . ▶ ☐ | |
| **c** _____<br>_____<br>_____<br>_____<br>(Grants and allocations    $            ) If this amount includes foreign grants, check here . . ▶ ☐ | |
| **d** _____<br>_____<br>_____<br>_____<br>(Grants and allocations    $            ) If this amount includes foreign grants, check here . . ▶ ☐ | |
| **e** Other program services . . . . . . . . . . . . . . . . . . . . . . . . . . . .<br>(Grants and allocations    $            ) If this amount includes foreign grants, check here . . ▶ ☐ | |
| **f  Total of Program Service Expenses** (should equal line 44, column (B), Program services) . . . . . . . . . . . . . . . . . . ▶ | |

**BAA**

Form **990** (2005)

Form 990 (2005)   Nansen Lodge , No 410,  District 3                    13-2881755          Page 4

**Part IV**  **Balance Sheets** (See Instructions)

Note:  Where required, attached schedules and amounts within the description column should be for end-of-year amounts only.

| | | | (A) Beginning of year | | (B) End of year |
|---|---|---|---|---|---|
| **A S S E T S** | 45 | Cash — non-interest-bearing.................................... | | 45 | |
| | 46 | Savings and temporary cash investments............................. | 2,338. | 46 | 1,388. |
| | | | 64,924. | | 68,047. |
| | 47a | Accounts receivable.................. 47a | | | |
| | b | Less: allowance for doubtful accounts ....... 47b | | 47c | |
| | 48a | Pledges receivable.................. 48a | | | |
| | b | Less: allowance for doubtful accounts ....... 48b | | 48c | |
| | 49 | Grants receivable ........................................... | | 49 | |
| | 50 | Receivables from officers, directors, trustees, and key employees (attach schedule). | | 50 | |
| | 51a | Other notes & loans receivable (attach sch)... See. St. 3.  51a  93,109. | | | |
| | b | Less: allowance for doubtful accounts ........... 51b | | 51c | |
| | 52 | Inventories for sale or use.................................. | 93,109. | 52 | 93,109. |
| | 53 | Prepaid expenses and deferred charges......................... | 3,000. | 53 | |
| | 54 | Investments — securities (attach schedule) ......... ☐ Cost ☐ FMV | | 54 | |
| | 55a | Investments — land, buildings, & equipment: basis  55a | | | |
| | b | Less: accumulated depreciation (attach schedule)........  55b | | 55c | |
| | 56 | Investments — other (attach schedule)........... See. Stmt. 4. | 1,000. | 56 | 1,000. |
| | 57a | Land, buildings, and equipment: basis...........  57a  1,762. | | | |
| | b | Less: accumulated depreciation (attach schedule)... Statement. 5...  57b  1,762. | | 57c | |
| | 58 | Other assets (describe ► | 178. | 58 | |
| | 59 | **Total assets** (must equal line 74). Add lines 45 through 58. | 164,549. | 59 | 163,544. |
| **L I A B I L I T I E S** | 60 | Accounts payable and accrued expenses.......................... | | 60 | |
| | 61 | Grants payable............................................. | | 61 | |
| | 62 | Deferred revenue.......................................... | | 62 | |
| | 63 | Loans from officers, directors, trustees, and key employees (attach schedule)..... | | 63 | |
| | 64a | Tax-exempt bond liabilities (attach schedule).................. | | 64a | |
| | b | Mortgages and other notes payable (attach schedule)........... | | 64b | |
| | 65 | Other liabilities (describe ► | | 65 | |
| | 66 | **Total liabilities.** Add lines 60 through 65. | 0. | 66 | 0. |
| **N E T  A S S E T S  O R  F U N D  B A L A N C E S** | Organizations that follow SFAS 117, check here ► [X] and complete lines 67 through 69 and lines 73 and 74. | | | | |
| | 67 | Unrestricted ............................................. | 139,162. | 67 | 135,934. |
| | 68 | Temporarily restricted...................................... | 25,387. | 68 | 27,610. |
| | 69 | Permanently restricted..................................... | | 69 | |
| | Organizations that do not follow SFAS 117, check here ► ☐ and complete lines 70 through 74. | | | | |
| | 70 | Capital stock, trust principal, or current funds................. | | 70 | |
| | 71 | Paid-in or capital surplus, or land, building, and equipment fund ........... | | 71 | |
| | 72 | Retained earnings, endowment, accumulated income, or other funds ........... | | 72 | |
| | 73 | **Total net assets or fund balances** (add lines 67 through 69 or lines 70 through 72; column (A) **must** equal line 19; column (B) **must** equal line 21). | 164,549. | 73 | 163,544. |
| | 74 | **Total liabilities and net assets/fund balances.** Add lines 66 and 73. | 164,549. | 74 | 163,544. |

BAA                                                                Form **990** (2005)

Form 990 (2005) Nansen Lodge , No 410, District 3  13-2881755  Page 5

## Part IV-A Reconciliation of Revenue per Audited Financial Statements with Revenue per Return (See instructions.)

| | | | |
|---|---|---|---|
| a | Total revenue, gains, and other support per audited financial statements | a | 14,329. |
| b | Amounts included on line a but not on Part I, line 12: | | |
| | 1 Net unrealized gains on investments | b1 | |
| | 2 Donated services and use of facilities | b2 | |
| | 3 Recoveries of prior year grants | b3 | |
| | 4 Other (specify): _____ | b4 | |
| | Add lines b1 through b4 | b | |
| c | Subtract line b from line a | c | 14,329. |
| d | Amounts included on Part I, line 12, but not on line b: | | |
| | 1 Investment expenses not included on Part I, line 6b | d1 | |
| | 2 Other (specify): _____ | d2 | |
| | Add lines d1 and d2 | d | |
| e | Total revenue (Part I, line 12). Add lines c and d | e | 14,329. |

## Part IV-B Reconciliation of Expenses per Audited Financial Statements with Expenses per Return

| | | | |
|---|---|---|---|
| a | Total expenses and losses per audited financial statements | a | 15,334. |
| b | Amounts included on line a but not on Part I, line 17: | | |
| | 1 Donated services and use of facilities | b1 | |
| | 2 Prior year adjustments reported on Part I, line 20 | b2 | |
| | 3 Losses reported on Part I, line 20 | b3 | |
| | 4 Other (specify): _____ | b4 | |
| | Add lines b1 through b4 | b | |
| c | Subtract line b from line a | c | 15,334. |
| d | Amounts included on Part I, line 17, but not on line a: | | |
| | 1 Investment expenses not included on Part I, line 6b | d1 | |
| | 2 Other (specify): _____ | d2 | |
| | Add lines d1 and d2 | d | |
| e | Total expenses (Part I, line 17). Add lines c and d | e | 15,334. |

## Part V-A Current Officers, Directors, Trustees, and Key Employees (List each person who was an officer, director, trustee, or key employee at any time during the year even if they were not compensated.) (See the instructions.)

| (A) Name and address | (B) Title and average hours per week devoted to position | (C) Compensation (if not paid, enter -0-) | (D) Contributions to employee benefit plans and deferred compensation plans | (E) Expense account and other allowances |
|---|---|---|---|---|
| Leonard Dahl c/o P O Box 140122 Staten Island, NY 10314 | Vice President 0 | 0. | 0. | 0. |
| Kenneth Gundersen 374 Demorest Avenue Staten Island, NY 10314 | President 0 | 0. | 0. | 0. |
| Eleanor Tollerson 738 Warwick Avenue Staten Island, NY 10314 | Secretary 0 | 0. | 0. | 0. |
| Richard Maren 2207 Courtney Lane Somerset, NJ 08873 | Treasurer 0 | 0. | 0. | 0. |
| | | | | |
| | | | | |
| | | | | |

BAA  TEEA0105L 10/17/05  Form 990 (2005)

Form 990 (2005) Nansen Lodge , No 410,  District 3          13-2881755      Page 6

## Part V-A Current Officers, Directors, Trustees, and Key Employees (continued)

|  | Yes | No |
|---|---|---|
| **75 a** Enter the total number of officers, directors, and trustees permitted to vote on organization business as board meetings. ► 4 | | |
| **b** Are any officers, directors, trustees, or key employees listed in Form 990, Part V-A, or highest compensated employees listed in Schedule A, Part I, or highest compensated professional and other independent contractors listed in Schedule A, Part II-A or II-B, related to each other through family or business relationships? If 'Yes,' attach a statement that identifies the individuals and explains the relationship(s).......................................................... **75b** | | X |
| **c** Do any officers, directors, trustees, or key employees listed in form 990, Part V-A, or highest compensated employees listed in Schedule A, Part I, or highest compensated professional and other independent contractors listed in Schedule A, Part II-A or II-B, receive compensation from any other organizations, whether tax exempt or taxable, that are related to this organization through common supervision or common control?........................................ **75c** | | X |
| **Note.** Related organizations include section 509(a)(3) supporting organizations. | | |
| If 'Yes,' attach a statement that identifies the individuals, explains the relationship between this organization and the other organization(s), and describes the compensation arrangements, including amounts paid to each individual by each related organization | | |
| **d** Does the organization have a written conflict of interest policy?........................................ **75d** | X | |

## Part V-B Former Officers, Directors, Trustees, and Key Employees That Received Compensation or Other Benefits (If any former officer, director, trustee, or key employee received compensation or other benefits (described below) during the year, list that person below and enter the amount of compensation or other benefits in the appropriate column. See the instructions.)

| (A) Name and address | (B) Loans and Advances | (C) Compensation | (D) Contributions to employee benefit plans and deferred compensation plans | (E) Expense account and other allowances |
|---|---|---|---|---|
| - - - - - - - - - - - - - - - | | | | |
| - - - - - - - - - - - - - - - | | | | |
| - - - - - - - - - - - - - - - | | | | |
| - - - - - - - - - - - - - - - | | | | |
| - - - - - - - - - - - - - - - | | | | |
| - - - - - - - - - - - - - - - | | | | |
| - - - - - - - - - - - - - - - | | | | |
| - - - - - - - - - - - - - - - | | | | |
| - - - - - - - - - - - - - - - | | | | |

## Part VI Other Information (See the instructions.)

|  |  | Yes | No |
|---|---|---|---|
| **76** Did the organization engage in any activity not previously reported to the IRS? If 'Yes,' attach a detailed description of each activity........................................ | **76** | | X |
| **77** Were any changes made in the organizing or governing documents but not reported to the IRS?.................... | **77** | | X |
| If 'Yes,' attach a conformed copy of the changes. | | | |
| **78a** Did the organization have unrelated business gross income of $1,000 or more during the year covered by this return? .. | **78a** | | X |
| **b** If 'Yes,' has it filed a tax return on **Form 990-T** for this year?........................................ | **78b** | N/A | |
| **79** Was there a liquidation, dissolution, termination, or substantial contraction during the year? If 'Yes,' attach a statement........................................ | **79** | | X |
| **80a** Is the organization related (other than by association with a statewide or nationwide organization) through common membership, governing bodies, trustees, officers, etc, to any other exempt or nonexempt organization?.............. | **80a** | X | |
| **b** If 'Yes,' enter the name of the organization ► See Statement 6 | | | |
| and check whether it is ☒ exempt **or** ☒ nonexempt. | | | |
| **81a** Enter direct and indirect political expenditures. (See line 81 instructions.)................ **81a**    0. | | | |
| **b** Did the organization file **Form 1120-POL** for this year?........................................ | **81b** | | X |

BAA                                          Form **990** (2005)

Form 990 (2005)   Nansen Lodge , No 410,  District 3          13-2881755          Page 7

**Part VI** | **Other Information** (continued)

|  |  | Yes | No |
|---|---|---|---|
| 82 a Did the organization receive donated services or the use of materials, equipment, or facilities at no charge or at substantially less than fair rental value?............................................................ | 82a |  | X |
| b If 'Yes,' you may indicate the value of these items here. Do not include this amount as revenue in Part I or as an expense in Part II. (See instructions in Part III.) .............. | 82b | N/A |  |  |
| 83 a Did the organization comply with the public inspection requirements for returns and exemption applications?.......... | 83a | X |  |
| b Did the organization comply with the disclosure requirements relating to quid pro quo contributions?................... | 83b | X |  |
| 84 a Did the organization solicit any contributions or gifts that were not tax deductible?............................ | 84a |  | X |
| b If 'Yes,' did the organization include with every solicitation an express statement that such contributions or gifts were not tax deductible?...................................................... | 84b | N/A |  |
| 85   501(c)(4), (5), or (6) organizations. a Were substantially all dues nondeductible by members?..... | 85a | N/A |  |
| b Did the organization make only in-house lobbying expenditures of $2,000 or less?.................... | 85b | N/A |  |
| If 'Yes' was answered to either 85a or 85b, **do not** complete 85c through 85h below unless the organization received a waiver for proxy tax owed for the prior year. |  |  |  |
| c Dues, assessments, and similar amounts from members............................ | 85c | N/A |  |  |
| d Section 162(e) lobbying and political expenditures........................... | 85d | N/A |  |  |
| e Aggregate nondeductible amount of section 6033(e)(1)(A) dues notices............ | 85e | N/A |  |  |
| f Taxable amount of lobbying and political expenditures (line 85d less 85e)............. | 85f | N/A |  |  |
| g Does the organization elect to pay the section 6033(e) tax on the amount on line 85f?.......................... | 85g | N/A |  |
| h If section 6033(e)(1)(A) dues notices were sent, does the organization agree to add the amount on line 85f to its reasonable estimate of dues allocable to nondeductible lobbying and political expenditures for the following tax year? | 85h | N/A |  |
| 86   501(c)(7) organizations. Enter:  a  Initiation fees and capital contributions included on line 12.......................................................... | 86a | N/A |  |  |
| b Gross receipts, included on line 12, for public use of club facilities....................... | 86b | N/A |  |  |
| 87   501(c)(12) organizations. Enter:  a  Gross income from members or shareholders......... | 87a | N/A |  |  |
| b Gross income from other sources. (Do not net amounts due or paid to other sources against amounts due or received from them.)................................. | 87b | N/A |  |  |
| 88   At any time during the year, did the organization own a 50% or greater interest in a taxable corporation or partnership, or an entity disregarded as separate from the organization under Regulations sections 301.7701-2 and 301.7701-3? If 'Yes,' complete Part IX............................................................ | 88 | X |  |
| 89 a 501(c)(3) organizations. Enter: Amount of tax imposed on the organization during the year under: section 4911 ► _____ N/A ; section 4912 ► _____ N/A ; section 4955 ► _____ N/A |  |  |  |
| b 501(c)(3) and 501(c)(4) organizations. Did the organization engage in any section 4958 excess benefit transaction during the year or did it become aware of an excess benefit transaction from a prior year? If 'Yes,' attach a statement explaining each transaction............................................................ | 89b | N/A |  |
| c Enter: Amount of tax imposed on the organization managers or disqualified persons during the year under sections 4912, 4955, and 4958............................................... ► | | | N/A |
| d Enter: Amount of tax on line 89c, above, reimbursed by the organization................................... ► | | | N/A |
| 90 a List the states with which a copy of this return is filed ►  None |  |  |  |
| b Number of employees employed in the pay period that includes March 12, 2005 (See instructions.) .................. | 90b | | 0 |

91 a The books are in care of ►  Richard Maren _____    Telephone number ► _____

Located at ►  2207 Courtney Lane, Somerset NJ _____    ZIP + 4 ►  08873

|  |  | Yes | No |
|---|---|---|---|
| b At any time during the calendar year, did the organization have an interest in or a signature or other authority over a financial account in a foreign country (such as a bank account, securities account, or other financial account)?......... | 91b |  | X |
| If 'Yes,' enter the name of the foreign country ► _____ |  |  |  |
| See the instructions for exceptions and filing requirements for Form TD F 90-22.1, Report of Foreign Bank and Financial Statements |  |  |  |
| c At any time during the calendar year, did the organization maintain an office outside of the United States?............. | 91c |  | X |
| If 'Yes,' enter the name of the foreign country .. ► _____ |  |  |  |

92   Section 4947(a)(1) nonexempt charitable trusts filing Form 990 in lieu of **Form 1041** – Check here.................... N/A... ► ☐

and enter the amount of tax-exempt interest received or accrued during the tax year..................... ► | 92 | | N/A

BAA                                                                                              Form **990** (2005)

Form 990 (2005) Nansen Lodge , No 410, District 3          13-2881755          Page **8**

## Part VII Analysis of Income-Producing Activities *(See the instructions.)*

Note: *Enter gross amounts unless otherwise indicated.*

| | Unrelated business income | | Excluded by section 512, 513, or 514 | | (E) Related or exempt function income |
|---|---|---|---|---|---|
| | (A) Business code | (B) Amount | (C) Exclusion code | (D) Amount | |
| 93 Program service revenue: | | | | | |
| a | | | | | |
| b | | | | | |
| c | | | | | |
| d | | | | | |
| e | | | | | |
| f Medicare/Medicaid payments . . . . . . . . | | | | | |
| g Fees & contracts from government agencies . . . | | | | | |
| 94 Membership dues and assessments . . | | | | 3,390. | |
| 95 Interest on savings & temporary cash invmnts . | | | 14 | 1,041. | |
| 96 Dividends & interest from securities . . | | | | | |
| 97 Net rental income or (loss) from real estate: | | | | | |
| a debt-financed property . . . . . . . . . . . | | | | | |
| b not debt-financed property . . . . . . . . . | | | | | |
| 98 Net rental income or (loss) from pers prop . . . . | | | | | |
| 99 Other investment income . . . . . . . . . . . | | | | | |
| 100 Gain or (loss) from sales of assets other than inventory . . . . . . . . . . . . . . . . | | | | | |
| 101 Net income or (loss) from special events . . . . . | | | | | 9,898. |
| 102 Gross profit or (loss) from sales of inventory . . . . | | | | | |
| 103 Other revenue: a | | | | | |
| b | | | | | |
| c | | | | | |
| d | | | | | |
| e | | | | | |
| 104 Subtotal (add columns (B), (D), and (E)) . . . . . | | | | 4,431. | 9,898. |
| 105 Total (add line 104, columns (B), (D), and (E)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ► | | | | | 14,329. |

Note: *Line 105 plus line 1d, Part I, should equal the amount on line 12, Part I.*

## Part VIII Relationship of Activities to the Accomplishment of Exempt Purposes *(See the instructions.)*

| Line No. ▼ | Explain how each activity for which income is reported in column (E) of Part VII contributed importantly to the accomplishment of the organization's exempt purposes (other than by providing funds for such purposes). |
|---|---|
| 94 | Membership dues in order to facilitate maintenance of the club. |
| 101 | Excess of revenues over expenditures from lodge activties during the year. |

## Part IX Information Regarding Taxable Subsidiaries and Disregarded Entities *(See the instructions.)*

| (A) Name, address, and EIN of corporation, partnership, or disregarded entity | (B) Percentage of ownership interest | (C) Nature of activities | (D) Total income | (E) End-of-year assets |
|---|---|---|---|---|
| Nansen Lodge Social Club, Inc. | 100.000 % | Social Club | 0. | 0. |
| 3441 Victory Blvd. | % | | | |
| Staten Island, NY 10314 | % | | | |
| 13-2518571 | % | | | |

## Part X Information Regarding Transfers Associated with Personal Benefit Contracts *(See the instructions.)*

a Did the organization, during the year, receive any funds, directly or indirectly, to pay premiums on a personal benefit contract? . . . . . . . . . . . . . . .  ☐ Yes  ☒ No

b Did the organization, during the year, pay premiums, directly or indirectly, on a personal benefit contract? . . . . . . . . .  ☐ Yes  ☒ No

Note: *If 'Yes' to (b), file Form 8870 and Form 4720 (see instructions).*

| Please Sign Here | Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge. | |
|---|---|---|
| | ► Signature of officer | Date |
| | ► Type or print name and title. | |

*PLEASE SIGN*

| Paid Pre- parer's Use Only | Preparer's signature ► | Date 7/11/06 | Check if self-employed ► ☐ | Preparer's SSN or PTIN (See General Instruction W) N/A |
|---|---|---|---|---|
| | Firm's name (or yours if self-employed), address, and ZIP + 4 ► | Potter, LaMarca & Company, LLP 101 Tyrellan Avenue Suite 400 Staten Island, NY 10309 | EIN ► N/A | |
| | | | Phone no. ► (718) 227-8000 | |

BAA          TEEA0108L 10/18/05          Form **990** (2005)

| 2005 | Federal Statements | Page 1 |
|---|---|---|
| | Nansen Lodge , No 410,  District 3 | |
| | Sons of Norway | |
| | | 13-2881755 |

**Statement 1**
**Form 990, Part I, Line 9**
**Net Income (Loss) from Special Events**

| Special Events | Gross Receipts | Less Contri-butions | Gross Revenue | Less Direct Expenses | Net Income (Loss) |
|---|---|---|---|---|---|
| Party and Fund Raisers | 19,202. | 0. | 19,202. | 9,304. | 9,898. |
| Total | $ 19,202. | $ 0. | $ 19,202. | $ 9,304. | $ 9,898. |

**Statement 2**
**Form 990, Part II, Line 43**
**Other Expenses**

| | (A) Total | (B) Program Services | (C) Management & General | (D) Fundraising |
|---|---|---|---|---|
| Advertising | 375. | | | |
| Awards | 5,528. | | | |
| Donations | 3,451. | | | |
| Dues & subscriptions | 222. | | | |
| Insurance | 650. | | | |
| Office expense | 2,354. | | | |
| Total | $ 12,580. | $ 0. | $ 0. | $ 0. |

**Statement 3**
**Form 990, Part IV, Line 51**
**Other Notes and Loans Receivable**

| Other Notes and Loans | Balance Due | Doubtful Accounts Allowance |
|---|---|---|
| Nansen Properties | | |
| Total Other Notes and Loans | $ 93,109. | $ 0. |
| | $ 93,109. | $ 0. |
| Total Net Receivables | $ 93,109. | |

**Statement 4**
**Form 990, Part IV, Line 56**
**Investments - Other**

| Description of Investment | Valuation Method | Book Value |
|---|---|---|
| Nansen Lodge Social Club | Cost | $ 1,000. |
| Total | | $ 1,000. |

| 2005 | Federal Statements | Page 2 |
|---|---|---|
| | Nansen Lodge , No 410,  District 3 | |
| | Sons of Norway | |
| | | 13-2881755 |

**Statement 5**
**Form 990, Part IV, Line 57**
**Land, Buildings, and Equipment**

| Category | | Basis | | Accum. Deprec. | | Book Value |
|---|---|---|---|---|---|---|
| Machinery and Equipment | $ | 900. | $ | 900. | $ | 0. |
| Improvements | | 862. | | 862. | | 0. |
| Total | $ | 1,762. | $ | 1,762. | $ | 0. |

**Statement 6**
**Form 990, Part VI, Line 80b**
**Related Organizations**

| Name of Organization | Exempt | Nonexempt |
|---|---|---|
| Nansen Lodge Social Club, Inc. | | X |
| Nansen Properties Inc. | X | |

Form **8868**
(Rev December 2004)

Department of the Treasury
Internal Revenue Service

**Application for Extension of Time to File an Exempt Organization Return**

► File a separate application for each return.

OMB No. 1545-1709

- If you are filing for an **Automatic 3-Month Extension, complete only Part I** and check this box............................ ►  ⊠
- If you are filing for an **Additional (not automatic) 3-Month Extension, complete only Part II** (on page 2 of this form).

**Do not complete Part II unless** you have already been granted an automatic 3-month extension on a previously filed Form 8868.

**Part I   Automatic 3-Month Extension of Time** — Only submit original (no copies needed)

**Form 990-T corporations** requesting an automatic 6-month extension — check this box and complete Part I only....................... ►  ☐

**All other corporations (including Form 990-C filers)** must use Form 7004 to request an extension of time to file income tax returns. Partnerships, REMICs and trusts must use Form 8736 to request an extension of time to file Form 1065, 1066, or 1041.

**Electronic Filing (e-file).** Form 8868 can be filed electronically if you want a 3-month automatic extension of time to file one of the returns noted below (6-months for corporate Form 990-T filers). However, you cannot file it electronically if you want the additional (not automatic) 3-month extension, instead you must submit the fully completed signed page 2 (Part II) of Form 8868. For more details on the electronic filing of this form, visit *www.irs.gov/efile.*

| Type or print<br>File by the due date for filing your return. See instructions. | Name of Exempt Organization<br>Nansen Lodge , No 410,  District 3<br>Sons of Norway | Employer identification number<br>13-2881755 |
| --- | --- | --- |
| | Number, street, and room or suite number. If a P.O. box, see instructions.<br>P.O. Box 140122 | |
| | City, town or post office. For a foreign address, see instructions.<br>Staten Island, NY 10314 | state    ZIP code |

**Check type of return to be filed** (file a separate return for each return):

| | | |
| --- | --- | --- |
| ⊠ Form 990 | ☐ Form 990-T (corporation) | ☐ Form 4720 |
| ☐ Form 990-BL | ☐ Form 990-T (section 401(a) or 408(a) trust) | ☐ Form 5227 |
| ☐ Form 990-EZ | ☐ Form 990-T (trust other than above) | ☐ Form 6069 |
| ☐ Form 990-PF | ☐ Form 1041-A | ☐ Form 8870 |

- The books are in the care of ► Richard Maren

  Telephone No. ► _ _ _ _ _ _ _ _ _ _ _ _ _        FAX No. ► _ _ _ _ _ _ _ _ _ _ _ _ _

- If the organization does **not** have an office or place of business in the United States, check this box................................ ► ☐
- If this is for a **Group Return,** enter the organization's four digit Group Exemption Number (GEN) _____ . If this is for the **whole group,** check this box ► ☐ . If it is for part of the group, check this box ► ☐ and attach a list with the names and EINs of all members the extension will cover.

1   I request an automatic 3-month (6-months for a **Form 990-T corporation**) extension of time until  8/15 , 20 06 , to file the exempt organization return for the organization named above. The extension is for the organization's return for:
   ► ⊠ calendar year 20 05   or
   ► ☐ tax year beginning  _ _ _ _ _ _ _ _ , 20 _ _ _ , and ending  _ _ _ _ _ _ _ _ , 20 _ _ _

2   If this tax year is for less than 12 months, check reason:   ☐ Initial return   ☐ Final return   ☐ Change in accounting period

3a If this application is for Form 990-BL, 990-PF, 990-T, 4720, or 6069, enter the tentative tax, less any nonrefundable credits. See instructions .................................................... $ _____ 0.

 b If this application is for Form 990-PF or 990-T, enter any refundable credits and estimated tax payments made. Include any prior year overpayment allowed as a credit .................................... $ _____ 0.

 c **Balance Due.** Subtract line 3b from line 3a. Include your payment with this form, or, if required, deposit with FTD coupon or, if required, by using EFTPS (Electronic Federal Tax Payment System). See instructions............. $ _____ 0.

**Caution.** If you are going to make an electronic fund withdrawal with this Form 8868, see Form 8453-EO and Form 8879-EO for payment instructions.

**BAA  For Privacy Act and Paperwork Reduction Act Notice, see instructions.**

Form **8868** (Rev 12-2004)

FIFZ0501L  01/07/05

**POTTER, LAMARCA & COMPANY, LLP**
**101 TYRELLAN AVENUE SUITE 400**
**STATEN ISLAND, NY 10309**
**(718) 227-8000**

July 11, 2006

Nansen Lodge , No 410,  District 3
Sons of Norway
P.O. Box 140122
Staten Island, NY 10314

Dear Richard:

Enclosed for your review and filing are the following:

Form 990          2005 Return of Organization Exempt from Income Tax

Each tax return or form listed above should be filed in accordance with the enclosed filing instructions.

Please be sure to call us if you have any questions.

Sincerely,

Jeffrey J. Potter, CPA



**Form 990**

OMB No. 1545-0047

**Return of Organization Exempt From Income Tax**

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code
(except black lung benefit trust or private foundation)

► The organization may have to use a copy of this return to satisfy state reporting requirements.

**2006**

Open to Public Inspection

Department of the Treasury
Internal Revenue Service

**A** For the 2006 calendar year, or tax year beginning _____ , 2006, and ending _____

**B** Check if applicable:
- ☐ Address change
- ☐ Name change
- ☐ Initial return
- ☐ Final return
- ☐ Amended return
- ☐ Application pending

**C** Please use IRS label or print or type. See specific instructions.

Nansen Lodge , No 410, District 3
Sons of Norway
P.O. Box 140122
Staten Island, NY 10314

COPY

**D** Employer Identification Number
13-2881755

**E** Telephone number

**F** Accounting method: ☒ Cash ☐ Accrual
☐ Other (specify) ►

● Section 501(c)(3) organizations and 4947(a)(1) nonexempt charitable trusts must attach a completed Schedule A (Form 990 or 990-EZ).

**G** Web site: ► N/A

**H and I** are not applicable to section 527 organizations.

**H (a)** Is this a group return for affiliates? ☐ Yes ☒ No
**H (b)** If 'Yes,' enter number of affiliates ►
**H (c)** Are all affiliates included? ☐ Yes ☐ No
(If 'No,' attach a list. See instructions.)
**H (d)** Is this a separate return filed by an organization covered by a group ruling? ☒ Yes ☐ No

**J** Organization type (check only one) ► ☒ 501(c) 8 ◄ (insert no.) ☐ 4947(a)(1) or ☐ 527

**K** Check here ► ☐ if the organization is not a 509(a)(3) supporting organization and its gross receipts are normally **not** more than $25,000. A return is not required, but if the organization chooses to file a return, be sure to file a complete return.

**I** Group Exemption Number... ► 0108

**M** Check ► ☒ if the organization is not required to attach Schedule B (Form 990, 990-EZ, or 990-PF).

**L** Gross receipts: Add lines 6b, 8b, 9b, and 10b to line 12 . ► 28,432.

## Part I  Revenue, Expenses, and Changes in Net Assets or Fund Balances (See the instructions.)

| | | | |
|---|---|---:|---:|
| **1** | Contributions, gifts, grants, and similar amounts received: | | |
| **a** | Contributions to donor advised funds............ | 1a | |
| **b** | Direct public support (not included on line 1a)...... | 1b | |
| **c** | Indirect public support (not included on line 1a)...... | 1c | |
| **d** | Government contributions (grants) (not included on line 1a)... | 1d | |
| **e** | Total (add lines 1a through 1d) (cash $ _____ noncash $ _____ ) | 1e | 0. |
| **2** | Program service revenue including government fees and contracts (from Part VII, line 93)... | 2 | |
| **3** | Membership dues and assessments.................... | 3 | |
| **4** | Interest on savings and temporary cash investments......... | 4 | 3,755. |
| **5** | Dividends and interest from securities.................. | 5 | 1,443. |
| **6a** | Gross rents...................... | 6a | |
| **b** | Less: rental expenses................ | 6b | |
| **c** | Net rental income or (loss). Subtract line 6b from line 6a... | 6c | |
| **7** | Other investment income (describe ► _____ ) | 7 | |
| **8a** | Gross amount from sales of assets other than inventory. (A) Securities 8a | (B) Other | |
| **b** | Less: cost or other basis and sales expenses. 8b | | |
| **c** | Gain or (loss) (attach schedule). 8c | | |
| **d** | Net gain or (loss). Combine line 8c, columns (A) and (B)... | 8d | |
| **9** | Special events and activities (attach schedule). If any amount is from **gaming**, check here ► ☐ | | |
| **a** | Gross revenue (not including $ _____ of contributions reported on line 1b). 9a | 23,234. | |
| **b** | Less: direct expenses other than fundraising expenses.......... 9b | 10,915. | |
| **c** | Net income or (loss) from special events. Subtract line 9b from line 9a.......Statement 1 | 9c | 12,319. |
| **10a** | Gross sales of inventory, less returns and allowances....... 10a | | |
| **b** | Less: cost of goods sold................ 10b | | |
| **c** | Gross profit or (loss) from sales of inventory (attach schedule). Subtract line 10b from line 10a | 10c | |
| **11** | Other revenue (from Part VII, line 103)............ | 11 | |
| **12** | **Total revenue.** Add lines 1e, 2, 3, 4, 5, 6c, 7, 8d, 9c, 10c, and 11.............. | 12 | 17,517. |
| **13** | Program services (from line 44, column (B)).............. | 13 | |
| **14** | Management and general (from line 44, column (C))........... | 14 | |
| **15** | Fundraising (from line 44, column (D))................ | 15 | |
| **16** | Payments to affiliates (attach schedule)............... | 16 | |
| **17** | **Total expenses.** Add lines 16 and 44, column (A)............ | 17 | 22,110. |
| **18** | Excess or (deficit) for the year. Subtract line 17 from line 12......... | 18 | -4,593. |
| **19** | Net assets or fund balances at beginning of year (from line 73, column (A))...... | 19 | 163,544. |
| **20** | Other changes in net assets or fund balances (attach explanation)...... | 20 | |
| **21** | Net assets or fund balances at end of year. Combine lines 18, 19, and 20.......... | 21 | 158,951. |

**BAA** For Privacy Act and Paperwork Reduction Act Notice, see the separate instructions.

TEEA0109L 01/22/07

Form 990 (2006)

**Part II**   **Statement of Functional Expenses**   All organizations must complete column (A). Columns (B), (C), and (D) are required for section 501(c)(3) and (4) organizations and section 4947(a)(1) nonexempt charitable trusts but optional for others.

| *Do not include amounts reported on line 6b, 8b, 9b, 10b, or 16 of Part I.* | | **(A) Total** | **(B) Program services** | **(C) Management and general** | **(D) Fundraising** |
|---|---|---|---|---|---|
| **22a** Grants paid from donor advised funds (attach sch) | | | | | |
| (cash $ _____ | | | | | |
| non-cash $ _____ ) | | | | | |
| If this amount includes foreign grants, check here ► ☐ | **22a** | | | | |
| **22b** Other grants and allocations (att sch) | | | | | |
| (cash $ _____ | | | | | |
| non-cash $ _____ ) | | | | | |
| If this amount includes foreign grants, check here ► ☐ | **22b** | | | | |
| **23** Specific assistance to individuals (attach schedule) | **23** | | | | |
| **24** Benefits paid to or for members (attach schedule) | **24** | | | | |
| **25a** Compensation of current officers, directors, key employees, etc listed in Part V-A (attach sch) | **25a** | 0. | | | |
| **b** Compensation of former officers, directors, key employees, etc listed in Part V-B (attach sch) | **25b** | 0. | | | |
| **c** Compensation and other distributions, not included above, to disqualified persons (as defined under section 4958(f)(1)) and persons described in section 4958(c)(3)(B) (attach schedule) | **25c** | 0. | | | |
| **26** Salaries and wages of employees not included on lines 25a, b, and c | **26** | | | | |
| **27** Pension plan contributions not included on lines 25a, b, and c | **27** | | | | |
| **28** Employee benefits not included on lines 25a - 27 | **28** | | | | |
| **29** Payroll taxes | **29** | | | | |
| **30** Professional fundraising fees | **30** | | | | |
| **31** Accounting fees | **31** | 2,675. | | | |
| **32** Legal fees | **32** | | | | |
| **33** Supplies | **33** | | | | |
| **34** Telephone | **34** | | | | |
| **35** Postage and shipping | **35** | 930. | | | |
| **36** Occupancy | **36** | | | | |
| **37** Equipment rental and maintenance | **37** | | | | |
| **38** Printing and publications | **38** | 2,022. | | | |
| **39** Travel | **39** | | | | |
| **40** Conferences, conventions, and meetings | **40** | | | | |
| **41** Interest | **41** | | | | |
| **42** Depreciation, depletion, etc (attach schedule) | **42** | | | | |
| **43** Other expenses not covered above (itemize): | | | | | |
| **a** See Statement 2 | **43a** | 16,483. | | | |
| **b** _____ | **43b** | | | | |
| **c** _____ | **43c** | | | | |
| **d** _____ | **43d** | | | | |
| **e** _____ | **43e** | | | | |
| **f** _____ | **43f** | | | | |
| **g** _____ | **43g** | | | | |
| **44** Total functional expenses. Add lines 22a through 43g. (Organizations completing columns (B) - (D), carry these totals to lines 13 - 15) | **44** | 22,110. | | | |

**Joint Costs.** Check ► ☐ if you are following SOP 98-2.

Are any joint costs from a combined educational campaign and fundraising solicitation reported in **(B)** Program services? . . N/A ► ☐ Yes ☐ No

If 'Yes,' enter **(i)** the aggregate amount of these joint costs $ _____ ; **(ii)** the amount allocated to Program services

$ _____ ; **(iii)** the amount allocated to Management and general $ _____ ; and **(iv)** the amount allocated to Fundraising $ _____

BAA

TEEA0102L  01/23/07

Form 990 (2006)

| **Part III** | **Statement of Program Service Accomplishments** | 13-2881755 | Page **3** |

Form 990 is available for public inspection and, for some people, serves as the primary or sole source of information about a particular organization. How the public perceives an organization in such cases may be determined by the information presented on its return. Therefore, please make sure the return is complete and accurate and fully describes, in Part III, the organization's programs and accomplishments.

What is the organization's primary exempt purpose? ►

All organizations must describe their exempt purpose achievements in a clear and concise manner. State the number of clients served, publications issued, etc. Discuss achievements that are not measurable. (Section 501(c)(3) and (4) organizations and 4947(a)(1) nonexempt charitable trusts must also enter the amount of grants and allocations to others.)

*Program Service Expenses: (Required for 501(c)(3) and (4) organizations and 4947(a)(1) trusts; but optional for others.)*

**a** _____

_____

_____

_____

(Grants and allocations    $                    ) If this amount includes foreign grants, check here . . ► ☐

**b** _____

_____

_____

_____

(Grants and allocations    $                    ) If this amount includes foreign grants, check here . . ► ☐

**c** _____

_____

_____

_____

(Grants and allocations    $                    ) If this amount includes foreign grants, check here . . ► ☐

**d** _____

_____

_____

_____

(Grants and allocations    $                    ) If this amount includes foreign grants, check here . . ► ☐

**e** Other program services . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

(Grants and allocations    $                    ) If this amount includes foreign grants, check here . . ► ☐

**f Total of Program Service Expenses** (should equal line 44, column (B), Program services) . . . . . . . . . . . . . . . . . . . . . ►

BAA

Form **990** (2006)

Form 990 (2006)   Nansen Lodge , No 410,  District 3                    13-2881755            Page **4**

## Part IV Balance Sheets *(See the instructions.)*

Note: *Where required, attached schedules and amounts within the description column should be for end-of-year amounts only.*

| | | **(A)** Beginning of year | | **(B)** End of year |
|---|---|---|---|---|
| 45 | Cash — non-interest-bearing | 1,388. | 45 | 2,370. |
| 46 | Savings and temporary cash investments | 68,047. | 46 | 62,472. |
| 47a | Accounts receivable | 47a | | |
| b | Less: allowance for doubtful accounts | 47b | | 47c |
| 48a | Pledges receivable | 48a | | |
| b | Less: allowance for doubtful accounts | 48b | | 48c |
| 49 | Grants receivable | | | 49 |
| 50 a | Receivables from current and former officers, directors, trustees, and key employees (attach schedule) | | | 50a |
| b | Receivables from other disqualified persons (as defined under section 4958(f)(1)) and persons described in section 4958(c)(3)(B) (attach schedule) | | | 50b |
| 51a | Other notes and loans receivable (attach schedule) | 51a | | |
| b | Less: allowance for doubtful accounts | 51b | 93,109. | 51c |
| 52 | Inventories for sale or use | | | 52 |
| 53 | Prepaid expenses and deferred charges | | | 53 |
| 54a | Investments — publicly-traded securities ▶ ☐ Cost ☐ FMV | | | 54a |
| b | Investments — other securities (attach sch). ▶ ☐ Cost ☐ FMV | | | 54b |
| 55a | Investments — land, buildings, & equipment: basis | 55a | | |
| b | Less: accumulated depreciation (attach schedule) | 55b | | 55c |
| 56 | Investments — other (attach schedule) ........See Stmt 3. | 1,000. | 56 | 94,109. |
| 57a | Land, buildings, and equipment: basis | 57a | 1,762. | |
| b | Less: accumulated depreciation (attach schedule) ........Statement 4 | 57b | 1,762. | 57c |
| 58 | Other assets, including program-related investments (describe ▶ _____ ) | | | 58 |
| 59 | **Total assets** (must equal line 74). Add lines 45 through 58 | 163,544. | 59 | 158,951. |
| 60 | Accounts payable and accrued expenses | | | 60 |
| 61 | Grants payable | | | 61 |
| 62 | Deferred revenue | | | 62 |
| 63 | Loans from officers, directors, trustees, and key employees (attach schedule) | | | 63 |
| 64a | Tax-exempt bond liabilities (attach schedule) | | | 64a |
| b | Mortgages and other notes payable (attach schedule) | | | 64b |
| 65 | Other liabilities (describe ▶ _____ ) | | | 65 |
| 66 | **Total liabilities.** Add lines 60 through 65 | 0. | 66 | 0. |
| Organizations that follow SFAS 117, check here ▶ ☒ and complete lines 67 through 69 and lines 73 and 74. | | | | |
| 67 | Unrestricted | 135,934. | 67 | 134,738. |
| 68 | Temporarily restricted | 27,610. | 68 | 24,213. |
| 69 | Permanently restricted | | | 69 |
| Organizations that do not follow SFAS 117, check here ▶ ☐ and complete lines 70 through 74. | | | | |
| 70 | Capital stock, trust principal, or current funds | | | 70 |
| 71 | Paid-in or capital surplus, or land, building, and equipment fund | | | 71 |
| 72 | Retained earnings, endowment, accumulated income, or other funds | | | 72 |
| 73 | **Total net assets or fund balances.** Add lines 67 through 69 or lines 70 through 72. (Column (A) **must** equal line 19 and column (B) **must** equal line 21) | 163,544. | 73 | 158,951. |
| 74 | **Total liabilities and net assets/fund balances.** Add lines 66 and 73 | 163,544. | 74 | 158,951. |

ASSETS (left margin, lines 45–59)
LIABILITIES (left margin, lines 60–66)
NET ASSETS OR FUND BALANCES (left margin, lines 67–74)

BAA                                                                   Form **990** (2006)

Form 990 (2006)   Kaiser Lodge, No 410, District 3   13-2881755   Page 5

**Part IV-A** | Reconciliation of Revenue per Audited Financial Statements with Revenue per Return (See the instructions.)

| | | | |
|---|---|---|---|
| a | Total revenue, gains, and other support per audited financial statements............................... | a | N/A |
| b | Amounts included on line **a** but not on Part I, line 12: | | |
| 1 | Net unrealized gains on investments..........................................| b1 | | |
| 2 | Donated services and use of facilities........................................| b2 | | |
| 3 | Recoveries of prior year grants................................................| b3 | | |
| 4 | Other (specify): _____| b4 | | |
| | Add lines **b1** through **b4**................................................ | | |
| c | Subtract line **b** from line **a**.......................................... | b | |
| d | Amounts included on Part I, line 12, but not on line **a**: | c | |
| 1 | Investment expenses not included on Part I, line 6b............| d1 | | |
| 2 | Other (specify): _____| d2 | | |
| | Add lines **d1** and **d2**................................................ | | |
| e | **Total revenue** (Part I, line 12). Add lines **c** and **d**........................ ▶ | d | |
| | | e | |

**Part IV-B** | Reconciliation of Expenses per Audited Financial Statements with Expenses per Return

| | | | |
|---|---|---|---|
| a | Total expenses and losses per audited financial statements............................... | a | N/A |
| b | Amounts included on line **a** but not on Part I, line 17: | | |
| 1 | Donated services and use of facilities........................................| b1 | | |
| 2 | Prior year adjustments reported on Part I, line 20..........................| b2 | | |
| 3 | Losses reported on Part I, line 20...........................................| b3 | | |
| 4 | Other (specify): _____| b4 | | |
| | Add lines **b1** through **b4**................................................ | | |
| c | Subtract line **b** from line **a**.......................................... | b | |
| d | Amounts included on Part I, line 17, but not on line **a**: | c | |
| 1 | Investment expenses not included on Part I, line 6b............| d1 | | |
| 2 | Other (specify): _____| d2 | | |
| | Add lines **d1** and **d2**................................................ | | |
| e | **Total expenses** (Part I, line 17). Add lines **c** and **d**........................ ▶ | d | |
| | | e | |

**Part V-A** | Current Officers, Directors, Trustees, and Key Employees (List each person who was an officer, director, trustee, or key employee at any time during the year even if they were not compensated.) (See the instructions.)

| (A) Name and address | (B) Title and average hours per week devoted to position | (C) Compensation (if not paid, enter -0-) | (D) Contributions to employee benefit plans and deferred compensation plans | (E) Expense account and other allowances |
|---|---|---|---|---|
| Leonard Dahl 568 Forster Road Staten Island, NY 10309 | President 0 | 0. | 0. | 0. |
| Paul Kornbrekke 256 Barnard Avenue Staten Island, NY 10307 | Vice President 0 | 0. | 0. | 0. |
| Eleanor Tollerson 178 Warwick Avenue Staten Island, NY 10314 | Secretary 0 | 0. | 0. | 0. |
| Richard Maren 2207 Courtney Lane Somerset, NJ 08873 | Treasurer 0 | 0. | 0. | 0. |
| | | | | |
| | | | | |

BAA                                                TEEA0105L  01/18/07                                    Form **990** (2006)

Form 990 (2006) Nansen Lodge , No 410,   District 3                                    13-2881755                    Page 6

## Part V-A | Current Officers, Directors, Trustees, and Key Employees (continued)

|  | Yes | No |
|---|---|---|
| **75a** Enter the total number of officers, directors, and trustees permitted to vote on organization business as board meetings . ► 4 | | |
| **b** Are any officers, directors, trustees, or key employees listed in Form 990, Part V-A, or highest compensated employees listed in Schedule A, Part I, or highest compensated professional and other independent contractors listed in Schedule A, Part II-A or II-B, related to each other through family or business relationships? If 'Yes,' attach a statement that identifies the individuals and explains the relationship(s) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 75b | X |
| **c** Do any officers, directors, trustees, or key employees listed in form 990, Part V-A, or highest compensated employees listed in Schedule A, Part I, or highest compensated professional and other independent contractors listed in Schedule A, Part II-A or II-B, receive compensation from any other organizations, whether tax exempt or taxable, that are related to the organization? See the instructions for the definition of 'related organization' . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 75c | X |
| If 'Yes,' attach a statement that includes the information described in the instructions. | | |
| **d** Does the organization have a written conflict of interest policy? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 75d | X |

## Part V-B | Former Officers, Directors, Trustees, and Key Employees That Received Compensation or Other Benefits (If any former officer, director, trustee, or key employee received compensation or other benefits (described below) during the year, list that person below and enter the amount of compensation or other benefits in the appropriate column. See the instructions.)

| (A) Name and address | (B) Loans and Advances | (C) Compensation (if not paid, enter -0-) | (D) Contributions to employee benefit plans and deferred compensation plans | (E) Expense account and other allowances |
|---|---|---|---|---|
| None | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

## Part VI | Other Information (See the instructions.)

|  |  | Yes | No |
|---|---|---|---|
| **76** | Did the organization make a change in its activities or methods of conducting activities? If 'Yes,' attach a detailed statement of each change. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 76 | | X |
| **77** | Were any changes made in the organizing or governing documents but not reported to the IRS? . . . . . . . . . . . . . . . . . . . | 77 | | X |
| | If 'Yes,' attach a conformed copy of the changes. | | | |
| **78a** | Did the organization have unrelated business gross income of $1,000 or more during the year covered by this return? . . | 78a | | X |
| **b** | If 'Yes,' has it filed a tax return on **Form 990-T** for this year? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 78b | N/A | |
| **79** | Was there a liquidation, dissolution, termination, or substantial contraction during the year? If 'Yes,' attach a statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 79 | | X |
| **80a** | Is the organization related (other than by association with a statewide or nationwide organization) through common membership, governing bodies, trustees, officers, etc, to any other exempt or nonexempt organization? . . . . . . . . . . . . . . | 80a | X | |
| **b** | If 'Yes,' enter the name of the organization ► See Statement 5 _____ and check whether it is [X] exempt or [X] nonexempt. | | | |
| **81a** | Enter direct and indirect political expenditures. (See line 81 instructions.) . . . . . . . . . . . . . | 81a | 0. | |
| **b** | Did the organization file **Form 1120-POL** for this year? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 81b | | X |

BAA                                                                                                        Form 990 (2006)

TEEA0106L 01/18/07

Form 990 (2006)   Nansen Lodge , No 410 , District 3                          13-2881755                     Page 7

**Part VI** | **Other Information** *(continued)*

| | | Yes | No |
|---|---|---|---|
| **82 a** Did the organization receive donated services or the use of materials, equipment, or facilities at no charge or at substantially less than fair rental value?................................................................. | **82 a** | | X |
| **b** If 'Yes,' you may indicate the value of these items here. Do not include this amount as revenue in Part I or as an expense in Part II. (See instructions in Part II.)............... | **82 b** | N/A | | |
| **83 a** Did the organization comply with the public inspection requirements for returns and exemption applications?......... | **83 a** | X | |
| **b** Did the organization comply with the disclosure requirements relating to *quid pro quo* contributions?.......... | **83 b** | X | |
| **84 a** Did the organization solicit any contributions or gifts that were not tax deductible?................... | **84 a** | | X |
| **b** If 'Yes,' did the organization include with every solicitation an express statement that such contributions or gifts were not tax deductible?........ | **84 b** | N/A | |
| **85** *501(c)(4), (5), or (6) organizations.* **a** Were substantially all dues nondeductible by members?.................... | **85 a** | N/A | |
| **b** Did the organization make only in-house lobbying expenditures of $2,000 or less?......................... | **85 b** | N/A | |
| If 'Yes' was answered to either 85a or 85b, **do not** complete 85c through 85h below unless the organization received a waiver for proxy tax owed for the prior year. | | | |
| **c** Dues, assessments, and similar amounts from members............................... | **85 c** | N/A | | |
| **d** Section 162(e) lobbying and political expenditures............................ | **85 d** | N/A | | |
| **e** Aggregate nondeductible amount of section 6033(e)(1)(A) dues notices.................. | **85 e** | N/A | | |
| **f** Taxable amount of lobbying and political expenditures (line 85d less 85e)............ | **85 f** | N/A | | |
| **g** Does the organization elect to pay the section 6033(e) tax on the amount on line 85f?.......................... | **85 g** | N/A | |
| **h** If section 6033(e)(1)(A) dues notices were sent, does the organization agree to add the amount on line 85f to its reasonable estimate of dues allocable to nondeductible lobbying and political expenditures for the following tax year?............................... | **85 h** | N/A | |
| **86** *501(c)(7) organizations.* Enter: **a** Initiation fees and capital contributions included on line 12........ | **86 a** | N/A | | |
| **b** Gross receipts, included on line 12, for public use of club facilities......................... | **86 b** | N/A | | |
| **87** *501(c)(12) organizations.* Enter: **a** Gross income from members or shareholders.......... | **87 a** | N/A | | |
| **b** Gross income from other sources. (Do not net amounts due or paid to other sources against amounts due or received from them.)............................. | **87 b** | N/A | | |
| **88 a** At any time during the year, did the organization own a 50% or greater interest in a taxable corporation or partnership, or an entity disregarded as separate from the organization under Regulations sections 301.7701-2 and 301.7701-3? If 'Yes,' complete Part IX............................. | **88 a** | X | |
| **b** At any time during the year, did the organization, directly or indirectly, own a controlled entity within the meaning of section 512(b)(13)? If 'Yes,' complete Part XI .........................................................▶ | **88 b** | | X |
| **89 a** *501(c)(3) organizations.* Enter: Amount of tax imposed on the organization during the year under: section 4911 ▶ _ _ _ _ _ _ _ _ N/A ; section 4912 ▶ _ _ _ _ _ _ _ _ _ ; section 4955 ▶ _ _ _ _ _ _ _ _ N/A | | | |
| **b** *501(c)(3) and 501(c)(4) organizations.* Did the organization engage in any section 4958 excess benefit transaction during the year or did it become aware of an excess benefit transaction from a prior year? If 'Yes,' attach a statement explaining each transaction......................... | **89 b** | N/A | |
| **c** Enter: Amount of tax imposed on the organization managers or disqualified persons during the year under sections 4912, 4955, and 4958.............................▶ _ _ _ _ _ _ _ _ N/A | | | |
| **d** Enter: Amount of tax on line 89c, above, reimbursed by the organization......................▶ _ _ _ _ _ _ _ _ N/A | | | |
| **e** *All organizations.* At any time during the tax year, was the organization a party to a prohibited tax shelter transaction?.. | **89 e** | | X |
| **f** *All organizations.* Did the organization acquire a direct or indirect interest in any applicable insurance contract?......... | **89 f** | | X |
| **g** *For supporting organizations and sponsoring organizations maintaining donor advised funds.* Did the supporting organization, or a fund maintained by a sponsoring organization, have excess business holdings at any time during the year?................................................... | **89 g** | | X |
| **90 a** List the states with which a copy of this return is filed ▶ None | | | |
| **b** Number of employees employed in the pay period that includes March 12, 2006 (See instructions.) | **90 b** | 0 | |
| **91 a** The books are in care of ▶ Richard Maren _ _ _ _ _ _ _ _ _ _ _ _   Telephone number ▶ _ _ _ _ _ _ _ _ | | | |

Located at ▶ 2207 Courtney Lane, Somerset NJ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _  ZIP + 4 ▶ 08873

| | | Yes | No |
|---|---|---|---|
| **b** At any time during the calendar year, did the organization have an interest in or a signature or other authority over a financial account in a foreign country (such as a bank account, securities account, or other financial account)?.......... | **91 b** | | X |
| If 'Yes,' enter the name of the foreign country ▶ .. _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | | |

See the instructions for exceptions and filing requirements for **Form TD F 90-22.1,** Report of Foreign Bank and Financial Accounts.

BAA

Form **990** (2006)

Form 990 (2006) Nansen Lodge , No 410, District 3                    13-2881755            Page 8

## Part VI | Other Information *(continued)*

|  |  | Yes | No |
|---|---|---|---|
| c At any time during the calendar year, did the organization maintain an office outside of the United States? | 91 c | | X |
| If 'Yes,' enter the name of the foreign country .. ▶ | | | |

92  Section 4947(a)(1) nonexempt charitable trusts filing Form 990 in lieu of **Form 1041** — Check here. . . . . . . . . . . . . . . . . . . . . . . N/A . . ▶ ☐

and enter the amount of tax-exempt interest received or accrued during the tax year. . . . . . . . . . . . . . . . . . ▶ | 92 |        N/A

## Part VII | Analysis of Income-Producing Activities *(See the instructions.)*

*Note: Enter gross amounts unless otherwise indicated.*

| | Unrelated business income | | Excluded by section 512, 513, or 514 | | (E) Related or exempt function income |
|---|---|---|---|---|---|
| | (A) Business code | (B) Amount | (C) Exclusion code | (D) Amount | |
| 93 Program service revenue: | | | | | |
| a | | | | | |
| b | | | | | |
| c | | | | | |
| d | | | | | |
| e | | | | | |
| f Medicare/Medicaid payments . . . . . . . . | | | | | |
| g Fees & contracts from government agencies . . . | | | | | |
| 94 Membership dues and assessments. . | | | | | |
| 95 Interest on savings & temporary cash invmnts . . | | | 14 | 3,755. | |
| 96 Dividends & interest from securities . . | | | 14 | 1,443. | |
| 97 Net rental income or (loss) from real estate: | | | | | |
| a debt-financed property . . . . . . . . . . . . . . | | | | | |
| b not debt-financed property . . . . . . . . . . | | | | | |
| 98 Net rental income or (loss) from pers prop . . . . | | | | | |
| 99 Other investment income . . . . . . . . . . . | | | | | |
| 100 Gain or (loss) from sales of assets other than inventory . . . . . . . . . . . . . . . | | | | | |
| 101 Net income or (loss) from special events . . . . . | | | | | 12,319. |
| 102 Gross profit or (loss) from sales of inventory . . . | | | | | |
| 103 Other revenue: a | | | | | |
| b | | | | | |
| c | | | | | |
| d | | | | | |
| e | | | | | |
| 104 Subtotal (add columns (B), (D), and (E)) . . . . . | | | | 5,198. | 12,319. |
| 105 Total (add line 104, columns (B), (D), and (E)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ | | | | | 17,517. |

*Note: Line 105 plus line 1d, Part I, should equal the amount on line 12, Part I.*

## Part VIII | Relationship of Activities to the Accomplishment of Exempt Purposes *(See the instructions.)*

| Line No. ▼ | Explain how each activity for which income is reported in column (E) of Part VII contributed importantly to the accomplishment of the organization's exempt purposes (other than by providing funds for such purposes). |
|---|---|
| 94 | Membership dues in order to facilitate maintenance of the club. |
| 101 | Excess of revenues over expenditures from lodge activties during the year. |

## Part IX | Information Regarding Taxable Subsidiaries and Disregarded Entities *(See the instructions.)*

| (A) Name, address, and EIN of corporation, partnership, or disregarded entity | (B) Percentage of ownership interest | (C) Nature of activities | (D) Total income | (E) End-of-year assets |
|---|---|---|---|---|
| Nansen Lodge Social Club, Inc. | 100.000 % | Social Club | 27,874. | 10,295. |
| 3441 Victory Blvd. | % | | | |
| Staten Island, NY 10314 | % | | | |
| 13-2518571 | % | | | |

## Part X | Information Regarding Transfers Associated with Personal Benefit Contracts *(See the instructions.)*

| | | | |
|---|---|---|---|
| a Did the organization, during the year, receive any funds, directly or indirectly, to pay premiums on a personal benefit contract? . . . . . . . . . . . . . . . . . | | ☐ Yes | X No |
| b Did the organization, during the year, pay premiums, directly or indirectly, on a personal benefit contract? . . . . . . . . . | | ☐ Yes | X No |

*Note: If 'Yes' to **(b)**, file Form 8870 and Form 4720 (see instructions).*

BAA                                                           TEEA0108L  01/19/07        Form 990 (2006)

| Part XI | Information Regarding Transfers To and From Controlled Entities. *Complete only if the organization is a controlling organization as defined in section 512(b)(13).* | | 13-2881755 | Page 9 |

| 106 | Did the reporting organization **make** any transfers **to** a controlled entity as defined in section 512(b)(13) of the Code? If 'Yes,' complete the schedule below for each controlled entity | | | Yes | No X |

| | (A) Name, address, of each controlled entity | (B) Employer Identification Number | (C) Description of transfer | (D) Amount of transfer |
|---|---|---|---|---|
| a | | | | |
| b | | | | |
| c | | | | |
| | Totals | | | |

| 107 | Did the reporting organization **receive** any transfers **from** a controlled entity as defined in section 512(b)(13) of the Code? If 'Yes,' complete the schedule below for each controlled entity | | | Yes | No X |

| | (A) Name, address, of each controlled entity | (B) Employer Identification Number | (C) Description of transfer | (D) Amount of transfer |
|---|---|---|---|---|
| a | | | | |
| b | | | | |
| c | | | | |
| | Totals | | | |

| 108 | Did the organization have a binding written contract in effect on August 17, 2006, covering the interest, rents, royalties, and annuities described in question 107 above? | | | Yes | No X |

**Please Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge.

► Signature of officer                                    Date

► Type or print name and title.

**Paid Preparer's Use Only**

| Preparer's signature | | Date 6/21/07 | Check if self-employed ► | Preparer's SSN or PTIN (See General Instruction W) N/A |
| Firm's name (or yours if self-employed), address, and ZIP + 4 | Potter, LaMarca & Company, LLP 101 Tyrellan Avenue Suite 400 Staten Island, NY 10309 | | EIN ► N/A | |
| | | | Phone no. ► (718) 227-8000 | |

BAA

Form 990 (2006)

**2006**  **Federal Statements**  **Page 1**

Nansen Lodge , No 410,  District 3

Sons of Norway

13-2881755

**Statement 1**
Form 990, Part I, Line 9
Net Income (Loss) from Special Events

| Special Events | Gross Receipts | Less Contri- butions | Gross Revenue | Less Direct Expenses | Net Income (Loss) |
|---|---|---|---|---|---|
| Party and Fund Raisers | 23,234. | 0. | 23,234. | 10,915. | 12,319. |
| Total | $ 23,234. | $ 0. | $ 23,234. | $ 10,915. | $ 12,319. |

**Statement 2**
Form 990, Part II, Line 43
Other Expenses

| | (A) Total | (B) Program Services | (C) Management & General | (D) Fundraising |
|---|---|---|---|---|
| Advertising | 686. | | | |
| Conventions | 5,816. | | | |
| Donations | 2,970. | | | |
| Dues & subscriptions | 247. | | | |
| Insurance | 623. | | | |
| Office expense | 641. | | | |
| Scholarship Awards | 5,500. | | | |
| Total | $ 16,483. | $ 0. | $ 0. | $ 0. |

**Statement 3**
Form 990, Part IV, Line 56
Investments - Other

| Description of Investment | Valuation Method | Book Value |
|---|---|---|
| Nansen Lodge Social Club | Cost | $ 1,000. |
| Nansen Properties, Inc. | Cost | 93,109. |
| | Total | $ 94,109. |

**Statement 4**
Form 990, Part IV, Line 57
Land, Buildings, and Equipment

| Category | Basis | Accum. Deprec. | Book Value |
|---|---|---|---|
| Machinery and Equipment | $ 900. | $ 900. | $ 0. |
| Improvements | 862. | 862. | 0. |
| Total | $ 1,762. | $ 1,762. | $ 0. |

**2006**

# Federal Statements

### Nansen Lodge , No 410,  District 3
### Sons of Norway

**Page 2**

13-2881755

---

**Statement 5**
**Form 990, Part VI, Line 80b**
**Related Organizations**

| Name of Organization | Exempt | Nonexempt |
|---|---|---|
| Nansen Lodge Social Club, Inc. | | X |
| Nansen Properties Inc. | X | |



128.8

From: luckyeddie410@aol.com
To: Anubis1016@aol.com; Dee7238@aol.com; Jvitkovich@aol.com; KVQuest@aol.com; ThulinEL@aol.com; TThor353@aol.com; cthor42332@aol.com; CPThor36@aol.com; liitex222@aol.com; Pagexlewis@aol.com; Uffda1218@aol.com; caheedys@aol.com; Tjthefox@aol.com; glowpete@aol.com; gramila@aol.com; MARGANNNYC@aol.com; LornaAnne@aol.com; jmccra573@aol.com; Gusm01@aol.com; luckycato@aol.com; Chrsign@aol.com; Moebill@aol.com; LONGSHIP50@aol.com; LFB99@aol.com; whitelce@aol.com; thevlk3001@aol.com; Trump6053@aol.com; Kacy86l@aol.com; Todostroll@aol.com; evelynher@aol.com; troll410@aol.com; jham0702@aol.com; kengundersen@aol.com; GulliksenP@aol.com; goldenpilot6060@aol.com; kath00613@aol.com; jh411@aol.com; chasjoy30412@aol.com; irishviking@aol.com; xkdalyx@aol.com; DHLHS2@aol.com; ladyvikin@aol.com; Jannburt184@aol.com; rbrids@aol.com; cyobwiocy@aol.com; Frankjwjw@aol.com; RanderU128@aol.com; HenryandEmmy@aol.com; dja906@yahoo.com; dblond@tds.net; hebhector@verizon.net; jbilezikjian@gmail.com; trishabolt@verizon.net; brekviking@msn.com; memacal@att.net; Rcasparie@verizon.net; Anneward58@verizon.net; arinamaycotogno@yahoo.com; JudyMayDahl@si.rr.com; laneydahl@verizon.net; Mr.Forks@gmail.com; Jmdyon@prodigy.net; Legebo@aol.com; meklund@sasair.com; SandraE420@aol.com; Norig@yahoo.com; bjfosse@gmail.com; karengilmartin@rocketmail.com; olav8wads@yahoo.com; Hubba83@optonline.net; debll0420@yahoo.com; gladya_kairless@msn.com; kjacobus@optimum.net; Bea.Jay@att.net; jensenlb@yahoo.com; kkaiser343@gmail.com; karlrob@verizon.net; howphyl@comcast.net; mormoriovesya@yahoo.com; hjwk1@verizon.net; hkuell@yahoo.com; kkuell@comcast.net; fosse1238@verizon.net; nyc_sonja@hotmail.com; mkkishelles@yahoo.com; dablge18@yahoo.com; kenzen1@verizon.net; liorentzen@hotmail.com; ilorentzen@verizon.net; pal10314@aol.com; slorentzen95@verizon.net; jfmckillop@verizon.net; Jmckillop335@verizon.net; sonjam210@msn.com; ctc0918@verizon.net; every1lovestimmy@aim.com; highway467@msn.com; jeffnorbs@verizon.net; TaubeO@msn.com; brian@qinternet.com; KLO@Rochdale.com; polly@theoutzens.com; astridmarie@verizon.net; Vikingmom@si.rr.com; tor22@yahoo.com; Pickles10192@verizon.net; cs30760@verizon.net; nordikwolv68@yahoo.com; Fiskmonsen@verizon.net; hstromnes@yahoo.com; Robet57@verizon.net; dave5480@verizon.net; slroet2@verizon.net; vikintelly@hotmail.com; tlellefsen@si.rr.com; seanglent@aol.com; ethorklidsen@si.rr.com; THORK144@LTIS.NET; etollevsen@si.rr.com; viking49@si.rr.com; ingerv@earthlink.net; KVanWart@gmail.com; ewalsh@cityhall.nyc.gov; Katliswin@yahoo.com; lillyyeno@verizon.net
Subject: Fwd: Nansen Lodge Special Meeting 15 December 2009
Date: Fri, Jan 8, 2010 11:17 am

This morning I, as well as the others listed, received this email from Ralph Peterson regarding the special meeting that was called on Dec. 15th. As part of my duties to get out the information relating to the lodge im forwarding this to all local members that i have the email address for.

-----Original Message-----
From: nodakralph@aol.com
To: longship50@aol.com
Cc: rege882@catskill.net; farmorkar@msn.com; trollbu@verizon.net; kdollymore@aol.com; kmdoly@comcast.net; publicity@sofn3d.org; jmckillop335@verizon.net; mlarson@northfloridapo.com; maryandersen@erisadiagnostics.com; vikingphil@tampabay.rr.com; judimaxsmom@rcn.com; lolsenmd@gmail.com; araszoo@aol.com; amokljohnsen@yahoo.com; carolnphil@juno.com; BBerntsen1@aol.com; audun99@ptd.net; shelberg@sofn.com; slorentzen95@verizon.net; rumaren@verizon.net; lardou@gmail.com; luckyeddie410@aol.com; Brian@qinternet.com; cthor42332@aol.com; Etollevsen@si.rr.com; henryandemmy@aol.com; chris41358@yahoo.com
Sent: Fri, Jan 8, 2010 12:03 am
Subject: Nansen Lodge Special Meeting 15 December 2009

President Kornbrekke:

As discussed in our recent phone conversations, I received several emails concerning a letter dated December 9, 2009 from nine of your lodge members requesting a "Special Meeting".

According to the letter the purpose of the meeting was to "allow the general membership, and the Properties and Social Boards to have an overview of the proposed contract and financial history of Properties Inc. since our initial contract with the caterer in 1994 and prior to the signing of the contract."

I have also received a copy of the email sent by Vice President
Lorentzen on December 14, 2009 to several of your members calling for a
Special Meeting to be held December 15, 2009. The purpose of this Special
Meeting was not the same as the request for the special
meeting dated December 9, 2009..

I subsequently received an email requesting assistance of the 3rd District President in declaring the calling of the
meeting and any actions taken during the meeting to be made null and void because of improper calling of the meeting.

The SON Charter, Constitution and Procedures along with Roberts Rules
of Order provide guidance on how a Special Meeting is to be called and
run. Based on the information that I have, it appears that the procedures Nansen lodge used in calling the
meeting were not in accordance with the, Constitution and Procedures and Roberts Rules of Order.
The Constitution Chapter 2 (4.2.4) states that the President shall
inform the Secretary of the time, place and purpose of such Special
Meeting and the Secretary shall inform members of the same. No other
matters than those mentioned in the notice shall be considered.
The Procedures manual Chapter 16 (8.16.1.4.7) states that the Secretary shall
inform the members of the time of all Special Meetings.
Roberts Rules of Order page 89 lines 10-18 gives additional guidance
regarding the calling of a Special Meeting. It states that the notice of
a Special Meeting will include the time, place and exact purpose of
the meeting and be mailed to all members a reasonable number of days
in advance.

It appears that the notice of Nansen's Special Meeting failed several of the above
requirements.

It is my understanding that The Secretary did not notify all of your members; I was informed that 101
members were notified by email of the meeting by your Vice President. Forty additional members with
email address were not notified by email. While the Constitution does not
specify how to notify "all" the members it does say to notify the
members. Roberts Rules of Order amplifies the constitution by stating that notification is to be
made to "all" the members and made by mail. As the Constitution doesn't specify how local lodges are to be
notified (it does specify how to notify the International Board of Special Meetings) then
Roberts Rules of Order should have been followed and the notification
made to all members by mail. It appears that the email notification covered only about 20% of your members. I
am aware that phone calls were made to some members advising them of the meeting. Further, I have been
informed that at least two of the members who submitted the letter requesting a special meeting were not notified
by email and they both have their email address listed on the Nansen Lodge membership list found on the SON
web site.

The Constitution does not specify a specific time period for calling
the special meeting for local lodges ( It calls for a 5 day period for
the International Board) but Roberts Rules of Order states that the
notice of the meeting must be mailed to the members a reasonable
number of days in advance". Calling a meeting with 24 hours notice
does not meet the reasonable criteria except in the most dire of emergencies and this does not appear to fall in
that category.

The Constitution states that agenda for the special meeting will be
limited to the agenda item stated in the request for the special
meeting and that agenda item should be that which was in the request letter for the special meeting. . It appears
that this criteria was not met.

I have reviewed all the governing documents including Nansen's by-laws and find that the letter requesting the
special meeting and the email requesting that any actions taken at the 15 December meeting be declared null and
void as the meeting was not called properly, were properly submitted.

Over the past weeks I have suggested that you recall the meeting. I offered to meet with your old Board, new
Board, a member from the committee currently negotiating the new contract and a member who signed the letter

128.8

requesting the special meeting to see if an understanding could be reached. . I did not receive a reply. In view of the above I am obligated to take action.

One of my duties as District President as specified in the SON Procedures manual Chapter 16 (7.16.1.4) is to "Decide all cases appealed to the office of the District President". I have received an appeal to declare the meeting null and void and based on the correspondence, SON Charter/Constitution/Procedures, and Roberts Rules of Order that I have received, I find that the meeting was improperly called and declare any business transacted at the meeting to be null and void.

Further, I recommend that Special Meeting be called in a procedurally correct manner at a time convenient to all while following the procedures as laid out by the Constitution and Roberts Rules of Order. In my opinion, if you notify those members with valid email addresses via email; document anyl phone call notifications to members without valid email addresses and/or by US postal mail allowing the letters 5 days to reach their destination, you will satisfy the intent of the Constitution and Procedures as well as Roberts Rule of Order in notification of the meeting.

In accordance with Chapter 8 of the Constitution (2.8.1), you may appeal my ruling to the International President or just recall the Special Meeting .

Fraternally

Ralph Peterson
President
District Three
Sons of Norway



**NYC DEPARTMENT OF HEALTH & MENTAL HYGIENE**   **DIVISION OF ENVIRONMENTAL HEALTH**
Bureau of Food Safety and Community Sanitation, 253 Broadway, 13TH Floor, CN 59A, New York 10007, Tel:(212)676-1600, Fax:(212)676-1608

## INSPECTION REPORT

Owner: NANSEN LODGE SOCIAL CLUB,INC.  D.B.A.: TASTE OF HONEY AT NANSEN PARK
CAMIS No.: 41468119 Permit No.: 2540-0000000   Addr: 3441 VICTORY BOULEVARD   Boro: Staten Island   Zip: 10314
Inspection Date: January 28,2010   Start Time: 04:22 PM   Time Issued: 04:48 PM  Tel:(718)983-0464
Activity: Initial Inspection (Primary Inspection)   Pre-permit (Establishment in operation)
Finding: Notice of Violation Served (Reinspection not scheduled)

**44.1**

| Inspection Summary: | Total Score: | -5 |
|---|---|---|
| Violation Code | Condition | Score |
| 04P | 1 | -05 |
| 18A | | |

Inspection Notes:

Re: Pre Permit Initial Cycle inspection PP/A

FPC Holder Donna Malone 03-06592 was present at time of inspection.

Ownership ( Nansen Lodge Social Club, Inc) verfied via COA# 132518571 validated on 07/12/1995

Establishment opens at 10 am and closes at 8 p.m.

No SFAA violations.

All signs conspicuously posted.

Hand wash sinks provided in kitchen and bar

Three walk in boxes present at the time of inspection

Backyard observed.

Accurate metal stem type thermometer provided at time of inspection.

Gas hot water heater observed in the basement. No backdraft or carbon monoxide detected.

Male and Female restroom facility observed

Low temperature dishwasher along with test sanitizing kit observed.

Hot and Cold running water at adequate temperature

Food Service Establishment in compliance with Trans Fat Regulations.

CPR Kit provided.

No vermin activity observed.

HOT TOPICS

DOHMH Rep.Sig                                DOHMH Rep.Signature:

Name:Kingsley Ohikuare  Id No.:1565                 Name:         Id No.:
DEPARTMENT OF HEALTH & MENTAL HYGIENE EMPLOYEES MUST SHOW IDENTIFICATION. FALSIFICATION OF ANY
STATEMENT MADE HEREIN IS AN OFFENSE PUNISHABLE BY A FINE OF NOT MORE THAN $500 OR NOT MORE THAN
60 DAYS IMPRISONMENT OR BOTH,NYC ADMIN CODE-SECTION 10.154.

I acknowledge that I have received a copy of this inspection report.

Received by                                     Date:January 28,2010

**NYC DEPARTMENT OF HEALTH & MENTAL HYGIENE**
Bureau of Food Safety and Community Sanitation, 253 Broadway, 13TH Floor, CN 59A, New York 10007, Tel:(212)676-1600, Fax:(212)676-1608
**DIVISION OF ENVIRONMENTAL HEALTH**
**INSPECTION REPORT**
Owner: NANSEN LODGE SOCIAL CLUB,INC.   D.B.A: TASTE OF HONEY AT NANSEN PARK
CAMIS No.: 41468119 Permit No.:2540-0000000   Addr: 3441 VICTORY BOULEVARD   Boro: Staten Island   Zip: 10314
Inspection Date: January 28,2010   Start Time: 04:22 PM   Time Issued: 04:48 PM  Tel:(718)983-0464
Activity: Initial Inspection (Primary Inspection)   Pre-permit (Establishment in operation)
Finding: Notice of Violation Served (Reinspection not scheduled)

Settlement Now Available for Food Service Establishment Violations   The DOHMH is now offering food service establishments the opportunity to settle their violations in lieu of having to wait at the Administrative Tribunal for their cases to be heard. Beginning on November 30, 2009, the DOHMH began making settlement offers to any interested establishment appearing at the Tribunal on the date of its scheduled hearing. To accept an offer, a food service establishment must acknowledge that the violations alleged in the NOV existed at the time of the inspection. However, the penalties offered by the agency to settle are generally lower than the penalties it recommends be imposed for the same violations if they are sustained at a hearing. In the future, the DOHMH plans to offer food service establishments the opportunity to settle by mail or online prior to their scheduled hearing dates. For more information, please dial 311.

Health Department Proposes Letter Grading for Restaurants   The Health Department is proposing to give restaurants letter grades - A, B, or C - based on a restaurant's inspection score, and to require the grade be posted near the restaurant entrance as of July 1, 2010. Frequency of inspections during the following months will be tied to the score received. Any restaurant with a score that would result in a B or C grade would get a chance to improve its score on a second inspection before having to post its grade. The second inspection would be conducted no sooner than seven days after the initial inspection. If on that second inspection the restaurant's score still resulted in a grade of B or C, it would still not have to post its grade until it has had an opportunity to have the Notice of Violation issued at that inspection adjudicated at the Administrative Tribunal.  The Department is accepting public comments on the grading proposal until February 5 2010. Go to http://www.nyc.gov/html/doh/downloads/pdf/notice/article-81-amend-1209.pdf to read the proposal, and follow the directions on page 1 for pre-registering to speak and submitting comments by mail, fax, email, and online.

DOHMH Rep.Sig

DOHMH Rep.Signature:

Name:Kingsley Ohikuare  Id No.:1555          Name:          Id No.:
**DEPARTMENT OF HEALTH & MENTAL HYGIENE EMPLOYEES MUST SHOW IDENTIFICATION. FALSIFICATION OF ANY STATEMENT MADE HEREIN IS AN OFFENSE PUNISHABLE BY A FINE OF NOT MORE THAN $500 OR NOT MORE THAN 60 DAYS IMPRISONMENT OR BOTH.NYC ADMIN CODE-SECTION 10.154.**

I acknowledge that I have received a copy of this inspection report.

Received by :

Date:January 28,2010

Page 2 of 2



136

**NANSEN LODGE**
**EXECUTIVE BOARD MEETING**
**April 27, 2010**

<u>PRESENT</u>:  President Brian Olsen, Vice President David Thorsen, Treasurer Christine
Hansen, Recording Secretary Eleanor Tollevsen and Counselor Paul Kornbrekke
<u>GUEST: Gail Ekloff, 3rd District Vice President</u>

<u>President Brian</u> opened the meeting at 7:15 pm.  He just wanted to go on record that he is
just trying to look after the best interest of the Lodge.  At our last meeting we discussed
the Lodge membership, the financial status and the retention of a law firm in the interest
of guarding the interests of the Lodge.  Now I would like to take a vote on this

<u>Motion to Vote</u>

<u>Eleanor</u>:  First of all we do not need a coast-to-coast law firm – if anything, only a New
York law firm.  We do not know if we can afford this law firm considering our present
financial condition and how much legal work we are really going to have. We do not
have any idea what the hourly rates are. I really don't think we should be voting on this
now. As Paul said, it should be discussed with the other boards and get other opinions. I
don't think we have the right to make this vote at this time or to put the Lodge in this
position - having to come up with $5000.  The members are going to hit the ceiling when
they hear it.  My vote is absolutely "no."

<u>Paul</u>:  As I said before, Brian, this should really be discussed with the three boards. I vote
no.

<u>Christine</u>:  I looked them up and I think the law firm would be good for the Lodge and
not be that expensive. It doesn't necessarily have to be the law firm in question. I vote
yes.

<u>Brian</u> - Yes
<u>David</u> -Yes

<u>Motion to retain Fox Rothschild with a $5000 retainer is approved by a 3:2 vote.</u>

<u>President Brian</u>  adjourned the meeting at 7:20 pm.

Respectfully submitted,


Eleanor Tollevsen
Recording Secretary



( 176.2 )

February 4, 2011


Mr. Carl Heiberg, CEO
Sons of Norway International
1455 West Lake Street
Minneapolis, MN 55408-2666

Dear Mr. Heiberg:

As a former member of Nansen Lodge #410 I was pleased to read, in the January 2011 issue of Viking magazine, of the recent changes/clarifications to the policies, procedures and laws of Sons of Norway which were approved at the International Lodge Convention. It has been my understanding that Sons of Norway International has been, in recent years, advocating for Lodge Executive Boards to handle all the business of the lodge, so as not to interfere with the social/cultural aspects of the fraternity. For most lodges I'm sure this is the ideal way to keep members interested in attending meetings. It becomes a bit complicated for Lodges who own property to operate in this manner. In addition to more over-sight by the District and International levels of SON, I believe that it is important for lodge members to have recourse to request Special Meetings if the situation calls for it.

My family and I had a long history as active members of Nansen Lodge, from June 1965 to May 2010, and while we never felt our many years of membership gave us any special rights, we did feel (and still do) that part of being a productive and active member of SON requires knowledge about the rules and regulations of the constitution, by-laws, etc., regular attendance at meetings, serving on committees and as officers (my husband, *Ted, in particular, is a past President, served as Zone5 Director and 3rd District Cultural/Social Director*) in addition to enjoying all of the social and cultural activities. However, it was with great sadness that we left Nansen Lodge #410 because of issues greatly disturbing to us and many other members, which were damaging to the lodge itself, particularly in the exact areas the recent changes addressed. Therefore, because of the great deal of care you and SON International have taken to address the many issues modern lodges are facing, I felt compelled to give you a concrete example of exactly what they are meant to prevent by sharing with you the exact issues present within Nansen Lodge that have led to financial hardship, deception of members, and what many believe are various illicit and illegal activities.

As you know, Nansen Lodge #410 has recently had and still has its share of issues. However, these issues stem from problems rooted deep within its organizational history and make-up, starting in the early 1990's. **(attachments 100.7 & .8)** Prior to 1995, the oversight body within the lodge was made up of a cross section of the membership and worked reasonably well. In an effort to improve the communication and transparency of the business side of Nansen, the Executive Board assumed the "oversight" responsibility and their duties were added to the Lodge By-Laws to clearly outline their authority. However, rather than open the line of communication between the two corporations and the lodge membership, discussion was gradually eliminated from lodge business meetings. In fact, questioning by the general membership was highly discouraged and members who spoke up were subject to ridicule and thought of as un-fraternal.

I personally encountered some problems in 1996 when I requested that all members be notified of a special meeting to vote on options for a major renovation of the Lodge. The cost of the proposed project had been estimated to run anywhere from $200,000 to $300,000+ and would definitely have required a mortgage in order to proceed. My request was approved by a vote on the floor of the lodge.

1

All members were notified in writing and ultimately had an opportunity to vote on the options. This action lead to attacks on my character by a small minority of members who stated I had "interfered" within the business of the lodge. A pattern of behavior that continued toward, not only me, but anyone who spoke out against the ruling minority and went on unchallenged until several distinct issues and events took place including the uncovering of *knowledge that a "partnership" [was formed in 1995 "Nansen Lodge Social Club Inc. DBA Taste of Honey at Nansen Park"* **(attachments 42 & 44)** *which established the true reason the executive board was created.* Unfortunately though, it took until 2007 before we realized the full extent these actions were damaging and doing a disservice to the future of the lodge when the 2006 Properties Board annual financial report **(attachment 10)** was presented at the April 2007 lodge business meeting.

This was the first notice to the membership that the Properties Board had depleted its reserve and had become dependent on loans from the lodge treasury to bridge the 6 to 7 months between the lucrative picnic season. Income from the Main Hall was minimal in regard to the cost of operation. Since this financial situation had obviously been developing over a period of time without regular notice to the lodge members, it appeared the only way to know what was happening with the corporation finances was to join the Properties Board, particularly since they were in need of new members. Together with my son, David, and Brian Olsen, we attended the June 2007 Properties Board meeting and formally joined the Board in July 2007 **(attachment 103)**. Although I had never served on either of the corporation boards before, I was familiar with the workings of the Properties Board from my husband's many years of service - both as a member and President of the Properties Board. I had always been impressed with the businesslike manner in which they ran the Corporation. When I joined Properties it came as a surprise to me to find that they had become very lax **(attachments 2007min  105-114)** in regard to their business practices. Contracts were missing (Picnic Grounds Contract with the caterer and T-Mobile cell tower contract), there was a lack of knowledge of pertinent information included in the contract, no paperwork was present to indicate that the caterer had fulfilled her contractual agreement in regard to going forward with her 5 year option on the contract, there were no receipts, deductions were made without Board approval, etc. **(attachments D, 16, 27, 85, 92, 93, 95, 103, 108, 110, 116.1)**

We were given a copy of the Nansen Properties By-Laws at the June 2007 meeting **(attachment 100)**. Unknown to most of the membership, including myself, was the fact that the Properties Board was officially no longer responsible and accountable for the general management and business affairs of the corporation. The by-laws had been changed in November 1995 **(attachment 100.5)** to read that the Board of Directors shall be responsible to and act at the direction of the Nansen Lodge Executive Committee for the general management and business affairs of the corporation. Since the Executive Board of the lodge is considered the Lodge's over-sight, it appeared to me to be a conflict of interest for them to be in control of reviewing their own decisions. The reason most of the general membership was unaware of this by-laws change was because the Executive Board chose not to give the customary proposed by-laws change written notification (via the Nansen News).

In reviewing the 2005 Properties minutes, the aforementioned By-Law's change came about after a member of the Properties Board challenged the Executive Board's **(attachment 121.1)** right to withdraw a large sum of money ($14,000 *which was used as a deposit for drapes, etc.*) from the Properties Money Market reserve fund without discussion and a vote by the Properties Board. The Executive Boards remedy for this problem was to change the By-Laws to officially give themselves the authority that they had gradually been assuming since 1995.

2

( 116.2 )

Confidence in the Executive Board also weakened when we learned early in 2010 that the Lodge had not been required by the International Lodge, in the Fall of 2004, to strip our By-Laws of the rules and regulations pertinent to the operation of our Lodge and switch to the generic By-Laws offered by International (attachments 100.1-100.5). A Manual of Procedures was written to contain the information eliminated from the By-Laws, but the Manual was not distributed to the membership and ultimately not adhered to by the Executive Board. When I requested a copy of the Manual of Procedures, I was informed by Richard Maren, By-Laws Chair, that it was not necessary for anyone but the officers of the lodge to have a copy of that particular document. *(I was also designated by the Properties Board to be one of two Properties Board representatives on the By-Laws committee. Richard Maren, Chair of the By-Laws committee refused to allow my participation on this committee and excluded me from any discussions conducted by the committee.)* (attachments 100.7)

Going back to the Properties Board, a motion was made and approved at the August 2007 (attachment 104.2) Properties Board meeting for Chris Logan (Properties Treasurer) and myself form a research committee in regard to the contracts, etc. The purpose of this committee was to locate the 2001 Picnic contract (it mysteriously appeared with the Social Board's records), to establish whether or not the caterer, Evelyn Rogers, had actually exercised her right to the additional 5 year option to renew her contracts until 2011. *(There was nothing in writing from the caterer (as per the 2001 contracts), nothing in Properties Minutes to indicate that the option had been formally acted upon and a general lack of memory amongst the Properties Board and Lodge Executive Board members in regard to this issue. No documentation was ever found in regard to Ms. Roger's exercising the 5 year option. In lieu of that, the Executive Board of the Lodge determined that she was entitled to the 5 year option despite not having following the rules of the contract* (attachment 109)

The committee was also charged with researching the needs of the Properties Board in regard to the next contract to be drawn with the caterer which was due on January 1, 2011. Information in regard to finances, contracts etc., from 1993 through 2007, was included in the research project and detailed reports presented to Properties through the Fall of 2007. (attachments3.6, 3.7, 3.8)

When I joined the Properties Board, Harry Kuell was serving as acting President under the Vice President's title. In October 2007 Harry became the President and I was voted to be the new Vice President. As Vice President I was now allowed to attend the joint executive Board meetings and became privy to more information about the present operation of the Lodge.

Members of the lodge attempted to rectify these situations by nominating younger members to run against what was viewed by many as a monopoly of power and two nominees, Brian Olsen and David Thorsen were subsequently elected President and Vice President of Nansen I November 2010. President and Vice President Brian Olsen and David Thorsen worked closely with lodge members, as well as S/N 3rd District President, Ralph Petersen, and Vice President, Gail Eklof, to bring the true nature of the business operation of Nansen Lodge to the attention of the membership of the Lodge and SON in general. They shared the information found with the 3rd District Officers and were guided in many of their actions by said officers. Unfortunately, the lengths that some of the old power monopoly would go to protect their financial interests were underestimated and despite Brian's and David's efforts to protect the financial interests of the lodge for future generations, false rumors, vicious attacks, and slanderous attack, and fear mongering frightened many members away from attending meetings. Meeting attendance dropped down fewer than 80 members per meeting out of the close to 600 members total and without the support of the majority of members who actually attend meetings (10% [+or-] of the lodge membership). As well as the attacks that were escalating in size and

3

viciousness, Ralph Petersen advised them resign from office, forget about the issues facing Nansen Lodge and start a new Lodge on Staten Island. (attachments 140-148)

Upon Brian's and David's resignation from office, the 2009 Lodge executive officers, including Paul Kornbrekke, Harry Kuell, and others resumed the positions they held in 2009 and immediately began altering Nansen's bylaws and Manual of Procedures so that younger members could never run for officer positions again, further sealing their duplicitous hold over the lodge. Furthermore, Paul Kornbrekke's final President's address in the January 2011 Nansen News (attachment "A") credits International Secretary Audun Gythfeldt and International Director Barbara Berntsen for their assistance and support during last year's crisis. Aside from his presence at the November 5, 2010 lodge meeting (attachment "B"), I assume that he worked behind the scenes. Barbara, on the other hand, was quite visible and verbal. Her presence added strength to Mr. Kornbrekke's "contingent" in their success in blocking the special meeting legitimately requested in writing on December 9, 2009. The members who requested the special meeting (myself included) did so in an effort to slow down the signing of new contracts with the caterer. The actual expiration date of the contracts was not until January 2011 but Mr. Kornbrekke, as President of the Lodge and, as such, ordained head of the contract committee, had placed a rush on getting the new contracts in place before the new 2010 officers took office. Our request for the meeting was ignored despite the very real financial issues in question (unpaid bills, threats by the electric and gas companies to turn off our service, bills going to collection agencies, members having to lay out their own money to cover bills, etc.) (attachments E, 102, 104.1,118.1-118.12). In place of the meeting we requested, Mr. Kornbrekke called his own special meeting (held on 12/15/09) with a mere 24 hour notice (e-mail) to less than a third of the membership of the lodge. Barbara Berntsen was in attendance at the 12/15/09 meeting (attachment "C"). She introduced herself as a representative from International and played a prominent role during the meeting.

I realize there is a bond of friendship between some of the International Board officers and the Kornbrekke "contingent," but I find it distressing that neither Audun or Barbara made any attempt to contact either Brian Olsen, David Thorsen, myself or any of the other members who had requested the special meeting (attachment 128.1) to find out exactly what issues we were attempting to address. Considering their positions within Sons of Norway, their lack of impartiality was disappointing. That being said, it is my understanding that at that particular point in time the jurisdiction of our lodge issues was under the 3rd District level so Barbara Berntsen was very much out of order in using her influence and title as an International Officer to sway the membership in any direction.

In regard to Audun and Barbara, I had spoken "off the record" (attachment 153) to each of them in the past in regard to my personal concerns about the financial operation of the lodge and the lack of transparency between the Executive Board and the membership of Nansen Lodge, etc. My discussions with each of them included my concern that Sons of Norway's avocation of Lodge executive boards conducting all the business of the lodge was not practical in the case of lodges who own property. One of my discussions with Barbara was particularly lengthy and closed with her recommendation to me was that if we were unhappy with the leadership at the lodge we needed to have people run against them...which was tried, as you know, but ultimately failed. The forces were too strong against them.

Based on the documentation that was researched both prior to and following Brian Olsen and David Thorsen's installation to the offices of President and Vice President, the following issues contributed to the present financial and, I believe, various illegal operations that have and continue to take place at Nansen Lodge.

4



In addition to the issues I have previously addressed, the items listed below are also among the "problems" that were uncovered during my tenure on the Nansen Properties Board. The serious nature of the issues, guided by President Ralph Petersen, prompted the new 2010 Lodge executive board members to get legal counsel, issue a formal letter of complaint and form an investigation committee. (138.1, 138.4 )

## Off the books payments to employees/Unreported Income (Attachments 2 written & audio, 5.10,11,13, 15,16,17-21,24, 86, 93, 113.)

- Since 1998, shared payment of caretaker between Nansen Properties and the caterer, Evelyn Rogers. Cash payment made directly to the caretaker by the caterer and 75% of the cost deducted from monthly "rent" to Nansen Properties. (Documentation includes written and audio minutes of the 2/24/10 Executive Board meeting called to discuss the Board of Health issues and the new contracts, where Paul Kornbrekke outlines the off-the-books relationship with the caretaker and that 1099's have and will not be issued for off-the-books employees. Attached documents also note substantial off-the-books payments to members and non-members for various services including but not limited to snow removal, grounds-keeping, construction activities, etc. Payments are/were often listed on caterer and properties financial statements under the category of maintenance and/or maintenance and repairs

### Unreported income:

- Without the knowledge of the Properties Board, the caterer has made unauthorized deductions and expenditures (with no receipts or documentation) from monies contractually due to Nansen Properties. The deductions were made to cover various business costs incurred by the caterer and were done with the approval of Paul Kornbrekke and are referred to a pass-through costs by Mr. Kornbrekke. The deductions include financial contribution to the salaries of waitresses, linens, special chairs or equipment requested by client, bread & butter, etc. (attachments 2 & 117)

## False Documentation to Federal/State/City agencies and misrepresentation to the membership of Nansen Lodge:

- False information to the NYC Board of Health the Nansen Social Club Inc. is a catering company "doing business as" Taste of Honey at Nansen Park. They are in fact allowing the caterer, Evelyn Rogers operate an additional catering business on the property under the Catering Liquor License held by Nansen Social Club Inc. (attachment 2, 39, 44.1, 45, 46.2, 48.1-6, 47 47.1, 49,130,131 Audio)
- False document to both the NYC Workmen's Compensation in regard to employee status by Nansen Properties and Social Club. (attachment 39)
- Federal/State/City income Tax Returns – No mention of a catering partnership between Nansen Lodge Social Club Inc and Evelyn Rogers –"Taste of Honey at Nansen Park." Information on income tax forms list Nansen Lodge as being 100% Social Club/meeting hall. (attachments 55, 56, 59, 60, 66, 80.2
- False information submitted in regard to status of the corporation in an audit of the year 2003 (attachment 80.1)
- Accountants, Potter and LaMarca , yearly financial statements prepared for the Lodge and corporations contain no mention of the "partnership" relationship between Nansen Lodge Social Club Inc. and Evelyn Rogers, Taste of Honey. (attachment 78)
- Agreed upon contracts related to Ms. Rogers business – "A Taste of Honey"  There is no known written contract between Nansen Lodge Social Club Inc. and Taste of Honey at Nansen Park. Attachments:  (attachments 3 & 4)

5

- The general membership of the lodge was not informed as to the "catering" arrangement between Nansen Lodge Social Club Inc. and Taste of Honey at Nansen Park.
- The "seasoned" members of the executive boards gave false information to the new executive board officers and members of the Properties and Social Board directors in regard to the true nature of the business conducted by the Social Club and the caterer (attachment 2, 45, 46, 48 audio of meeting, 49,133, 135,139,144)
- Unreported name addition to New York City Property rolls. From the time the property was purchased in 1948, Nansen Properties Inc. has held the title of owner. Starting in 2007 an additional name was added to the NYC Property rolls: **Nansen PK Inc.** There is no record in the Properties Board minutes to indicate the reason or necessity of adding the additional name. (attachment 120)

### Neglect of Fiduciary Responsibilities:

- From 1993-2010 the executive board positions within lodge and its two corporations were closely guarded and rotated amongst a small group of people which made it possible for them to gradually assume control of the financial affairs of the lodge and create a lack of transparency to the membership. Certain members, in particular Paul Kornbrekke, were allowed to remain as signatories on the bank accounts of more than one board at a time. (attachment 1, 96)
- **New Contract 2110 Picnic and Catering Contracts** (15 year duration of contracts) rushed through (prior to the new President being installed and without the new President's knowledge of content of contract) one year in advance of expiration date. (attachment 3.1 , 3.3, 3.5, 4.1, 4, 104.2, 108, 109, 161, 3.2)
- **Loans** from Nansen Lodge's Treasury to Nansen Properties without notification or a vote (as called for by the by-laws) by the membership and **transfer of funds** from the Nansen Properties Money Market Reserve (to pay for basic operating costs, etc), as per instructions by the Lodge Executive Board. No prior discussion or vote of approval offered to the Nansen Properties Board.. (attachment 22, 25.2, 32, 82, 84, 95, 91, 95, 101, 113, 115)
- Appropriate business matters (including loans from the lodge treasury, major financial construction projects, etc.) requiring lodge membership vote not brought to the lodge floor. Rather, decisions were made on behalf of the lodge by the Executive Board and not routinely reported to the membership.
- Misrepresentation to the lodge membership that the Nansen Social Club operates under a Club Liquor License. **Until May 2010, new members have been required to sign up and pay a token fee in order to become a member of the Social Club and have the right to purchase liquor from the bar.** Unknown to the general membership, Nansen Lodge Social Club has been operating under a Catering Liquor License since 1995. (attachments 40.6, 42, 42.1, 42.2)
- They have knowingly abused the rules and regulations of the State Liquor Authority by:
    - -Allowing the caterer to serve liquor purchased from outside sources through Nansen Social club's license.
    - -Allowing the caterer to "borrow/purchase" liquor from Nansen's inventory for use under their own catering liquor license which covers the caterer for Small Hall and Picnic Grounds events at the lodge. (attachment 152)
- "Seasoned" officers abused the authority of the offices they held/hold and violated the bonds of fraternal unity by bullying, threatening and intimidating members in their attempts to address issues such as the Board of Health which ultimately lead to the impeachment charges brought against President Olsen and Vice President Thorsen, the complaint against the officers of Nansen Lodge, the formation of an investigation committee, the disengagement of the legal

6

176.2

firm of Fox Rothschild, the resignation and/or transfer of members from lodge membership, etc. (attachment 40.1-40.3, 41.1-41.5, 122,124, 135, 136, 138, 139, 140, 141,142, 143, 144.1-144.5, 145, 146, 147)

## Conflict of Interest:

- Outside business relationship between the Kornbrekke family and Evelyn Rogers of ATOH. Operation of the restaurant "Grasmere Grill" from 2003 through 2009. (attachment 119.1-119.6)
- Since the sale of the restaurant in 2009, Brian Kornbrekke (son to Paul Kornbrekke) has been employed by Evelyn Rogers as one of the main chef's for her catering business – A Taste of Honey.
- Conflict of interest by Paul Kornbrekke who, in addition to the outside business relationship with the caterer, he has also served as the Ms. Roger's representative and the go-between for all business and contract negotiations between the Ms. Rogers catering business and the two corporations.
- Conflict of interest by executive board members who have retained duties and responsibilities as they have rotated from one executive board to the other (3 Executive Boards: Lodge, Properties Board and Social Board.)

The issues listed above have developed over a minimum period of fifteen years. Although documents substantiate all of the issues addressed within my letter, I still find the situation confusing and almost impossible to believe. These situations have developed under the leadership of long-time members of the lodge. They have each in their own way also contributed so many positive things to our organization through the years. Unfortunately, not all of their actions have been for the benefit of Nansen Lodge. They refused to address any of the issues that we attempted to bring up. Their only defense has been to spread a multitude of rumors which have taken a life of their own. Accusations range from misappropriation of the SON Bond and the lodge treasury (attachments 144.1-144.5, 156-160) to personal vendettas against certain families within the lodge. This is a smoke screen. There are real issues at Nansen lodge. I had not originally planned to send supporting documentation to you, but the complexity and believability of the entire situation called for more than I could describe.

In closing, I'd like to say that as long-time members of Nansen, we treasure the memories of the standards that Nansen Lodge governed under for so many years. Our remembrances of the many people who were responsible for the formation and development of Nansen Lodge in addition to the various offices and activities that we personally participated in at the Lodge will never be forgotten.

It was with mixed emotions when our family chose to transfer our memberships out of Nansen Lodge in May of 2010. We truly hope that our honest concern in regard to the present financial operation of the Lodge and the lack of transparency to its membership will ultimately be resolved. In the meantime, we feel a sense of relief that we remained steadfast to the ideals that countless numbers of Nansen Lodge officers and members labored under for so many years.

I apologize for the length of my letter, but it was the best I could do to condense a long-term situation. As you know, the 3rd District S/N was apprised of many of the existing problems. President Petersen was requested to come to Nansen Lodge to help work out some of the issues. Unfortunately he was unable to honor our request but sent Gail Eklof to represent him at the April 19, 2010 Officers Meeting. Ultimately, President Petersen's advice was to get a lawyer and work the problems out within the Lodge. This proved to be impossible and at long last prompted my decision to forward the information and documentation to the International Board for review by you and your legal department. If nothing else, it will offer you an example of what can happen without more oversight

7

and involvement from District and International levels of Sons of Norway in regard to the operation of Lodges who own their own property and **run businesses**.

Fraternally,


Christine Thorsen
708 Jewett Avenue
Staten Island, NY  10314
718 442-1881


Attachments:  All copies of documentation were made during the research process.
              All original documentation, used for copy purpose file/stored at Nansen Lodge.

8





**SONS OF NORWAY**

1455 West Lake Street
Minneapolis, MN 55408-2666

May 11, 2011

*(handwritten)* 176.2

*(handwritten)* ✳ Response from Eivind. Heiberg, CEO Sons of Norway International in regard to letter and documentation sent to him on 2/4/2011.

Ms. Christine Thorsen
708 Jewett Avenue
Staten Island, NY 10314-2808

Dear Christine:

Thank you very much for your letter dated February 4, 2011, and your thorough explanation of a number of the issues related to Nansen Lodge. I appreciate your providing me with the historical background and the extensive amount of supporting materials.

It is sad to see a Sons of Norway lodge being split among its membership as has been the case with Nansen. However, even though you and your family have decided to transfer your membership out of Nansen Lodge, I am glad that you have chosen to remain members of Sons of Norway. Thank you very much for your long-term commitment and support of Sons of Norway and its mission. Our fine organization certainly needs more energetic and enthusiastic members like yourself and I hope you will remain a member for years to come.

Again, thank you very much for your letter and background material on Nansen Lodge. Please feel free to give me a call any time if you would like to talk about this in the future.

Fraternally,

*(signature)* Eivind Heiberg

Eivind Heiberg
Chief Executive Officer
(612) 821-4606



Subj:    **Re: Staten Island lodges (NYC)**
Date:    1/30/2012 3:49:52 P.M. Eastern Standard Time
From:
To:
CC:
Dave,

Per your response we will continue the investigation as planned. Also, we are now at the point in the process where we will be forwarding a notice of the complaint (dispute #5) to those referenced.

In regards to a face to face meeting, here is my current availability:
Feb. 15 - mid to late afternoon
Feb. 16 - mid to late afternoon.

Let me know if you are able to meet during those times.

Fraternally,
Eivind J. Heiberg
Chief Executive Officer
Sons of Norway

CThor42332@aol.com
eheiberg@sofn.com
01/30/2012 01:20 PM
Re: Staten Island lodges (NYC)

Hei, Eivind,

Im sorry, I think you misunderstood me.  I do NOT wish for that investigation to be put on hold, time is something that there is not much of.  My proposal has more to do with limiting the fall-out from what will (most likely) happen.
It is my fervent wish to protect and support the greater organization of Sons of Norway and Scandinavians living in the metro area, and I have an idea that I wish to present to you.  I can hold off my family for a little bit, perhaps you can let me know when you have an hour?  That all the time that the presentation of my proposal would require. Again after Feb 14th though.

Fraternally,
Dave Thorsen
Fredheim Lodge 3-242

In a message dated 1/30/2012 2:00:49 P.M. Eastern Standard Time, eheiberg@sofn.com writes:
Hi Dave,

Thanks for your follow up.

We can certainly put the dispute investigation on hold until you come to Minneapolis next month for a conversation. Although my schedule is relatively busy on Feb. 15 and 16. we can probable find time for a brief meeting.

Let me know what you think.

Fraternally,
Eivind J. Heiberg

Chief Executive Officer
Sons of Norway

17 61

CThor42332@aol.com
eheiberg@sofn.com
01/27/2012 10:42 AM
Staten Island lodges (NYC)

Hello Eivind,

I hope things are going well on your end.  I will be out west in Minneapolis to take care of some family business and I wanted to know if I could schedule a meeting with you on Feb 15th or 16th.  I Have a proposal that I wish to put before you as you work your way through this process ( RE: Nansen).

Thank you for your time
Dave Thorsen



# THE SLUSARZ LAW FIRM, LLC

Frances Codd Slusarz
frances@slusarzlaw.com
direct:  (203) 733-0294

August 17, 2012

**Via Email and U.S. Mail**

David M. Ness, Esq.
Fafinski Mark & Johnson, P.A.
Flagship Corporate Center
775 Prairie Center Drive
Suite 400
Eden Prairie, MN 55344

Re:   Thorsen/Sons of Norway

Dear Mr. Ness:

As you know, this firm represents the Thorsen family with respect to the disputes that David Thorsen submitted to the International Lodge of the Sons of Norway ("SofN").

I write in response to your letter dated August 16, 2012, wherein you state, "I have received notice from at least five Nansen lodge members of their desire to move forward with the arbitration proceeding with your client.  Accordingly, we will be contacting an arbitrator to commence the proceeding."

Please be advised that the Thorsens **do not consent** to arbitrating whatever disputes the Nansen lodge members may have against them.  As you know, arbitration cannot be forced where there is no agreement of the parties to arbitrate.  As between Nansen lodge members and the Thorsens, presumably the source of the agreement to arbitrate is the SofN Charter, Constitution and Proceedings ("CCP").  The CCP, however, does not authorize arbitration as the forum to bring an initial complaint.  The CCP only authorizes arbitration as a second appeal pursuant to Chapter 5.8, after a dispute is ruled upon, appealed, and an unsuccessful mediation is held.  See CCP 5.8.1.3 ("STEP 1. APPEAL.... STEP 2. MEDIATION.... STEP 3. ARBITRATION."  CCP 5.8.1.; emphasis in original.)

Because the Nansen lodge members have not even filed a complaint, they have not exhausted their administrative remedies, and have not satisified the conditions precedent to

THE SLUSARZ LAW FIRM, LLC

David M. Ness, Esq.
August 17, 2012
Page 2

bringing any arbitration against the Thorsens. If any untimely or unauthorized arbitration is brought against them, and the Thorsens expend any funds to dismiss or defend against the claims, they will seek damages from the SofN for having facilitated the arbitration.

I trust that you will inform those Nansen members who "desire to move forward with the arbitration proceeding" that they have no standing to compel arbitration against the Thorsens, and that they must follow the dispute resolution provisions of the CCP. By copy of this letter, the Thorsens give notice to Nansen Lodge that its members may not avail themselves of arbitration at this time. If any Nansen members bring an untimely or unauthorized arbitration against the Thorsens, and the Thorsens expend any funds to dismiss the claims, the Thorsens will seek damages for the vexatious legal action.

If the International Board empowered the Nansen Dispute Review Committee to circumvent the CCP in addressing David Thorsen's disputes, or the disputes of SofN members against the Thorsen family, please provide me with a copy of whatever document formally authorizes the Nansen Dispute Review Committee to act, as well as the section of the CCP that empowers the International Board give the Nansen Dispute Review Committee that authority.

Finally, the Thorsens will address other statements in your August 16, 2012 letter, and the report of the Nansen Dispute Review Committee in future correspondence.

Thank you.

Very truly yours,

Frances Codd Slusarz

cc: Laney Dahl, Secretary of Nansen Lodge



1455 West Lake Street
Minneapolis, MN 55408-2666

 **SONS OF NORWAY**

## CONFIDENTIAL

Date:   July 26, 2012

To:     Paul Kornbrekke, Harry Kuell, Kenneth Gundersen, Richard Maren, the current Board of
        Directors of Nansen Lodge, the current Board of Directors of Nansen Lodge Social Club,
        the current Board of Directors of Nansen Properties Inc., and Sons of Norway
        International Director Barbara Berntsen

Cc:     International Board of Directors
        Frances Codd Slusarz, Attorney for David Thorsen

From:   Nansen Dispute Review Committee

Re:     Committee Report

This is a report of the Nansen Dispute Review Committee.  The report has been approved by the
International Board of Directors and the requirements set forth herein are made with the
authority of the Board of Directors.

### Background
Due to the length of Mr. Thorsen's original 25 page complaint and the lack of proper procedural
guidelines within the Charter, Constitutions and Procedures of Sons of Norway to handle such a
complaint, Mr. Thorsen agreed to the appointment of a special committee to investigate several
primary issues within the complaint.   Accordingly, the International Board of Directors
authorized International President Dan Rude to appoint a committee to review the Nansen
complaint and to issue any findings and remedial requirements as may be necessary.  Mr.
Thorsen has since engaged an attorney related to the complaint and she has forwarded
correspondence detailing several primary issues from his complaint.

### Primary Issues
Below are the findings for each of the primary issues set forth in the Nansen complaint:

1.      **Nansen Properties, Inc. – Tax Status and Incorporation**
        **Background:** In 1948, Nansen Properties, Inc. was established as a domestic business
        corporation with the state of New York.  In 1950, Nansen Properties, Inc. filed for a
        federal tax exemption.  Since the original incorporation, Nansen Properties, Inc. has
        remained a domestic business corporation and has not reorganized as a state non-profit
        corporation Sons of Norway bylaws require that lodges owning real estate establish a
        separate non-profit corporation under local law and obtain a 501(C)(2) exemption
        pursuant to federal law.  Nansen Properties, Inc. is currently filing IRS Form 990 as a

1

501(c)(2). Whether the exemption was granted by the Internal Revenue Service, however, remains in question.

Nansen Properties, Inc. was established as domestic business corporation with the state of New York and is currently registered as an "active" domestic business corporation.

The New York City Department of Finance lists Nansen PK, Inc. as the owner of the property pursuant to the property tax records.

**Complaint:**   Nansen Properties, Inc. is not organized as a 501(c)(2) entity, was incorrectly formed and registered under New York law as a domestic business corporation and has titling issues with respect to city regulators.

**Committee Analysis:**
1.  Sons of Norway requires that real property be owned in a separate tax-exempt entity both to limit liability as well as to mitigate the tax burden associated with the property.  District 3 should be familiar with a lodge in its district incurring significant income tax liability related to incorrect corporate formation.

2.  The sole purpose of a 501(c)(2) is to hold title to the real estate of another 501(c) entity.  This exemption is particularly important for those entities that recognize income or that may anticipate selling their property.

3.  It is unclear whether Nansen Properties, Inc. was granted a 501(c)(2) exemption by the Internal Revenue Service.  While Nansen Properties, Inc. files its Form 990 as a 501(c)(2), there has been no confirmation forwarded that the IRS originally granted 501(c)(2) status pursuant to applying for said designation. It has been repeatedly acknowledged by the IRS that exemption designations claimed on returns are not evidence of a validly granted exemption.

    Nansen Properties, Inc. is registered as a domestic corporation under New York law. This registration could create adverse state and federal tax consequences as well as other legal complications.  Further, the registration is in violation of the Sons of Norway Charter and Constitution which requires that lodges establish a "non-profit corporation under local law."

4.  The NYC Department of Finance incorrectly lists Nansen PK, Inc. rather than Nansen Properties, Inc. on their property tax records.  While this is believed to be an error on the part of city officials, such an error must be corrected to prevent future title, insurance and tax-related complications.

**Remedial Requirements:**
1.  Forward a copy (to the Sons of Norway Headquarters) of the approved IRS Form 1024 or other written confirmation from the IRS that Nansen Properties, Inc. has been granted 501(c)(2) status.

2. Reorganize Nansen Properties, Inc. as a state non-profit corporation.  In doing so, the corporate charter must confine the purposes and powers of the entity to hold title to property, collect income and turn the income over to Nansen Lodge as required by the Internal Revenue Code.  After reorganization, please forward a copy of the newly filed and approved Articles of Incorporation and newly executed charter crafted in a manner required by the IRC.

3. Take corrective action to change title to the real property with city authorities so that Nansen Properties, Inc. is listed as the property owner.  Forward proof of said title to the Sons of Norway Headquarters.

## 2.    Member Complaints

**Background:** In Mr. Thorsen's complaint, there are various claims against current and former members of Nansen Lodge, Nansen Social Club, Nansen Properties, Inc. and Sons of Norway International Director Barbara Berntsen.  Due to the number of complaints filed by Mr. Thorsen, the committee agreed with Mr. Thorsen to focus the attention of this review committee to complaints related to Nansen and its property.   It has come to the committee's attention, through Mr. Thorsen's attorney, that Mr. Thorsen wishes to reassert these claims.

**Complaint:**  Mr. Thorsen alleges that members of Nansen breached their conduct as members of Sons of Norway or in their leadership role with Sons of Norway.  He further alleges defamation, discrimination, misrepresentation, and other violations of his civil rights.

**Committee Analysis:** During our review, the committee uncovered allegations of defamation and other claims by both sides in this dispute.  Due to the number of parties and the potential conflicts associated with administering the claims via Sons of Norway bylaws and procedures, we recommend that the matter be referred outside the organization for adjudication.

**Remedial Requirements:**  To facilitate resolution between the parties involved, should the parties wish to continue these claims, Sons of Norway will pay the reasonable fees and costs related to binding arbitration.  Sons of Norway will not pay the costs of the parties (such as attorney fees or other costs and expenses).  Additional requirements for the proceeding may be determined by the Nansen Dispute Review Committee (hereafter Review Committee).

## 3.    Nansen Properties, Inc. Funding

**Background:**  Nansen Lodge and Nansen Social Club, both tax-exempt entities, have engaged in fundraising efforts or loan arrangements with Nansen Properties, Inc., a domestic business corporation.  Due to the financial problems of Nansen Properties, Inc., Nansen Lodge and the Nansen Social Club have contributed proceeds from their fundraisers to Nansen Properties, Inc. Nansen meeting minutes also cite various instances of co-mingled funds between the three entities.

**Complaint:** The purpose of much of Nansen Lodge fundraising is to assist with the financial shortfalls of Nansen Properties, Inc. The Lodge, Social Club and Properties regularly commingle funds and transfer funds between themselves without proper accounting or regard to the federal tax code. For a period of time, Nansen Lodge split its dues between the Lodge and Properties.

**Committee Analysis:**

1. Each entity must be run as a separate and distinct economic unit and may not commingle funds. Should contributions be permissible, said contributions must be evidenced in writing.

2. When fundraising efforts are made in the name of Nansen Lodge, the funds derived shall only be applied to Nansen Lodge's charitable purpose.

3. The process of sharing dues between entities, given their current status of the entities and without evidence of disclosure and documentation, is extremely problematic.

4. A 501(c)(2) is a title holding corporation that must be organized for the exclusive purpose of holding title to property, collecting income therefrom, and turning over the entire amount, less expenses, to its tax-exempt parent corporation (Nansen Lodge). See 501(a) and Rev. Rule 66-102.

5. Contributions to 501(c)(2) entities are typically not tax deductible, so transfers from other entities whose contributions may be tax deductible seems problematic.

6. As noted above, 501(c)(2) entities may pass funds back to the parent organization, but not vice versa.

7. The existence of shortfalls, given the relationship with A Taste of Honey ("ATOH") is also concerning. At least one set of financials provided indicated that there should not have been a shortfall in the operations of Nansen Properties, Inc., so it appears that errors may have been made somewhere in the accounting process.

8. The only way to properly determine what has occurred and to obtain recommendations to properly structure the entities (from an accounting perspective) is to obtain an outside and professional review.

9. Nansen Lodge members should invite the prospect of a review to ensure lodge funds have been administered properly and to ensure that the proper structure is in place for future administration of lodge funds.

4

**Remedial Requirement:**

1. An independent audit shall be conducted of Nansen Lodge, Nansen Social Club and Nansen Properties, Inc. The auditor shall be selected by the Review Committee and Sons of Norway will pay the reasonable fees and costs of the auditor. Sons of Norway will not pay costs of the parties related to audit findings or corrective measures. The scope of the audit will be determined by the Review Committee upon consultation with the auditors. The auditors will be engaged to review, analyze and provide recommendations for operations of the entities.

2. The parties shall fully cooperate with the auditors and comply with all recommendations therefrom.

3. The Committee expects that a plan will be developed for the proper segregation of business operations between the entities.

4. **A Taste of Honey Affiliations**
   **Background:** Nansen Properties, Inc. and Nansen Social Club have entered into contracts with a catering company called, A Taste of Honey ("ATOH"). The contracts provide exclusive catering rights, a first right of refusal for land purchase and a potential term of 15 years without cancellation or termination provisions.

   **Complaint:** Former Nansen Lodge President Paul Kornbrekke negotiated the contracts with ATOH which created a joint venture between Nansen Properties, Inc. and ATOH for the personal benefit of Kornbrekke and his family. The complaint further alleges that the contracts place Nansen Properties, Inc. in a precarious financial position, provide improper exclusivity and fail to include contract termination provisions and other standard contract provisions that are normally common with such transactions.

   The complaint further alleges that the Social Club is forced to carry a "catering" license rather than a "club" license to the detriment of Nansen and for the benefit of ATOH.

   In light of the above, the complaint alleges that the entities and ATOH are in a partnership that is in violation of the tax code. The complaint further alleges that the parties are engaged in various conspiracies to initiate and continue the contracts.

   **Committee Analysis:**
   1. It is unclear whether the current operations of Nansen Properties, Inc. would fall within the permissible operations of the a 501(c)(2) entity.

   2. The contracts heavily favor ATOH. Whether other catering options were available to the lodge is a question. However, the contracts certainly could have been prepared with more industry standard terms.

   3. Given the close relationship between some parties, private inurement issues may exist.

5

4. The timing of the execution of the agreements appears to be questionable.

5. Given the need for the audit as set forth above, there should be a review of the ATOH agreements to determine the best course of action going forward.

6. The interests of Nansen Lodge should always be first and foremost. A more detailed review will determine whether these agreements are in the best interest of the Lodge and the options available.

**Remedial Requirement:**
1. The Committee will refer the claims of self-dealing, liquor license issues, and improper joint venture to the auditor. In addition, the auditor will be asked to review whether the Lodge properly granted authority to Kornbrekke and the Executive Committee to enter into the contracts and whether too much authority was granted. Options for the contracts and structure between the entities will be analyzed going forward to ensure that the entities are in compliance with the law and in the best interest of the Lodge.

2. Each of the three entities shall implement a written Conflict of Interest policy. In addition, each board member from each entity shall execute a policy acknowledgement and disclosure on an annual basis (pursuant to the policy). Said acknowledgements and disclosures shall be made available to each entity to ensure that there are no conflicts. A sample policy will be forwarded from the Sons of Norway Headquarters.

3. Nansen Lodge shall strictly adhere to their bylaws regarding member approval of appropriations. The Lodge is cautioned not to grant too much authority to its Executive Committee.

**5. Loan Program**
**Background:** Nansen Properties, Inc. appears to have created/developed a loan program whereby they are requesting that Nansen Lodge members loan money to Nansen Properties, Inc.

**Complaint:** Nansen Properties, Inc. initiated a bond program in violation of the Securities Act of 1933 by failing to file and properly administer the program. Thorsen's attorney alleges that any offer to sell securities must be registered with the SEC or meet one of the exceptions to registration set forth by the Regulation D Rules as provided under federal law.

**Committee Analysis:**
1. Thorsen's attorney's description of the securities requirements is inaccurate.

2. The loan program was not, in the opinion of Nansen Properties, Inc., an offering of securities.

6

3. Regardless of the characterization of the loan program, it may not have been in compliance with all applicable requirements, and the committee has concerns as to how his program was structured and was marketed among the membership. Information submitted to the committee gives the appearance that members may have believed that the funds were being raised for Nansen Lodge or for purposes other than may have been advertised and it appears possible that some required disclosure may not have been made.

**Remedial Requirements:**

1. The program implemented to generate funds will be referred to the auditor given its close connection to the entity transactions previously noted.

2. The loan program should be reviewed by outside counsel and tax professionals.

3. All financing and fundraising efforts shall be properly disclosed and structured to ensure compliance with the law.

6. **Fair Labor Standards**
   **Background:** The entities utilize the assistance of paid employees and volunteers for their operations.

   **Complaint:** Mr. Thorsen claims violations of labor and other laws related to employees and volunteers of the entities.

   **Committee Analysis:** The claims of paying individuals "off the books" are concerning.

   **Remedial Requirements:**
   1. This matter shall be referred to the auditors in their normal course of auditing the operations of the entities.

   2. The entities are encouraged to consult with local counsel to ensure they are operating within the law relative to their employment practices.

7. **Knowledge of Nansen Violations**
   **Background:** On or near February 11, 2011, CEO Heiberg received a letter from Christine Thorsen asserting some of these claims. On or near November 7, 2011, CEO Heiberg received a letter from David Thorsen asserting the 25 page complaint. On June 5, 2012, Legal Counsel Ness received an 8 page letter from Thorsen's attorney clarifying many of the claims. The Sons of Norway Headquarters had received letters previously related to Lodge activities but they lacked detail and did not rise to the level as set forth above.

   **Complaint:** Sons of Norway had knowledge of these claims and failed to act.

**Committee Analysis:**
1.  Only within the last several months did headquarters receive detailed information and documents asserting the claims herein.

2.  The Committee has worked diligently since its formation to review and analyze a significant amount of information forwarded by the parties.

**Remedial Requirements:**
The auditor will be asked to offer its opinion regarding how the Thorsen Complaint was handled by Sons of Norway.

## Summary and Requirements

Sons of Norway will immediately interview auditor candidates and engage an auditor for the purposes noted above.  Sons of Norway will assist in the selection and engagement of the arbitrator should the parties wish to continue the review and adjudication of the member dispute claims.  Sons of Norway shall pay the reasonable costs and fees of the arbitration (excluding the costs and fees of the parties).   To discuss arbitration of the member dispute claims, contact Sons of Norway legal counsel.

The timeline for the remedial requirements set forth above is as follows:

1.  Cooperate with the independent auditors appointed by Sons of Norway and provide all requested documents and other information in a timely manner.

2.  The following remedial requirements must completed by October 31, 2012:
    a.  Proof that Nansen Properties, Inc. is listed as landowner with the NYC Department of Finance.
    b.  New corporate charter for Nansen Properties, Inc. and registration confirmation with the State of New York.
    c.  IRS Form 1024 or other written confirmation that the IRS has granted 501(c)(2) status to Nansen Properties, Inc.
    d.  Signed Conflict of Interest Policies for each of the entities.

3.  Comply with any recommendations from the auditors as set forth in the report.  The timeline for compliance with any auditor recommendations shall be determined by the Review Committee upon receipt of the audit report.

**4.  Should Nansen (all three entities) fail to comply with the requirements, the International Board shall be forced to suspend the lodge pending compliance.**

The Committee welcomes the opportunity to discuss this report with the parties in this dispute and will soon be in contact regarding the same.  As a reminder, this dispute remains confidential.  You are advised not to discuss, or otherwise convey, matters related to this dispute to anyone other than a named party.

8

To ensure that lodge members and other interested parties are informed regarding the issues pertaining to the Lodge and Lodge property, the committee will prepare a general summary of the report (and related committee follow up) and distribute the summary to members of the Lodge.

Fraternally,

Dan Rude
International President
Nansen Dispute Review Committee Chair

Eivind Heiberg
Chief Executive Officer
Committee Member

David Ness
Legal Counsel
Committee Member

9





SONS OF NORWAY

1455 West Lake Street
Minneapolis, MN 55408-2666

March 27, 2013

Dear Nansen Lodge Members:

I am writing you as Chair of the Nansen Dispute Review Committee to inform you of the status of the audit performed on Nansen Lodge 3-410, Nansen Properties, Inc. and Nansen Social Club, Inc. As you may recall, the International Board commissioned the audit in response to allegations related to the structure, accounting and operations of the three Nansen entities. The audit was performed by the independent audit firm of Eide Bailly, LLP. During the course of the audit, representatives from Eide Bailly visited the lodge to meet with those responding to the allegations on behalf of the entities. Seven board members were interviewed as well as two representatives from the Potter & LaMarca accounting firm.

A brief summary of the findings are as follows:
- No improper benefits were found to be received by board members related to the ATOH contracts.
- No intentional "off-book" payments were identified.
- No tax-related issues were identified related to the funding of Nansen Properties through loans or fundraising activities.
- No criminal violations where identified.
- Nansen Properties, Inc. is properly structured as a tax exempt title holding company under the Section 501(c)(2) of the Internal Revenue Code.
- Nansen Properties, Inc. is structured as a domestic corporation under New York law in violation of the Sons of Norway Charter and Constitution.
- Sons of Norway International was active in investigating the disputes and allegations.

The above findings related to specific allegations made in the complaints against the lodge and lodge officers. The auditors where charged with conducting a forensic review related to those allegations as well as to offer tax exempt consulting relative to the structure of the three entities. During their review and examination, the following recommendations were offered:
- The contracts with ATOH should be reviewed and renegotiated, if possible.
- Nansen Properties, Inc. should be restructured as a nonprofit corporation under state law to comply with the Sons of Norway Constitution.
- Nansen Properties, Inc. must continue to operate in furtherance of the charitable purposes of Nansen Lodge.
- Various internal control recommendations related to operations and accounting.

Since the audit report was issued, members of our committee traveled to your lodge to review and discuss the audit report in detail with representatives of the three entities and their advisors. The representatives were commended for their cooperation with the auditors and for the favorable results of the audit. In addition, the representatives from the three entities agreed to examine and adopt the auditor recommendations where appropriate.

Should you have questions, feel free to contact Chief Executive Officer Eivind Heiberg.

Sincerely,

Dan Rude, Chair

Eivind Heiberg, CEO

David Ness, Legal Counsel

cc:     Marit Kristiansen, International President



# THE SLUSARZ LAW FIRM, LLC

Frances Codd Slusarz
frances@slusarzlaw.com
direct: (203) 542-0274

November 19, 2012

**Via Email**
David M. Ness, Esq.
Fafinski Mark & Johnson, P.A.
Flagship Corporate Center
775 Prairie Center Drive
Suite 400
Eden Prairie, MN  55344

>Re:  **Theodore Thorsen, Christine M. Thorsen, David Thorsen v. Nansen Lodge, Nansen Properties, Inc., and Nansen Social Board, Inc., and their Officers and Directors**

Dear Mr. Ness:

As you know, this firm represents the Thorsen family with respect to its disputes against Sons of Norway ("SofN") and certain members of Nansen Lodge ("Nansen").

It has been some weeks since we last corresponded.  In your last letter, you informed me that certain members of Nansen planned to pursue claims against David Thorsen through arbitration. Immediately thereafter, on August 17, 2012, I wrote you a letter advising you that the Thorsens do not consent to arbitrating any disputes that members of Nansen may have against them, and that such an action would be *ultra vires* the SofN Charter, Constitution and Procedures ("CCP"). I have not heard anything further from you, nor have the Thorsens received any demand for arbitration, so I must conclude that you agree with my analysis.

From his initial complaints going back to 2010, David Thorsen identified as endemic within Nansen Lodge, a complete disregard for the CCP.  He must have been thinking too narrowly by focusing solely at the lodge level, since this same disregard permeates the Final Report of the Nansen Dispute Review Committee (the "Committee") that was issued on August 14, 2012. Following is a list of the specific exceptions that the Thorsens take to the Final Report.

1. **Background**.  *"Due to the length of Mr. Thorsen's original 25 page complaint and the lack of proper procedural guidelines within the [CCP] to handle such a complaint, Mr. Thorsen agreed to the appointment of a special committee to investigate several primary issues within the complaint."*

# THE SLUSARZ LAW FIRM, LLC

David M. Ness, Esq.
November 29, 2012
Page 2

This statement is inaccurate for several reasons. First, the CCP specifically addresses the resolution of complaints and disputes. *See* CCP Ch. 1.8. Mr. Thorsen filed his complaints pursuant to CCP §1.8.5, which is by its own terms, sets forth "the sole means to present an resolve grievances, complaints or disputes brought by members, certificate owners or beneficiaries, against the Sons of Norway or its directors, officers, agents, and employees."

Second, Mr. Thorsen did not agree to the appointment of a committee merely to "investigate several primary issues." He agreed to the appointment of a committee to address all of his complaints. Mr. Thorsen never waived any of his complaints, despite your claims that he did so in the Final Report. I am curious to know why, when Mr. Thorsen took care to submit his complaints in writing, you would believe that he would waive any of them orally. Mr. Thorsen reasonably expected that each of his complaints would be adjudicated in accordance with CCP § 1.8.5.1, which states that the dispute resolution procedures "are meant to provide prompt, fair and efficient opportunities for dispute resolution..."[1]

Notwithstanding, SofN failed to resolve Mr. Thorsen's complaints in a prompt or efficient manner. Of the six written complaints that Mr. Thorsen submitted from October 2011 to December 2011, SofN resolved only one – the complaint concerning Nansen Lodge's corporate structure -- and only after a delay of seven months.

2.  Member complaints. *"Due to the number of complaints filed by Mr. Thorsen, the committee agreed with Mr. Thorsen to focus the attention of this review committee to complaints related to Nansen and its property. It has come to the committee's attention, through Mr. Thorsen's attorney, that Mr. Thorsen wishes to reassert these claims."*

This is utter fiction. Mr. Thorsen did not waive any of his complaints or come to an agreement that the Committee need only focus on the complaint with the least impact on his life and the lives of his parents. Mr. Thorsen made three complaints of a personal nature -- libel and slander, insurance fraud, and abuse of office – and two complaints that affect SofN in general -- misuse of the Sons of Norway logo and name, and issues concerning Nansen Lodge's corporate structure. It defies logic that Mr. Thorsen would be content to let Nansen Lodge officers call him a thief and an international officer to use the authority of her office to enforce her personal interpretation of the CCP to interfere

---

[1] Notably, the CCP addresses dispute **resolution**, not simply **investigation**.

# THE SLUSARZ LAW FIRM, LLC

David M. Ness, Esq.
November 29, 2012
Page 3

with lodge-level politics, as long as the corporate structure of a lodge from which he resigned conforms with the CCP.

Indeed, my letter dated June 5, 2012 (copy attached) did not resurrect the ostensibly waived claims. Rather, it informed SofN of additional issues requiring its attention; specifically, the self-dealing of Paul Kornbrekke in his premature renegotiation of Nansen Lodge's contracts with A Taste of Honey. My letter also notes that the "Invest in Nansen" scheme about which Mr. Thorsen informed SofN in his November 9, 2011, is a violation of the Securities Act of 1933, and that Nansen Lodge's practice of having members "volunteer" for a for-profit entity violates the Fair Labor Standards Act.

3.   Member complaints. Committee Analysis: *"During our review, the committee uncovered allegations of defamation and other claims by both sides in this dispute. Due to the number of parties and potential conflicts associated with administering the claims via [its SofN] bylaws and procedures, we recommend that the matter be referred outside the organization for adjudication."*

The Committee has no authority to force the Thorsens to arbitrate their complaints. In fact, the CCP sets forth "the sole means to present an resolve grievances, complaints or disputes brought by members, certificate owners or beneficiaries, against the Sons of Norway or its directors, officers, agents, and employees." CCP § 1.8.5. The CCP does not provide for arbitration where SofN leadership finds it inconvenient to adjudicate complaints.

The Committee's position that it cannot adjudicate Mr. Thorsen's claims against SofN members frustrates the clear intent of the CCP that disputes be handled internally and in a fraternal manner. Indeed, the Committee's position is inconsistent with the notion that the SofN can adjudicate any internal disputes. At our meeting, I specifically asked how SofN could adjudicate any complaint between or among members if it took the position that it could not adjudicate claims where there could be a conflict of interest. It is, after all, unlikely that SofN dispute resolution committee members would have no connection with disputing parties in an internal dispute. You responded that in the instance of Mr. Thorsen's claims, the Committee "chose not to" adjudicate the disputes. Rather than discharge its duty consistent with the CCP, the Committee chose to take the politically expedient route of passing the buck.

Finally, as set forth more fully in my letter dated August 17, 2012, the Committee has no authority to force the Thorsens to arbitrate claims that any SofN members may wish to

# THE SLUSARZ LAW FIRM, LLC

David M. Ness, Esq.
November 29, 2012
Page 4

bring against them. Such an arbitration is outside the scope of the CCP and, therefore, is not anything to which the Thorsens agreed.

4. Loan Program. Committee Analysis: *Thorsen's attorney's description of the securities requirements is inaccurate… The loan program was not, in the opinion of Nansen, Properties, Inc., an offering of securities.*

   The File Report does not explain how or why my "description of the securities requirements is inaccurate." Moreover, the opinion of Nansen Properties, Inc. as to whether the loan program was in offerings of securities is irrelevant.

5. Knowledge of Nansen Violations. The documents sent to SofN by Mr. Thorsen and others concerning Nansen violations speak for themselves. I have no doubt that a disinterested fact finder will be unimpressed with the Committee's claim that SofN did not have sufficient information to act upon earlier complaints.

Consistent with your request that the Thorsens inform appropriate regulatory authorities of any violations in which Thorsens have a good faith basis to believe the SofN has engaged, the Thorsens filed a complaint with the New York State Attorney General concerning abuse of the not-for-profit corporate form. (Please see attached.) I have begun preparing the Thorsens' legal complaints for violations of the federal Racketeer Influenced Corrupt Organization Act and other state and federal claims, and plan to file the complaint no later than November 30, 2012.

The Thorsen reserve all rights with respect to their claims concerning the SofN.

Very truly yours,

*Frances Codd Slusarz*

Frances Codd Slusarz

Enclosure